# UNITED STATES of America

v.

# Steven B. AISENBERG and Marlene J. Aisenberg

## No. 8:99–CR–324–T23MAP.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 31, 2003.

Stephen Kunz, Ernest F. Peluso, Rachelle DesVaux–Bedke, John Moran, Terry Zitek, U.S. Attorney's Office, Tampa, FL, for U.S.

Barry A. Cohen, Todd Foster, Michael A. Gold, Stephen L. Romine, Harry M. Cohen, Kevin J. Darken, Cohen, Jayson & Foster, Tampa, FL, for defendants Steven and Marlene Aisenberg.

## ORDER

MERRYDAY, District Judge.

Steven and Marlene Aisenberg (the Aisenbergs) seek recovery of "a reasonable attorney's fee and other litigation expenses" pursuant to Section 617 of Public Law Number 105–119, 111 Stat. 2440, 2519 (1997) (the Hyde Amendment).[1] For reasons conspicuous in the record of this extraordinary case, the United States of America concedes liability—apparently the only such concession by the Department of Justice since enactment of the Hyde Amendment—for a prosecution that was either "vexatious, frivolous, or in bad faith" within the meaning of the Hyde Amendment. The United States' unprecedented

---

1. The Hyde Amendment, which is widely published as a "legislative note" attached to 18 U.S.C. § 3006A (popularly entitled "The Criminal Justice Act"), states:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [Nov. 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

concession leaves for determination only the correct statutory measure of the "reasonable attorney's fee and other litigation expenses" available under the Hyde Amendment.[2]

## THE AISENBERG PROSECUTION

By a telephone call to the "911" emergency service, Marlene Aisenberg reported the disappearance of her daughter Sabrina in the early morning on November 24, 1997. Law enforcement responded promptly and in the next days an intense and thorough "manhunt" occurred but failed to recover Sabrina. (The Aisenbergs insist with distinctive force that this search was mainly a search for Sabrina's dead body, rather than a search for a living child. The United States contests this interpretation. In either event, an enormous effort occurred.) Sabrina remains missing.

On December 12, 1997, eighteen days after Sabrina's disappearance and after developing suspicions directed at the Aisenbergs, the Hillsborough County Sheriff's Office applied successfully to the circuit court in Hillsborough County, Florida, for authorization to intercept oral communication, including telephonic communication, in the Aisenbergs' home. Authorities furtively placed electronic interception devices throughout the Aisenbergs' home the next day, December 13, 1997. Owing to extensions of the interception authority, for which law enforcement applied on January 9 and again on February 6, 1998, the surveillance remained active until March 2, 1998, yielding seventy-nine days of surveillance, including approximately 2,600 conversations recorded on fifty-five audio recordings (the interception protocol included minimization at two minutes and cessation of the bedroom interception between midnight and 7:00 a.m.).

On September 9, 1999, about twenty-one months after Sabrina's disappearance and about eighteen months after discontinuation of the state-authorized interception in the Aisenbergs' home, a federal grand jury returned a twenty-seven page, six-count indictment alleging (1) that both in the Aisenbergs' initial report and during the consequent investigation the Aisenbergs

---

**2.** The United States conceded the application of the Hyde Amendment to the Aisenberg prosecution in the initial response (Doc. 378) to the Aisenbergs' application. (Doc. 367) The United States' concession states:

> While rejecting the general tenor and specific characterizations of Defendants' application, the Government has concluded, after thorough review and consultation within the United States Attorney's Office for the Middle District of Florida, and the Department of Justice, Washington, D.C., that the best interests of justice are served by not contesting the application of the Hyde Amendment in this case.
>
> On February 14, 2001, the Magistrate judge issued a comprehensive, meticulous, and thoroughly researched Report and Recommendation to the Court in which he determined that important affidavits of Hillsborough County Sheriff's Office detectives were, among other things, the product of reckless disregard for the accuracy of criti-

cal information. He thereafter recommended that this Court suppress evidence which was critical to the successful prosecution of the indictment handed up against the Defendants. The Government closely reviewed and carefully considered the Magistrate Judge's Report and Recommendation. While not fully agreeing with the Magistrate Judge, the Government concluded that objections to the Report and Recommendation would be unsuccessful. Accordingly, the Government requested leave of the District Court to file a dismissal of the indictment against Defendants. That request was granted on February 22, 2001. Therefore, based upon the specific findings in the Magistrate Judge's Report and Recommendation, and for the purpose and in the context of this case only, the Government does not contest the application of the Hyde Amendment for a determination of Defendants' reimbursable attorneys' fees and costs.

violated 18 U.S.C. §§ 1001 and 1002 by, among other things, uttering "false, fictitious, or fraudulent statements" to law enforcement respecting Sabrina's disappearance and (2) that the Aisenbergs conspired to effect the deceptions that violated Sections 1001 and 1002.[3]

The indictment begins in part A, paragraphs one through eight, by alleging some unusual details, including the Aisenbergs' exact street address, the name of the Aisenbergs' pet dog ("Brownie"), the number of bedrooms and bathrooms in the house, the existence of certain physical features at and near the Aisenbergs' home (a cut-de-sac, a wooden fence, a concrete wall, a nearby road, street lights), and the presence of both the Aisenbergs' alarm system and an accompanying exterior sign, which warns prospective intruders and other passersby about the alarm system.

In paragraph two the indictment refers for the first time to Sabrina Aisenberg, and the indictment's author elects to designate Sabrina as "Baby Sabrina" (presumably to capture whatever sensational and evocative value attaches to an alleged crime against an innocent infant). Paragraph nine of the indictment alleges that:

> In November 1997, Baby Sabrina suffered from ear infections and perforated ear drums, requiring medical treatment. STEVEN B. AISENBERG and MARLENE J. AISENBERG missed two follow-up medical appointments for Baby Sabrina on November 10, 1997 and November 17, 1997.

(The obvious thrust of paragraph nine, which eventually proves wholly unjustified and misleading because Sabrina saw the pediatrician during her siblings' appointments and the Aisenbergs canceled Sabri-

3. Between Sabrina's disappearance and the indictment, the United States issued subpoenas requiring Steven and Marlene Aisenberg to appear before the grand jury. The United States effected service of the subpoenas on the Aisenbergs in a provocative manner (i.e., personal service at the Aisenbergs' home rather than service through the Aisenbergs' attorney) and at an unusual time (i.e., Friday evening, January 30, 1998, just four days before February 4, 1998, return date). Both in correspondence and in a hearing before United States District Judge Henry Adams, the Aisenbergs communicated to the United States an unequivocal intent to invoke the Fifth Amendment in any appearance before the grand jury. Although the Aisenbergs obtained a brief postponement of their grand jury appearance, the United States persisted. Accordingly, the Aisenbergs appeared before the grand jury (at a time inexplicably known by all members of the interested press) and, as promised, refused to testify. In other words, the United States insisted upon placing before the grand jury witnesses (characterized dubiously by the United States as mere "subjects" of the grand jury investigation) whom the United States knew would not testify after asserting their Fifth Amendment rights. *See* United States Department of Justice, *United States Attorneys' Manual* § 9–11.154 (Aug.

2002), *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/; 1 Sara Sun Beale et al., *Grand Jury Law and Practice* §§ 6:10, 6:23 (2d ed.2002). A review of the transcript of the Aisenbergs' appearance before the grand jury reveals that they were asked approximately one hundred futile but undoubtedly embarrassing questions (each of which the Aisenbergs lawfully declined to answer). The transcript provides a graphic and disquieting example of the sort of mischief by the United States that commends the arguments against permitting a grand jury summons under circumstances similar to those involving the Aisenbergs (i.e., after a formal notice by counsel for grand jury "targets" of an assertion of the right against self-incrimination). The grand jury is a forum for the pursuit of solemn investigation and not a theater for the presentation of a spectacle. *See United States Attorneys' Manual* § 9–11.010. ("In dealing with the grand jury, the prosecutor must always conduct himself or herself as an officer of the court whose function is to ensure that justice is done and that guilt shall not escape nor innocence suffer. . . . In discharging these responsibilities, the prosecutor must be scrupulously fair to all witnesses and must do nothing to inflame or otherwise improperly influence the grand jurors.")

na's separate appointments, is to project to the reader an image of parental disregard and disinterest in Sabrina's medical welfare, presumably only days before her disappearance.)

In part B the indictment succinctly charges a conspiracy between the Aisenbergs to violate Section 1001 and continues into part C, which alleges in twelve paragraphs the "manner and means" by which the Aisenbergs implemented the alleged conspiracy, including falsely reporting both the kidnapping and the "circumstances of the disappearance," failing to comply with law enforcement's requests for certain cooperation, providing false and misleading information to law enforcement, agreeing between themselves not to "tell anyone the truth concerning the disappearance of Baby Sabrina," and diverting toward their "personal expenses" the money received from others to assist in the search for Sabrina. (This latter accusation presumably evidences the Aisenbergs' supposed moral laxity rather than an identified federal crime.)

In part D the indictment specifies fifty-nine "overt acts" (counting one per paragraph) allegedly undertaken by the Aisenbergs in furtherance of their conspiracy to deceive law enforcement. The "overt acts" begin with an allegedly false report to police about the time of Sabrina's disappearance and with the allegedly conflicting reports concerning the details. The "overt acts" section of the indictment contains much that has caused controversy and rancor throughout this case. Some of the allegations seem trivial; for example, Brownie's alleged and suspicious failure to bark on the night of Sabrina's disappearance.[4] Some of the allegations seem almost gratuitous; for example, the repeated (and undoubtedly embarrassing) reference to Marlene Aisenberg's involuntary urination when she found Sabrina missing. Some of the allegations seem redundant or, at least, unnecessarily elongated; for example, the detailed account of the Aisenbergs' alleged lethargy and disinterest in law enforcement's investigation. In sum, the indictment of the Aisenbergs is unaccountably lengthy and replete with matters that are (at best) mere surplusage and unnecessary to the essential purpose of an indictment, which is to provide a "plain, concise, and definite written statement of the essential facts constituting the offense charged," as prescribed by Rule 7(c)(1), Federal Rules of Criminal Procedure. This purpose is properly accomplished by an orderly and businesslike ac-

---

**4.** Presumably the reader of the indictment is invited to recall (with dark suspicion) the exploits of Sherlock Holmes. As they searched for the cherished racehorse "Silver Blaze," Holmes and Dr. Watson encountered one Colonel Ross, with whom they conversed concerning the horse's unaccountable disappearance:

> "Is there any point to which you [, Mr. Holmes,] would wish to draw my attention?" [, Ross asked.]
> "To the curious incident of the dog in the night-time."
> "The dog did nothing in the night-time."
> "That was the curious incident," remarked Sherlock Holmes.

Of course, Holmes later explains himself to Dr. Watson:

"... I had grasped the significance of the silence of the dog, for one true inference invariably suggests others. The Simpson incident had shown me that a dog was kept in the stables, and yet, though someone had been in and had fetched out a horse, he had not barked enough to arouse the two lads in the loft. Obviously the midnight visitor was someone whom the dog knew well."

2 Sir Arthur Conan Doyle, THE ANNOTATED SHERLOCK HOLMES, "Silver Blaze" (William S. Baring–Gould ed., Clarkson N. Potter, Inc., 2d ed.1977) (1892). The infallibility of Sherlock Holmes' miraculous powers of observation and deduction is, it is well to remember, merely delicious fiction.

count of "only those facts and elements of the alleged offense necessary to sufficiently inform the accused of the charge and to safeguard the accused from double jeopardy." *United States v. Gold,* 743 F.2d 800, 812 (11th Cir.1984). An indictment is an instrument designed to fairly notify a defendant of the essential facts comprising an offense against a specified law. An indictment is not an opportunity for the United States to marshal all available details of the inculpatory evidence, to advance arguments (especially tendentious or highly provocative arguments) and promote inferences in support of conviction, or to unnecessarily defame, embarrass, or—more to the particular point of the Hyde Amendment—gratuitously vex the defendant.

Admittedly, no distinct boundary exists distinguishing a merely lengthy or a "speaking" indictment from an indictment purposefully swollen with unduly suggestive detail. The prosecutor enjoys some latitude and, of course, an indictment is neither likely to nor intended to flatter a defendant. However, a fair reading of the Aisenberg indictment (independent of any consideration of the events that follow the indictment, which events adulterate one's view dramatically) leaves the disinterested observer with reinforced skepticism about the intention of the indictment's author. This troubling suspicion is compounded and further reinforced by a series of allegations of dubious relevance, detached context, or questionable veracity, for example, that Marlene Aisenberg "feigned a catatonic state in front of law enforcement agents," that the Aisenbergs "failed to provide the requested lists for law enforcement," that "Marlene J. Aisenberg ... denied that there was a bald spot on Baby Sabrina's head ...," that the Aisenbergs "retreated into their bedroom in the Aisenberg residence and turned the stereo on loudly ...," that Steven Aisenberg told his wife "what happens in this house stays in this house ...," that Marlene Aisenberg told her husband that "she doesn't like lying to her father concerning the disappearance of Baby Sabrina ...," that, as alleged in paragraph thirty-one of the indictment (in its entirety):

> On or about December 23, 1997, at approximately 10:00 a.m., STEVEN B. AISENBERG and MARLENE J. AISENBERG conducted a press conference at the office of the attorney, read from a prepared statement, and refused to answer any questions posed by the media.

... or that, as alleged in paragraph forty-one of the indictment (also, in its entirety):

> On or about January 12, 1998, STEVEN B. AISENBERG rehearsed and taped a statement that he planned to give and later gave to a Tampa radio station, WFLA 970.

(This latter allegation is based upon an obvious misinterpretation of a recorded telephone conversation between Steven Aisenberg and a member of the defense team.)

A more precise account or characterization of the indictment's degree of prolixity is unnecessary because a different aspect of the indictment presents problems that supersede the troubling matters already reviewed in this order. Several paragraphs of the indictment purport to quote incriminating statements attributed to the Aisenbergs. Among those paragraphs, each paragraph of which is a separate "overt act," are paragraphs thirty-two and thirty-three:

> On or about December 23, 1997, at approximately 7:20 p.m., MARLENE J. AISENBERG and STEVEN B. AISENBERG discussed the death of Baby Sabrina and possible stories that they could tell the police about how they came up with the kidnapping story. MARLENE J. AISENBERG then told STEVEN B. AISENBERG, "The baby's

dead and buried! It was found dead because you did it! The baby's dead no matter what you say—you just did it!" On or about December 23, 1997, at approximately 7:20 p.m., STEVEN B. AISENBERG replied, "Honey, there was nothing I could do about it. We need to discuss the way that we can beat the charge. I would never break from the family pact and our story even if the police were to hold me down. We will do what we have to do."

... paragraphs thirty-six and thirty-seven: On or about December 24, 1997, at approximately 11:20 p.m., STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed the possibility of neighbors being witnesses against STEVEN B. AISENBERG. STEVEN B. AISENBERG told MARLENE J. AISENBERG, "They can't hang me, the other four neighbors. They can't hang me unless you attack me before the evidence."

On or about December 24, 1997, at approximately 11:20 p.m., MARLENE J. AISENBERG stated, "Oh, Steve! I tried to save her, she died and ah we can't confuse them, but we'll try it Hon, you know." MARLENE J. AISENBERG further stated, "I don't think I have to wait for Joe Sarge to take me to jail ...." STEVEN B. AISENBERG replied, "None of us expects that, I don't expect that to happen ...." Then STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed their "timeline goof up."

... paragraphs forty-seven and forty-eight: On or about January 21, 1998, at approximately 9:00 p.m., STEVEN B. AISENBERG told MARLENE J. AISENBERG, "I wish I hadn't harmed her." On or about January 21, 1998, at approximately 9:00 p.m., MARLENE J. AISENBERG told STEVEN B. AISENBERG, "I just can't take the rap for this."

... and, finally, paragraphs fifty-three and fifty-four: On or about February 10, 1998, MARLENE J. AISENBERG told STEPHEN B. AISENBERG that she was concerned about what a friend of hers would tell the federal grand jury concerning what MARLENE J. AISENBERG had told her friend the morning Baby Sabrina was reported missing. Later, STEVEN B. AISENBERG told MARLENE J. AISENBERG, "We're in hot water thanks to you." MARLENE J. AISENBERG replied that if the police indicated that the police know where Sabrina is, "I guess we'll just tell that, that they know Sabrina is out there in the water and they have to stay looking for her ...."

On or about February 17, 1998, STEVEN B. AISENBERG and MARLENE J. AISENBERG discussed the Baby Sabrina situation, and the fact that "HRS" and the federal grand jury were still attempting to obtain proof. STEVEN B. AISENBERG told MARLENE J. AISENBERG, "They don't know the truth, right?", to which MARLENE J. AISENBERG responded, "Yeah." MARLENE J. AISENBERG further told STEVEN B. AISENBERG, "So, so in a way, you know, that means nobody knows what we did still." STEVEN B. AISENBERG replied, "Exactly."

These paragraphs and others among the "overt acts" in the indictment, in combination with the balance of the indictment, convey unmistakably and purposefully to the reader the conclusion (1) that Steven Aisenberg is responsible for the death of Sabrina by some mechanism and under circumstances known to the Aisenbergs and (2) that Marlene Aisenberg is unwilling to share legal responsibility ("take the

rap") for the acts of Steven Aisenberg, although she is willing to assist in shielding the facts from discovery. The indictment bears every indication that conveying these two messages was the author's manifest intent.

In addition to the return of an indictment against the Aisenbergs, September 9, 1999, featured another significant event in the Aisenbergs' prosecution. On that day, consequent upon the indictment in Florida, the Aisenbergs were arrested in Maryland, Steven Aisenberg's childhood home, to which the Aisenbergs moved after Sabrina's disappearance. (The need to conserve money and the desire to avoid the harsh glare of local publicity arising from Sabrina's disappearance impelled the Aisenbergs' return to Steven Aisenberg's parents' home in Maryland.) The Aisenbergs appeared that day before United States Magistrate Judge Charles B. Day in Maryland. Appearing in Maryland and urging the magistrate judge to require the Aisenbergs to submit to urinalysis and to require intervention by a "social services professional" to protect the Aisenbergs' other two children, an Assistant United States Attorney from the Middle District of Florida, offered this representation in behalf of the United States:

> The Government has in its possession a taped statement in which Steven Aisenberg states, among other things, "I wish I hadn't harmed her. It was the cocaine." The Government also has, Your Honor, other taped statements of both Steven Aisenberg and Marlene Aisenberg that indicate, based on the quality of their statements and their behavior, that—you can hear that they are drugged.

(The "taped statements" to which this Assistant United States Attorney alludes were not played for the magistrate judge; they were only described. In fact, as now is apparent, no such "taped statements"

exist.) Notwithstanding the representations of the United States, the Aisenbergs were released on bond.

Since the indictment, arrest, and arraignment, the Aisenbergs and the United States have contested this matter with great energy and determination and, consequently, at great length. A detailed account of the proceedings (although quite instructive) is beyond the scope of this order, which concerns a "reasonable attorney's fee and other litigation expenses" under the Hyde Amendment. However, in summary, three issues dominated the litigation from the day of the indictment. (1) The United States sought to disqualify the Aisenbergs' defense counsel and compel retention of separate, independent counsel for each defendant. (2) The Aisenbergs attacked the audibility of the recordings that the United States intended to offer as evidence at trial and attacked the validity of the transcripts that the United States prepared for submission to the jury in tandem with the recordings. (3) In an effort that proceeded *pari passu* with the audibility issue, the Aisenbergs sought a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and attacked the state warrants— an initial warrant and two extensions— authorizing the installation of listening devices and the interception of oral communications in the Aisenbergs' home. By reference, the disqualification issue and the *Franks* issue proceeded before United States Magistrate Judge Mark A. Pizzo; the audibility issue proceeded before the district judge.

### I.

First, the United States sought to disqualify defense counsel by alleging that "joint representation" creates an irresolvable conflict of interest that overrides the Aisenbergs' right to counsel of their

choice. (Doc. 22) The United States claimed that the Aisenbergs possessed inconsistent defenses (for example, the United States suggests in its motion to disqualify that " ... Marlene Aisenberg could attempt to explain [that] some of her conduct, statements, or inaction charged in the indictment was the result of the direction ... of ... Steven Aisenberg ... ") and were entitled to independent opportunities to plea bargain. The United States further suggested that defense counsel "may become a witness at the trial" because of his putative knowledge of events both occurring after the disappearance of Sabrina and constituting a violation of Sections 1001 and 1002. The United States characterized the prospect of defense counsel's testifying for the Aisenbergs as "very likely." The Aisenbergs responded (Doc. 24) and the United States' motion was denied after a finding of "good cause to believe that no conflict of interest is likely to arise."

## II.

Second, the Aisenbergs initiated an early effort to secure a prompt "audibility hearing" with respect to any recordings intended for use in evidence at trial. (Doc. 93) (The recordings intended for trial were fewer than all the recordings and fewer than those involved in the *Franks* hearing). The Aisenbergs' initial motion concerning the issue of audibility explained the Aisenbergs' perceived need for an audibility hearing:

> Several Overt Acts alleged in the indictment are based on conversations intercepted pursuant to a state Order Authorizing the Interception of Oral Communications, signed by Chief Judge Dennis Alvarez on December 12, 1997. It may be assumed that the government will attempt to introduce evidence of intercepted conversations alleged in the 24 Overt Acts by playing tapes generated by the intercept. The gov-

ernment has provided the defense with cassette tape copies of tapes generated during the intercept, digital copies of the conversations cited in the indictment, and, within the past few days, original tapes generated by the intercept. The defense has spent over 350 hours reviewing portions of the tapes and attempting to generate its own transcripts of the conversations. This process has included expert filtering of the tapes to remove background noises, using high-tech sound equipment to slow down and speed up the tape, and listening to specific words and phrases numerous times (over 30 per phrase or sentence). Even with this process, the defense has been unable to locate many conversations alleged by the government, and where transcripts have been made, they are often completely different from that alleged by the government. In most instances, the tapes are so inaudible that no complete and accurate transcript can be generated.

The United States' response in opposition (Doc. 138) submitted on April 17, 2000, with respect to recordings in the possession of law enforcement since March, 1998, states:

> If at all, the Court should conduct an audibility hearing only for those tape recordings that the United States will seek to introduce at trial and that the defendants claim are so unintelligible as to render the recordings as a whole untrustworthy. If such an audibility hearing is conducted, the Court should be able to conduct the hearing in a day's time shortly before the trial.

> • • • • •

> The defendants would have this Court believe that every one of the intercepted conversations referenced in the indictment is so inaudible that it should not be admitted into evidence. *See* Doc. 93 at

2–9. They assert that "no complete and accurate transcripts can be generated" and that "where transcripts have been made, they are often completely different from that alleged by the government." *Id.* at 2.

The transcripts of the intercepted conversations referenced in the indictment and the applications for extension of the oral interception order, which are filed *in camera* herewith, belie the defendants' contention. As evidenced by such transcripts, the government has prepared complete transcripts of the defendants' intercepted conversations. The transcripts clearly show that the tapes are "not inadmissible per se" because there are no "unintelligible portions [that] are so substantial as to render the recording[s] as a whole untrustworthy." *U.S.* v. *Avila,* 443 F.2d 792, 795 (5th Cir.1971); *see U.S. v. Pope,* 132 F.3d 684, 688 (11th Cir.1998); *U.S. v. Lively,* 803 F.2d 1124, 1129 (11th Cir.1986).

The government's transcripts are also accurate. To the extent that the defendants assert that the government's transcripts are not accurate, their remedy is to prepare their own versions of the transcripts for consideration by the jury at trial. *See* Doc. Nos. 62 and 67. It is the jury's responsibility to decide which version of the transcript, if any, is accurate. *See id.*

(footnote omitted).

In other words, the United States (by then undoubtedly fully familiar with the "contents" of the intercept recordings yet continuing to assert confidently both the audibility of the recordings and the accuracy of the transcripts) suggests either delaying the audibility hearing until trial or, preferably, directly submitting both the recordings and the United States' and the Aisenbergs' transcripts for consideration by the jury without an audibility hearing and without respect to either the audibility of the recordings or the accuracy of the transcripts. Eventually, the United States submitted for review *in camera* by the district court all the recordings intended for use at trial in the form of thirty-two compact discs, accompanied by a purported transcript of the contents of each disc. Both the United States and the Aisenbergs proposed details respecting the forthcoming determination of audibility.

At a hearing on September 28, 2000, the parties again discussed the scheduled audibility hearing. The United States opposed the playing of the intercept recordings at the audibility hearing to the extent that, as the United States stated, "[I]f the Court is inclined to have a hearing and to play the tapes in open court ... the case law that I have looked at makes it clear that the media is not entitled to hear anything that is deemed inadmissible ...." (In other words, the United States suggested that a hearing to determine audibility was a practical impossibility in the presence of the press because only admissible evidence could be revealed at a pre-trial hearing.) The Aisenbergs' counsel, who by that moment had heard the intercept recordings, responded:

We [the defendants] have no problem with the public hearing everything on those tapes. And the public will finally get an opportunity to see what this case is really about. So the media, we welcome them. We are not worried about any prejudice. And I can assure you that the prejudice that occurred in this case has already occurred.

(The history of the Aisenberg prosecution reveals many other moments, from early until late, at which the United States wanted the intercept recordings to remain secret and the defense demanded the broadcast of the recordings for the public to hear.) Also at the September 28, 2000, hearing, the Court confirmed that the As-

sistant United States Attorneys had listened to the recordings in the same or comparable manner to that offered to the Court. As to the first prosecutor:

THE COURT: [H]ave you listened to what I listened to?

AUSA # 1: Yes, Your Honor.

THE COURT: You have listened to the same discs?

AUSA # 1: I have.

THE COURT: Have you listened to it on the same equipment?

AUSA # 1: Yes, I have, Your Honor. I have listened to at least some of the CDs on the very same equipment, and I believe all of them. And I have also listened to them on other equipment.

THE COURT: Does the United States have any need to or desire to come to my office and listen to what I listened to on the equipment and in the manner that I listened to it to confirm the similarity—that's not the right word—the equality of the two?

AUSA # 1: No, Your Honor.

Tr. of Hr'g, Sept. 28, 2000, (Doc. 247) at 9. The results were consistent with the second prosecutor:

THE COURT: Have you listened to these tapes …?

AUSA # 2: Yes, sir, I have.

THE COURT: In the manner that I listened to them?

AUSA # 2: Yes, sir. Actually, Judge, not every one of them on the compact disc, but on actual tape recordings themselves I have, and a number of them on the compact discs.

Tr. of Hr'g, Sept. 28, 2000. (Doc. 247) at 18. On October 6, 2000, the audibility hearing was set for October 23, 2000. (Doc. 249) The United States moved successfully to continue the audibility hearing on October 18, 2000. (Docs. 261, 264) Again on November 1, 2000 (Doc. 276), the United States sought to continue the audibility hearing but without success. (Doc. 280)

Before the September 28, 2000, hearing, I had thoroughly reviewed the thirty-two compact discs intended for use by the United States as evidence against the Aisenbergs at trial. I had played each disc in sequence until completion. As I re-viewed the recordings, I recalled that the United States had expressed repeatedly that the recordings were the motive force and principal support for its case against the Aisenbergs. The lengthy indictment included strongly inculpatory quotations attributed to the Aisenbergs, quotations avowedly derived from the thirty-two compact discs and prominently featured by the United States at a conspicuous news conference held to announce the indictment a year earlier. But after careful review, I heard none of it. I heard many audible utterances, none of them decidedly and reliably inculpatory.

I promptly began another extended review of the recordings, now employing the transcripts provided by the United States and the Aisenbergs. I listened to the recordings and compared what I heard with the transcripts provided by the United States. The disparity was shocking. The Aisenbergs' transcripts were much closer to what I heard. But, the passages I could hear (and some passages were quite audible) were inconsequential in any criminal sense. With respect to the supposedly inculpatory matters quoted in the indictment, invoked at the Maryland arraignment, broadcast proudly by the United States at the news conference to announce the indictment, and republished nationwide by the print and broadcast media, I heard none of it.

Alerted to the prospect that one or more Assistant United States Attorneys might have advanced an ill-conceived prosecution, I expressed publicly at a hearing my (purposefully generalized) concern about the recordings. That concern, for example, explains my order requiring the United States to file transcripts of the grand jury testimony (in an effort to determine what, if anything, supported the indictment and what role the recordings and transcripts played in the grand jurors' deliberations).

However, after my final review of the recordings and transcripts. I issued an order (which resolved no pending motion and was entirely *sua sponte* ) explaining (principally to the United States) my studied view of the law governing the audibility of electronic recordings, explaining that particularized reasons sometimes allow for admissibility of relevant recordings even if highly inaudible and, more to the point of the present Hyde Amendment dispute, announcing for the first time formally and publicly that the recordings were "largely inaudible." The order (Doc. 288) states in part:

> The Court listened to these recordings by several methods. I listened at least twice without the aid of any extrinsic matter. I subsequently reviewed certain transcripts offered by both the United States and the Aisenbergs. I listened repeatedly and to some extent compared the sounds on the recordings to the competing transcripts. Accordingly, I made a gradual assessment of the quality of the recordings and the quality of the transcripts and remained acutely conscious of any influence from the transcripts. (Although I have reviewed the Aisenbergs' experts' affidavits, they will play no part in my determination.) I have reviewed these recordings thoroughly and attentively. The quality of these recordings generally is poor. The recordings contain background and foreground interference, other random noise, and prominent distortions, which together materially obscure large portions of most or all of these recordings. Considered in gross, these recordings are largely inaudible. At least some of the matters appearing in quotation marks in the indictment are inaudible.

*United States v. Aisenberg,* 120 F.Supp.2d 1345, 1352 (M.D.Fla.2000). This order was intended principally to signal to the responsible supervision at the office of the United States Attorney (who, perhaps, lacked first-hand knowledge of the matter) that the presiding district judge harbored an informed view that the recordings upon which the United States relied in this prosecution were apparently insubstantial as evidence (although the order invites any pertinent reassurance in the event that the purpose of the recordings was not visible from my vantage). Finally, the order continued the audibility hearing in deference to the schedule established by the magistrate judge for the *Franks* hearing (if the recordings were suppressed, an audibility determination was superfluous). The audibility hearing never occurred; the results of the magistrate judge's inquiry into the *Franks* issue intruded decisively.

### III.

Third, the Aisenbergs sought to suppress the proceeds of the electronic surveillance in their home. Based on *Franks,* the Aisenbergs asserted that the affidavits supporting the application to the state circuit judge for interception authority were supported by information provided by law enforcement with reckless disregard for the truth. The extended *Franks* hearing included the testimony of investigating officers and other persons involved in procuring the warrant, a review in open court of the recordings that resulted from the interceptions in the Aisenbergs' home, and expert testimony concerning the recordings. The magistrate judge's report and recommendation (Doc. 336) is attached to this order and incorporated by reference in its entirety into this order. The magistrate judge painstakingly detailed the troubled history of law enforcement's management of the interception. His conclusions are compelling:

> The Aisenbergs paint a consistent pattern, and they proved this pattern beyond a preponderance of the evidence at the *Franks* hearing. The detectives

report conversations no reasonably prudent listener can hear, quote conversations that do not appear in the supporting transcript at all or in the manner described, and deliberately or with reckless disregard summarize conversations out of context. The government steadfastly rejects all of this. It does so against a record showing: systemic, technical problems producing recordings plagued by distortion, interference, and mechanical noises; application transcripts that make no sense; revised transcripts that continue to make no sense; revised transcripts that contradict the application transcripts in material respects; a continual effort to amend transcripts (to purportedly improve them) up to and through the date of this report; admissions, as evidenced by the government's transcripts, that significant amounts of particular conversations cannot be understood or were not recorded (due to minimizations); and the government's tacit acknowledgment that certain recordings are so poor or so irrelevant it will not offer them as evidence at trial.

As detailed at length by the magistrate judge, the officials responsible for the warrant applications left a trail of reckless disregard for the truth and, of course, for the rights and well-being of the Aisenbergs. The magistrate judge observed that:

> The government hears what no reasonably prudent listener can; it interprets what can be heard as no reasonably prudent listener would. Faced with the quality and nature of the recordings so far presented in this case, it is doubtful any judge, no matter how skilled and dedicated, could parse the conversations into its component parts looking for evidence of murder, sale of a minor child, child neglect with great bodily harm, or aggravated child abuse.... [I]n this case, the nature and quality of the re-

cordings make it impossible. Moreover, the reality is that if evidence of these crimes existed, if the Defendants' intercepted conversations proved they had done these things to their child, they would not be in the dock of a federal court charged with false statement violations....

> ... The government's central theme is the Defendants falsely reported their daughter had been kidnapped. Obviously, it proposes to use the Defendants' intercepted conversations to prove something else likely happened to the child. The indictment, like the intercept applications, insinuates two possible scenarios: the Defendants either murdered or sold their child. If the government's approach at the *Franks* hearing is indicative, the government is not wedded to a specific theory. Either supposition, murder or sale of a child, will suffice, so long as it is plausible enough to convince a jury beyond a reasonable doubt the Defendants lied to investigators as charged. Yet, the intercepted conversations do not support probable cause to believe the Defendants murdered their child, the only offense authorized by FLA. STAT. § 934.07 (1997). Nor do these conversations provide probable cause to believe the Defendants committed the other crimes listed in the applications.

In the end, the magistrate judge recommended granting the Aisenbergs' motion to suppress the recordings arising from the three orders issued in state court—an initial warrant and two extensions. The United States' motion to dismiss the indictment against the Aisenbergs followed the magistrate judge's recommendation by only a few days.

Although neither party lodged objections to the magistrate judge's report and recommendation and no formal review by

the district judge occurred (the dismissal mooted review), my subsequent detailed review of the papers pertinent to the *Franks* hearing and the testimony and exhibits received by the magistrate judge during the *Franks* hearing reveals no misapprehension by the magistrate judge of either fact or law and no basis on which to disagree with his studied conclusions. (Of course, this dismissed action provides no present occasion for objections by the parties or formal acceptance or rejection of the magistrate judge's report and recommendation.) Similarly, I find no reason to fault the magistrate judge's choice of words and phrases in his writing. Admittedly, the conclusions at which he arrives are starkly expressed and unmistakable, without undue gloss, evasion, or deflection. The magistrate judge's choice of direct and focused language serves admirably to convey the force of the disturbing reality that produced the present Hyde Amendment controversy. In fact, the magistrate judge's order—although unsettling—is a temperate, fair, and cogent expression of the history he discovered during the *Franks* hearing and during his contemplation of his ruling. After my review of this matter, including the *Franks* hearing and its aftermath, over many months, I confirm that history; I join the magistrate judge in each of his words.

The magistrate judge issued his report and recommendation on February 14, 2001. (Doc. 336) One week later, on February 21, 2001, the United States moved for leave to dismiss the indictment against the Aisenbergs. (Doc. 341) The indictment was dismissed the next day. (Doc. 342) On March 26, 2001, the Aisenbergs moved for an award under the Hyde Amendment. (Doc. 367) The United States responded in opposition on July 2, 2001. (Doc. 378) The Aisenbergs filed a reply on August 21, 2001. (Doc. 382) After a court-ordered mediation resulted in an impasse, the parties filed numerous sup-

plemental papers. The parties presented their arguments in a four-day hearing on October 21, 22, 23, and 25, 2002, followed by an additional round of supplemental papers, leaving for present determination the issue of the Aisenbergs' award of a "reasonable attorney's fee and litigation expenses" under the Hyde Amendment.

### THE HYDE AMENDMENT

In *United States v. Gilbert,* 136 F.3d 1451 (11th Cir.1998), the defendant was indicted after expiration of the statute of limitations, and the resulting conviction was reversed. On remand, the defendant unsuccessfully sought an award of attorney's fees and expenses under the Hyde Amendment. In *United States v. Gilbert,* 198 F.3d 1293 (11th Cir.1999), the circuit court affirmed the denial of fees because the legal issue that resulted in reversal of the conviction was a question of first impression, with respect to which the district court agreed (erroneously) with the United States. (As the circuit court noted, "Once a district court judge accepts the government's legal position it will be extremely difficult to persuade us that the issue was not debatable among reasonable lawyers and jurists, i.e., that it was frivolous." 198 F.3d at 1304.)

*Gilbert's* interpretation of the Hyde Amendment, expounded by Judge Carnes in his opinion for the court, is controlling in the Eleventh Circuit (and favorably cited elsewhere throughout the United States by both appellate and trial courts). *Gilbert* includes both a review of the legislative history of the Hyde Amendment and an elaboration of the statutory terms "vexatious, frivolous, or in bad faith."

"Vexatious" means "without reasonable or probable cause or excuse." Black's Law Dictionary 1559 (7th ed.1999); *see also Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694,

700, 54 L.Ed.2d 648 (1978) (describing "vexatious" conduct in the Title VII context as being "frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith"). A "frivolous action" is one that is "[g]roundless ... with little prospect of success; often brought to embarrass or annoy the defendant." Black's Law Dictionary 668 (6th ed.1990); *see also Fed. R.Civ.P. 11.* Finally, "bad faith" "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th ed.1990); *see also Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (defining bad faith in the law enforcement context to include "reckless disregard for the truth").

198 F.3d at 1298–99. In this instance, the United States concedes that the prosecution of the Aisenbergs warrants the award of both a reasonable attorney's fee and other litigation expenses because the Aisenbergs suffered a prosecution that was either "frivolous, vexatious, or in bad faith." The amount of the resulting award, which depends upon proper application of the Hyde Amendment, remains in controversy.

The Hyde Amendment, as explained in *Gilbert,* passed through Congress with relative alacrity and left little, if any, meaningful legislative history. *Gilbert* judges the statutory language unambiguous and unaffected by the vagaries of its minimal legislative history. The Hyde Amendment's salient provision prescribes an "award to a prevailing party" of "a reasonable attorney's fee and other litigation expenses" after an unsuccessful criminal prosecution that the court finds "vexatious, frivolous, or in bad faith." [5] (The statute immediately excepts undefined "special circumstances [that] make such an award unjust," a provision inapplicable to the Aisenbergs' prosecution.)

The phrase "reasonable attorney's fee" is familiar to the law and subject to clarification by established principles elaborated in a plentiful supply of appellate opinions. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Norman v. Hous. Auth. of City of Montgomery,* 836 F.2d 1292 (11th Cir.1988); *Johnson v. Georgia Highway Exp., Inc.,* 488 F.2d 714 (5th Cir.1974). Only phrases such as "reasonable doubt" or "proximate cause" are equally familiar in the law. Few, if any, phrases in the language of the law are more readily recognized, more frequently litigated, or more familiar to judges, lawyers, and litigants in the United States. No one familiar with the law, lawyers, or litigation is unfamiliar with the phrase "reasonable fee." The phrase "reasonable fee" recurs in all jurisdictions, state and federal, in contract disputes and tort disputes, in civil cases and criminal cases, in cases great and small, in the trial courts and the appellate courts, and in lawyers' offices and clients' conference rooms. The

---

5. The phrase "litigation expenses" immediately strikes the informed observer as a legislative choice to avoid the more familiar term "costs," the statutory term most often used in conjunction with the price of litigation. *See, e.g.,* 28 U.S.C. § 1290; Fed.R.Civ.P. 54(d)(1). An award of "costs," to which a party is entitled by operation of statute, is more narrowly constrained than an award of "litigation expenses," an expansive term that detaches the restrictions buried in the term "costs" and gravitates explicitly toward a measure of actual, out-of-pocket expenditures incurred as a reasonably necessary incident of conducting a capable and informed defense.

law of professional responsibility applicable in each of the states pervasively and jealously enforces the notion of a "reasonable fee" in every legal engagement.

Congress presumably understood the phrase "reasonable attorney's fee" to bear the definition established under the governing law. As stated in *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952):

> And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*See also Napier v. Preslicka,* 314 F.3d 528, 532 (11th Cir.2002) ("Congress is presumed to know the settled legal meaning of the terms it uses in enacted statutes and to use those terms in the settled sense.").

The Hyde Amendment's statutory award of a "reasonable attorney's fee and other litigation expenses" is followed by this sentence:

> Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of Title 28, United States Code.

In other words, the awards specified in the first sentence of the Hyde Amendment are "pursuant to the procedures and limitations" of "section 2412," which is the Equal Access to Justice Act (EAJA), a statute that provides for fee awards in certain civil cases. The Hyde Amendment neither further defines nor further specifies the particular "procedures and limitations" to which the statute refers.[6]

To which "procedures and limitations" does the Hyde Amendment refer? This question presents an issue of signal importance both to the Aisenbergs and to every other victim of a prosecution that is "vexatious, frivolous, or in bad faith." The principal issue of present importance (given, in this case, the concession by the United States that the Hyde Amendment applies) is whether, as the United States contends, the Hyde Amendment incorporates the $125 per hour cap on attorney's fees that appears in a parenthetical in Section 2412(d)(2)(A) and, if so, whether the $125 per hour cap supersedes the Hyde Amendment's award of a "reasonable attorney's fee."

To illustrate the pertinent issue of statutory construction, consider this hypothetical: (1) Assume that the primary statute under consideration grants to a prevailing criminal defendant a remedial "award" of $100 if the court finds a prosecutor maliciously maintained a criminal action against the prevailing defendant but assume that the primary statute is silent concerning the time within which a claimant must apply. (2) Assume also that the

**6.** The choice of "pursuant to" followed by "limitations" is an awkward construction, creating the mildly oxymoronic notion of an "award" accomplished "pursuant to" a "limitation." "Pursuant to" smoothly and logically fits between "award" and "procedures" (i.e., an "award pursuant to procedures" specified elsewhere) but not between "award" and "limitation" (i.e., an "award pursuant to limitations" specified elsewhere). The Hyde Amendment in its essential and heartland language grants a "reasonable fee ... pursuant to Section 2412" and not "a reasonable fee ... [subject to] Section 2412." This choice of "pursuant to" rather than "subject to" conveys part of a legislative message, discussed more fully elsewhere in this order.

primary statute provides that the "award" granted in the primary statute is "pursuant to" the "procedures and limitations" specified in a secondary statute (situated in a different title of the pertinent code), which governs compensatory awards if a court finds that an entirely different and less offensive circumstance has occurred in a civil action. (3) Assume further that the "award" in the secondary statute governing the civil action is specifically limited to only $10 and to only those claims submitted in writing within thirty days. (4) Assume finally that the pertinent claimant is a prevailing party under the primary statute and that the prevailing party's claim is $100.

Assuming these matters, is the claimant entitled to the $100 awarded in the primary statute or to only the $10 provided in the secondary statute? Is the claimant party required to apply within thirty days? This order adopts a construction (1) by which the primary statute entitles the prevailing party to $100 in accord with the primary statute's heartland grant (notwithstanding the more restrictive grant of the secondary statute to which the primary statute refers) and (2) by which the prevailing party must apply in writing within thirty days, as required by only those "procedures and limitations" (a) that are incorporated by reference into the primary statute and prescribed in the secondary statute and (b) that implement and advance, but neither contradict nor negate, the preeminent grant of the primary statute.

In summary, evaluation of the Hyde Amendment in its relation to Section 2412 reveals three alternative interpretations, each of which leads to the same result in the circumstances of the Aisenberg prosecution. First, although the Hyde Amendment purports to incorporate certain "procedures and limitations" prescribed in the Section 2412, not all available "procedures

and limitations" are incorporated because some are irreconcilable with the plain terms of the Hyde Amendment. With respect to attorney's fees, the Hyde Amendment grants a "reasonable attorney's fee and other litigation expenses." The inconsistent provisions of Section 2412 (limiting the award to $125 per hour) are not incorporated into the Hyde Amendment. Second (and alternatively), to the extent that the Hyde Amendment incorporates the "procedures and limitations" of Section 2412 with respect to attorney's fees, the question recurs whether Section 2412 contains any limitation applicable to an award to the Aisenbergs, who are the victims of a prosecution that was "vexatious, frivolous, or in bad faith." Because a "vexatious, frivolous, or bad faith" prosecution is more nearly within the purview of the "bad faith" that the common law compensates by a reasonable fee under Section 2412(b) than the term "substantially unjustified" under Section 2412(d), no applicable limitation appears in Section 2412, which provides, exactly as the Hyde Amendment provides, for a "reasonable attorney's fee" in instances of "bad faith." In other words, although Section 2412(d) provides for a $125 per hour cap in the event of a "substantially unjustified" action, Section 2412(b) provides for "reasonable attorney's fees" in instances of "bad faith," which is the circumstance encountered by the Aisenbergs. Therefore, in "bad faith" cases, Section 2412 contains no applicable limitation on attorney's fees and awards a "reasonable fee," precisely the award granted by the Hyde Amendment. Third (again alternatively), even if the limitation of Section 2412 is incorporated and the incorporation includes the $125 per hour cap, the Aisenbergs' prosecution presents a compelling array of "special factors" that permit a departure from the $125 per hour cap and that warrant the award of a reasonable attorney's fee to compensate the

Aisenbergs. A detailed explanation follows.

## I.

A subsection-by-subsection review of Section 2412 confirms that the $125 per hour cap imposed on an attorney's fee in Section 2412(d)(2)(A) is inapplicable to the Hyde Amendment. More specifically, a detailed (and, unfortunately, somewhat laborious) review of Section 2412 reveals several statutory provisions within Section 2412 that are fairly within the scope of the phrase "procedures and limitations" that appears in the Hyde Amendment and are, accordingly, arguably candidates for incorporation into the Hyde Amendment. Some standard must govern whether all of these provisions, none of these provisions, or only some of these provisions in Section 2412 are incorporated into the Hyde Amendment. Congress undoubtedly enjoys the power to incorporate all of them, none of them, or some of them; the pertinent question is answered by discerning congressional intent (i.e., the statutory purpose) in this particular instance.

Section 2412(a) deals with "costs and fees." Section 2412(a) presents no "procedure" or "limitation" except that cost awards against the United States are limited to "reimbursing in whole or in part the prevailing party for the costs incurred by such a party in the litigation." The consequent interpretive question is whether the broad term "other litigation expenses" in the first sentence of the Hyde Amendment is limited by the term "costs" used in Section 2412(a). The most reasonable interpretation is that the principal purpose of the Hyde Amendment, exactly as the statute provides in its dominant first sentence, is to provide for the award of "a reasonable attorney's fee and other litigation expenses" in the circumstances described in the Hyde Amendment. The incidental reference to "costs" embedded in a part of Section 2412 governing "costs"

in civil actions involving the United States, although arguably a "limitation," neither impliedly amends nor otherwise diminishes the essential purpose of the Hyde Amendment, which is to authorize an award of a "reasonable attorney's fee and other litigation expenses." This "limitation" in Section 2412(a) is inapplicable to the Hyde Amendment because importing the "limitation" contravenes the Hyde Amendment illogically, reducing the statute's work to a nullity, a disfavored and incongruous result.

Section 2412(b) contains no explicit "procedure" or "limitation," but Section 2412(c) provides for payment of a judgment for "costs" or "attorney's fees and expenses of litigation" as provided in Sections 2414 and 2517, which allow for payment of judgments against the United States by the Secretary of the Treasury, sometimes with approval by the Attorney General. Section 2412(c) also creates an exception "if the basis for the award is a finding that the United States acted in bad faith," in which instance "the award shall be paid by any agency found to have acted in bad faith. . . ." Is this limitation to only "bad faith" cases a "limitation" or a "procedure" of Section 2412 that applies to the Hyde Amendment, which requires the Department of Justice to answer for fees and expenses incurred by a defendant in a "vexatious, frivolous, or bad faith" prosecution? The only reasonable interpretation is that a statute that requires the Department of Justice to pay fees and expenses in the event of a "vexatious, frivolous, or bad faith prosecution" is not limited by the requirements of Section 2412 that the Secretary of the Treasury pays except in cases of "bad faith," even if the Hyde Amendment purports to defer to the "limitations" of Section 2412. The central commands of the Hyde Amendment cannot be adulterated by reference to limitations of another statute "pursuant to" which the

terms of the Hyde Amendment are supposedly implemented. Those limitations can be imported into the Hyde Amendment only to the extent that the essential commands of the Hyde Amendment are unimpaired. (Actually, no conflict should exist between the Hyde Amendment and Section 2412(c) because the concept of "bad faith" under Section 2412 is sufficiently broad to include a prosecution that was either "vexatious, frivolous, or in bad faith." But, if not, the Hyde Amendment's requirement that the offending agency pay the award apparently yields to Section 2412's requirement that the Department of Treasury pay the award except in "bad faith" cases, leaving the Department of Treasury to pay Hyde Amendment claims in frivolous and vexatious cases but not in bad faith cases—an absurdity.)

Section 2412(d)(1)(A) first provides that, in addition to the costs awarded under Section 2412(a), a "prevailing party" is entitled to an award of "fees and other expenses ... unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." Is "substantially justified" a "limitation" that the Hyde Amendment adopts by force of the reference to Section 2412? The Hyde Amendment fixes the standard of proof at "vexatious, frivolous, or in bad faith." Although the Hyde Amendment purports to incorporate "procedures and limitations" from Section 2412, importation into the Hyde Amendment of the "substantially justified" standard would abrogate the essential grant that characterizes the Hyde Amendment and, consequently, apply the Hyde Amendment in unintended circumstances. Again, despite the literal terms of the Hyde Amendment, Section 2412's limitation to "substantially unjustified" actions by the United States is inapplicable to the Hyde Amendment.

Similarly, the question recurs whether the Hyde Amendment incorporates the exclusion in Section 2412(d)(1)(A) when "special circumstances make an award unjust." Obviously, the Hyde Amendment contains exactly the same language. If the Hyde Amendment automatically incorporates the "special circumstances" language of Section 2412(d)(1)(A), the "special circumstances" language in the Hyde Amendment becomes mere surplusage, a useless redundancy. The law disfavors an interpretation that renders statutory words redundant, meaningless, or absurd. 2A Norman J. Singer, *Statutes and Statutory Construction ("Sutherland Statutory Construction")* § 46:06 (6th ed.2000). If Congress directed that every "procedure and limitation" in Section 2412 was engrafted automatically into the Hyde Amendment, inclusion in the Hyde Amendment of the "special circumstances" phrase was a futile and unnecessary exertion. The sounder conclusion is that the "special circumstances" language was placed into the Hyde Amendment because congressional intent required inclusion, despite the phrase's pre-existing presence in Section 2412. In other words, once again, to preserve the congressional intent and meaning of the words of the Hyde Amendment, a "procedure" or "limitation" from Section 2412 is not borrowed.

Section 2412(d)(1)(B) presents the "procedures and limitations" most readily and reasonably applicable to the Hyde Amendment. Section 2412(d)(1)(B) requires submission within thirty days after final judgment (the statute says "thirty days of," but presumably means "after") of a detailed application both demonstrating the party's entitlement and containing an "itemized statement" of the attorney's and expert's fees and other expenses. Of course, a party claiming a fee under Section 2412(d)(1)(A) must "allege that the position

of the United States was not 'substantially justified.' "

However, in contrast to the easily assimilated "procedure" requiring a detailed, written application within thirty days, the last sentence of Section 2412(d)(1)(B) states:

> Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought.

This unquestionably presents a "limitation" (and, perhaps, also a "procedure"). In a proceeding to which this latter sentence applies the presiding judge is restricted to the record in the case to which the fee application pertains. In other words, the parties are allowed no further submissions. On the contrary, the Hyde Amendment provides that:

> To determine whether or not to award fees and costs under this section, the court, for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identity of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal.

Again, Section 2412(d)(1)(B) offers a "limitation" for possible incorporation into the Hyde Amendment by force of the "procedures and limitations" clause. Should the incorporation occur and thereby supersede the possibility of the submission of "classified evidence" and the like expressly allowed by the Hyde Amendment? Reason suggests that the language of the Hyde Amendment governs over inconsistent language in Section 2412(d)(1)(B) and,

notwithstanding the language of the Hyde Amendment incorporating the "limitations" of Section 2412, the explicit and heartland grants of the Hyde Amendment, including the provision for additional submissions (including ex parte submissions), remain in force despite inconsistent provisions in Section 2412.

Section 2412(d)(1)(C) provides that the court may "reduce" or "deny" a fee award "pursuant to this subsection" if the prevailing party "engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy." Of course, in awarding a "reasonable fee" under any statutory or contractual provision, a court is not bound to compensate for undue or unreasonable conduct, without respect to Section 2412(d)(1)(C). In that sense, Section 2412(d)(1)(C) is a congressional reminder disguised as a directive and contains no "procedure or limitation" pertinent to the Hyde Amendment. (One wonders at what moment a defendant's resistance to a frivolous, vexatious, or bad faith prosecution becomes "undue." One reasonable answer, subject to the dictates of law and ethics, is "Never.")

Section 2412(d)(1)(D), which applies to "a civil action brought by the United States" and "agency action" to enforce a statute or regulation, provides for an award of "fees and other expenses related to defending against [an] excessive demand" by the United States, except in instances of "willful violation of law," "bad faith," or "special circumstances" that "make an award unjust." Is this "limitation" incorporated into the Hyde Amendment, which, literally construed, adopts without limitation the "procedures" and "limitations" of Section 2412? For example, if a criminal defendant willfully and demonstrably violated the criminal law but is vexatiously indicted after expiration of the statute of limitations, i.e., after the

prosecution is barred, can the United States successfully resist the defendant's consequent Hyde Amendment claim by asserting the defendant's "willful violation" of the law, as provided in Section 2412(d)(1)(D)? Of course not. Common sense forbids the result. Notwithstanding the putative, wholesale incorporation by the Hyde Amendment of the "procedures and limitations" of Section 2412, the Hyde Amendment's grant of relief to vexatiously indicted defendants (even if guilty of a statutory violation) is not suspended by the provision of a civil statute that precludes a fee award if the defendant acted in willful violation of the law or in bad faith.

Further, the final sentence of Section 2412(d)(1)(D) provides that. "Fees and expenses awarded under this paragraph shall be paid only as a consequence of appropriations provided in advance." Although not entirely unambiguous, this provision apparently limits awards to circumstances in which a congressional appropriation has been "provided in advance," i.e., Congress has created a designated fund for payment. In other words, if no congressional appropriation has occurred "in advance" for the designated purpose of compensation under Section 2412(d)(1)(D), no award of fees and expenses, even if granted by the court, "shall be paid" by the United States. Is this "limitation" superimposed on the Hyde Amendment perforce the language that incorporates into the Hyde Amendment the "procedures and limitations" of Section 2412? Of course, the Hyde Amendment contains a precisely contrary direction concerning payment. The Hyde Amendment commands that:

> Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

Although some basis exists for varying interpretation, Section 2412(d)(1)(D) seems to protect the United States and its agencies from an award of attorney's fees and costs in civil cases unless an earmarked appropriation is provided in advance. In contrast, the Hyde Amendment in qualifying cases subjects the Department of Justice to payment of a "reasonable attorney's fee and other litigation expenses," requires the Department of Justice to pay the award from the agency's general appropriation, and prohibits any compensating or "new" appropriation to the Department of Justice to offset payments incurred "as a result of this provision," i.e., incurred as a result of the Hyde Amendment. In short, Section 2412(d)(1)(D) permits payments of fees and costs only if the agency is financially prepared by the mechanism of an anticipatory appropriation. On the other hand, Hyde Amendment payments are intended to resonate within the affected agency by denting the money available for the agency's other activities—without the prospect of reimbursement. Does Section 2412(d)(1)(D) of EAJA trump and nullify the Hyde Amendment by force of the provision in the Hyde Amendment incorporating the "limitations" of Section 2412? Reading the Hyde Amendment too literally, the answer is "Yes." However, because incorporating the advance appropriation provision of Section 2412(d)(1)(D) utterly neutralizes the Hyde Amendment's prohibition against a compensating appropriation to counter the budgetary effect of Hyde Amendment assessments, sound principles of statutory construction forbid incorporating into the Hyde Amendment a provision contrary to the express commands of the statute. In other words, the essential and motivating purpose of the statute is not subordinated to the inconsistent or impeding purpose of another statute merely because the former purports to adopt provisions of the latter, "pursuant

to" which the former is to be implemented and "pursuant to" which its statutory purpose is to be effected. Congress intended only to incorporate those provisions consistent with and useful to the heartland provisions of the primary statute. Stated differently, the dominant statute is neither controlled nor frustrated by the supporting statute and, if conflict appears, the dominant statute governs.

Section 2412(d)(2) provides certain definitions but limits those definitions to "the purposes of this subsection." Section 2412(d)(2)(A) defines "fees and other expenses" and provides that the defined phrase "includes" both "reasonable attorney's fees" and several other components, principally related to the exertions of experts and experts' analyses and reports. This definition contains no "limitation" pertinent to the Hyde Amendment. However, following the definition is a parenthetical statement, reminiscent of the language of Section 2412(d)(1)(C), which states that the "fees" (the parenthetical does not employ the phrase "reasonable fee" or "reasonable attorney's fee") "awarded under this subsection ... shall not be awarded in excess of $125 per hour" (except in circumstances not pertinent here but which are discussed below).

The clause "fees awarded under this subsection" of EAJA obviously is not a reference to the award of "a reasonable attorney's fee" under the Hyde Amendment. The parenthetical in Section 2412(d)(2)(A) contains self-limiting language that restricts the application of the $125 per hour provision to "fees awarded under this subsection," that is, fees awarded under Section 2412(d) of EAJA. An award of "a reasonable attorney's fee" under the Hyde Amendment is not an award of a fee under EAJA. Likewise, an award of a fee under EAJA is not an award of a fee under the Hyde Amendment. Reference in the Hyde Amendment to certain "procedures and limitations" in EAJA does not transform a fee under the Hyde Amendment to a fee award under EAJA, and certainly not to an "award of fees under this subsection," as stated in Section 2412(d)(2)(A). One is not the other; the two should not be confused.

The question presented by the Hyde Amendment's reference to Section 2412 and its "procedures and limitations" is whether the Hyde Amendment's signal grant, i.e., the award of a "reasonable fee," is frustrated and overridden by a merely parenthetical provision in the definition section of a subsection of EAJA, which parenthetical on its face refers only to "fees awarded under the subsection" (by which the provision obviously means Section 2412(d)). In fact, the parenthetical limitation in Section 2412(d)(2)(A) fails to restrict an award under Section 2412(b) or any other statute that awards fees, except the specific "subsection" to which it applies by its own language. In other words, only a fee calculated under Section 2412(d), the only "subsection" to which Section 2412(d)(2)(A) refers, is subject to the parenthetical in Section 2412(d)(2)(A). No other fee award is affected, including the award of a "reasonable fee" under either Section 2412(b) or the Hyde Amendment. Common sense rejects applying to the Hyde Amendment the limits of Section 2412(d)(2)(A), which do not even limit the balance of Section 2412. Section 2412(d)(2)(A) is not a "limitation of Section 2412" but is more strictly a limitation of only Section 2412(d).

Section 2412(d)(2)(A) also contains in the same parenthetical sentence (the parenthetical containing the $125 per hour provision) a provision that no "expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States." Does the Hyde Amendment incorporate

this limitation by force of the "procedures and limitations" clause? For the reasons explained earlier, the plain language "awarded under this subsection" explicitly limits the expert witness cap to fees awarded under Section 2412(d), the subsection in which the provision occurs and to which the provision refers exclusively. But, even without the limiting language, the expert fee cap of Section 2412(d)(2)(A) is inapplicable to the Hyde Amendment. Again, the Hyde Amendment purports to capture the "limitations" of Section 2412. Does this arcane provision capping expert fees based on the government's rate of pay trump the Hyde Amendment's broad award of "other litigation expenses"? Suppose the United States employs no independent experts and elects to use only law enforcement officers and employees of the FBI's famous criminal laboratory. Is the defendant barred from recovery?[7] Again, sound statutory construction forbids that result.

Unlike Section 2412(d)(2)(A), the language of Section 2412(d)(2)(B) contains no express restriction to "fees awarded under this subsection." Section 2412(d)(2)(B) purports to create classes of persons and entities excluded from access to the benefits of the subsection. For example, an individual whose "net worth"—the subsection provides no definition of "net worth"—exceeds two million dollars "at the time the civil action was filed" is excluded from the benefits of the subsection. *See City of Brunswick v. United States,* 849 F.2d 501 (11th Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1313, 103 L.Ed.2d 582 (1989). Because the Aisenbergs' net worth was (the parties stipulate) less than two million dollars on the day of their

indictment, the Aisenbergs are unaffected by Section 2412(d)(2)(B). In fact, this case presents no occasion for the consideration of this provision, except as an indicator of the proper interpretation of the balance of Section 2412 in its relation to the Hyde Amendment. (The question whether the statutory classification scheme in particular criminal cases carries constitutional implications or otherwise affects an invidious distinction is outside the present scope.) More specifically, the Hyde Amendment provides an award of an attorney's fee and litigation expenses to "a prevailing party, other than the United States." If incorporated into the Hyde Amendment by force of the "procedures and limitations" clause, Section 2412(d)(2)(B) simply identifies "a prevailing party" and creates no conflict with, and effects no emendation of, the Hyde Amendment. (If the Hyde Amendment awarded a fee to "*every* prevailing party," "*any* person whatsoever," or the like, the provisions of Section 2412(d)(2)(B) would more nearly clash irreconcilably with the Hyde Amendment and create a problem of interpretation.) For the purposes of the interpretation necessary to resolve the present case, Section 2412(d)(2)(B), neither limited by its language to "fees awarded under this subsection" nor clashing with any prescription of the Hyde Amendment, is incorporated into the Hyde Amendment by the "procedures and limitations" clause of Section 2412.

Sections 2412(d)(2)(C)-(d)(2)(I) and Section 2412(d)(3) provide several specific definitions and other provisions which are either logically irrelevant to the Hyde Amendment (for example, Section 2412(d)(2)(H) governs primarily eminent

---

7. Of course, this case presents no occasion to confront this potential difficulty because the United States retained Anthony Pellicano for "expert" analysis of the disputed recordings. The United States reimbursed Pellicano at $250 per hour for out of court work and $350 per hour for in court work, a surprisingly generous rate given Pellicano's credentials, and in excess of any of the notably more reputable experts retained by the Aisenbergs. *See* Tr. of Hr'g, Dec. 18, 2000, (Doc. 332) at 34.

domain cases) or which fit comfortably within the Hyde Amendment (for example, Section 2412(d)(2)(F) defines "court" in a manner inoffensive to the Hyde Amendment). Similarly, Section 2412(d)(3) applies to two categories of cases, those under 5 U.S.C. § 504(b)(1)(C) (certain administrative proceedings) and an "adversary adjudication under the Contract Disputes Act of 1978." *See* 41 U.S.C. § 605, *et seq.* However, as an indication of the proper interpretation of the Hyde Amendment, a review of these sections is informative because the Hyde Amendment awards fees "pursuant to" the "procedures and limitations" of Section 2412, and Section 2412(d)(2) and Section 2412(d)(3) contain numerous "limitations." None of these, even if subject to tortuous or overly literal interpretation, rightly applies to the Hyde Amendment. For example, Section 2412(d)(3) refers again to the "substantially justified" standard, although the words of the subsection limit the application of the "substantially justified" standard to actions under 5 U.S.C. § 504(b)(1)(C) and the Contract Disputes Act of 1978. This "limitation" should be construed in accordance with its specific language ("In awarding fees and other expenses under this subsection . . ."), that is, to apply to 5 U.S.C. § 504(b)(1)(C) and the Contract Disputes Act of 1978, and not construed as a "limitation" borrowed by the "procedures and limitations" clause of the Hyde Amendment for superimposition over the express terms of the Hyde Amendment.

Section 2412(d)(4) provides in language similar to that of the Hyde Amendment that:

Fees and other expenses awarded under this subsection to a party shall be paid by any agency over which the party prevails from any funds made available to the agency by appropriation or otherwise.

With the addition of this section, the list of conflicting statutory sources of money for payment of Hyde Amendment fees lengthens ominously. The Hyde Amendment provides for payment "by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision." The Hyde Amendment provides that "award shall be granted pursuant to the procedures and limitations . . . provided under Section 2412 of Title 28 . . . ." Section 2412 contains no fewer than four limitations on the source and allowability of payments of fees, one in Section 2412(c)(1), one in Section 2412(c)(2), one in Section 2412(d)(1)(C), and one in Section 2412(d)(4). Two options present themselves for consideration. The first option is to apply only the limitation expressed in the text of the Hyde Amendment and require the Department of Justice to pay Hyde Amendment awards out of current funds without a compensating appropriation, precisely as Congress directed and notwithstanding the "procedures and limitations" clause referring to Section 2412. This option proceeds on the assumption that the words of the Hyde Amendment prevail over any contrary words in Section 2412, to which the Hyde Amendment refers for "procedures and limitations." This order adopts this first option. The other option is to apply the "procedures and limitations" language unguardedly and attempt to determine which of Section 2412's four, somewhat different provisions (some of which in turn refer to 18 U.S.C. §§ 2414 and 2517 for guidance) regarding the source of fee awards should supersede the precise language of the Hyde Amendment. This "other option" results in an absurdity and is self-defeating, although commended by a too-literal reading of the Hyde Amendment's "procedures and limitations" clause.

Section 2412(e) pertains only to certain proceedings under the Internal Revenue Code and, although plainly a "limitation" contained within Section 2412, is not incorporated into the Hyde Amendment. Section 2412(f) (mercifully, the last provision of Section 2412) provides that:

> If the United States appeals an award of costs or fees and other expenses made against the United States under this section and the award is affirmed in whole or in part, interest shall be paid on the amount of the award as affirmed. Such interest shall be computed at the rate determined under section 1961(a) of this title, and shall run from the date of the award through the day before the date of the mandate of affirmance.

Is an amount awarded under the Hyde Amendment subject to Section 2412(f)? Simply stated, this right of interest on a judgment against the United States is not a "procedure or limitation" of any kind. The entitlement to interest under Section 2412(f) is merely a statutory "right," generally unavailable against the United States absent a statutory grant. *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986).

■ In summary, the Hyde Amendment has three signal and heartland provisions: (1) The court may award a "reasonable attorney's fee and other litigation expenses" (2) to a prevailing criminal defendant ensnared by a prosecution that was "vexatious, frivolous, or in bad faith," and (3) the Department of Justice (or other agency of the United States) must compensate the prevailing defendant from the current agency appropriation without any

"new appropriation" to compensate the agency for the expenditure. The Hyde Amendment purports to adopt in these circumstances the "procedures and limitations" of Section 2412. No specific subsection, paragraph, or clause of Section 2412 is designated for incorporation.[8] A review of Section 2412 compels the conclusion that not every "procedure and limitation" in Section 2412 applies. A reasoned review suggests incorporation of only those "procedures and limitations" that are consistent with the Hyde Amendment, serve to implement the Hyde Amendment, and provide a mechanism "pursuant to" which the Hyde Amendment's objectives are achieved. The Hyde Amendment's reference to Section 2412 is a convenient mechanism for implementation and not a disguised method of amendment or dilution of the manifest statutory purpose.

In other words, a detailed evaluation of the Hyde Amendment confirms precisely the summary offered in *United States v. Adkinson,* 247 F.3d 1289, 1291 n. 2 (11th Cir.2001):

> We recognize that recovery under the Hyde Amendment is allowed under only limited circumstances, and is subject to the restrictions and procedures articulated by the language of the law and its legislative history. *See Gilbert,* 198 F.3d at 1304. A criminal defendant must show, for example, that: (1) his trial had been in progress during fiscal year 1998 or a subsequent year; (2) his net worth was less than two million dollars; (3) he had been a "prevailing party" in his criminal case, even though

---

**8.** In other contexts Congress has succinctly avoided this difficulty by providing a specific statutory cross reference *See. e.g.,* 11 U.S.C. § 106(a)(3) (Bankruptcy Code fee shifting provision, which provides, "Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consis-

tent with the provisions and limitations of section 2412(d)(2)(A) of title 28."); 31 U.S.C. § 3730(g) (False Claims Act fee shifting provision, which provides. "In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.").

subject to possible retrial upon remand; (4) that his legal representation was not the result of court-appointment; and (5) his attorney's fees and costs are "reasonable."

The Hyde Amendment operates based primarily and preeminently on its own terms. The Hyde Amendment provides that "such awards," that is, awards of an attorney's "reasonable fee," "shall be granted pursuant to the procedures and limitations ... provided for an award under Section 2412 of Title 28." A careful review of Section 2412 reveals that only the thirty-day filing period for a detailed motion for attorney's fees contained in Section 2412(d)(1)(B) and the economic restrictions contained in Section 2412(d)(2)(B) engraft onto the Hyde Amendment without undue violence to the essential elements of the statute.

For these reasons and under the circumstances of the instant case, the Hyde Amendment requires an award to the Aisenbergs of "a reasonable attorney's fee and other litigation expenses," precisely in accord with the statutory grant. The Hyde Amendment is thereby not interpreted to impose on the Aisenbergs a statutory trap or trick. The Hyde Amendment does not award a "reasonable attorney's fee" and then reduce the fee by half or two-thirds by mere implication and reference to Section 2412. Neither does the Hyde Amendment require the Department of Justice to pay an award from current appropriations without a chance for a "new appropriation" and then vitiate that intended economic penalty by incorporating Section 2412 and precluding payments not funded "in advance" by Section 2412. Nor does the Hyde Amendment indulge the other interpretive twists suggested earlier. The Hyde Amendment grants a "reasonable attorney's fee" and "other litigation expenses" and the Aisenbergs are entitled to precisely that, no more and no less.

## II.

The second distinctive statutory interpretation assumes that the Hyde Amendment incorporates parts of Section 2412 or, at least, parts of Section 2412(b) and Section 2412(d), which relate to attorney's fees. Section 2412(b) and Section 2412(d) offer two markedly different provisions concerning attorney's fees in civil cases. This difference is expounded authoritatively in *Maritime Management, Inc. v. United States*, 242 F.3d 1326 (11th Cir.2001), in which the United States acted in bad faith in a contracting episode and in which the court evaluated the attorney's fee provisions of Section 2412.

The statutory framework of 28 U.S.C. § 2412 contains two parallel provisions for awarding attorneys' fees to plaintiffs that prevail in civil suits against the United States. The first of these, § 2412(b), waives sovereign immunity by making the United States liable for fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b). Because of this provision the equitable exceptions to the American Rule apply to the federal government in the same manner as they apply to private litigants. *Panola Land Buying Ass'n v. Clark*, 844 F.2d 1506, 1510 (11th Cir.1988). This makes an award of fees proper under common fund and common benefit theories, as well as in situations where the government has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" in its conduct of litigation. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *see also* 10 James Wm. Moore et al., Moore's Federal Practice § 54.172[1][b] (3d ed.1999) (describing equitable exceptions to American Rule as common fund, com-

mon benefit, and bad faith). The award of fees under § 2412(b) is discretionary.

. . . . .

Also, where § 2412(b) is discretionary, § 2412(d) is mandatory; the assessment of fees in favor of an eligible prevailing party and against the government is obligatory under subsection (d) unless "the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Another difference in keeping with the discretionary distinction between §§ 2412(b) and (d) is that under the former subsection, fees are awarded at a rate determined by the district court, whereas under the latter, awards are subject to a statutory cap. *See* 28 U.S.C. § 2412(d)(2)(A) (listing presumptive cap of $125 per hour); *Cazares v. Barber,* 959 F.2d 753, 755 (9th Cir.1992) (noting award under § 2412(b) is not subject to fee cap of § 2412(d)(2)(A)).

242 F.3d at 1331–32.

■ A review of *Maritime Management* and Section 2412 in their relation to the Aisenbergs' claim under the Hyde Amendment (assuming incorporation of Section 2412's attorney's fee provisions) reveals that the Aisenbergs' claim arises under circumstances in which the United States lodged a prosecution that was either "vexatious, frivolous, or in bad faith," any one of which is within the purview of the bad faith contemplated by Section 2412(b). Section 2412(d) simply is the improper section by which to determine an award of fees consequent upon an act of the United States that constitutes bad faith within the purview of Section 2412(b). An act of "bad faith" is qualitatively different from a "substantially unjustified" act that is compensated by an award under Section 2412(d). As stated in *Maritime Management:*

Much of this discussion is made academic by the conclusion infra that the Government was guilty of bad faith. Bad faith is generally considered to be a higher standard than substantial justification, in the context of the EAJA, *see, e.g., Perales v. Casillas,* 950 F.2d 1066, 1072 (5th Cir.1992) (noting failure of bad faith claim did not mandate conclusion that government's position was substantially justified); *Barry v. Bowen,* 825 F.2d 1324, 1334 (9th Cir.1987), *abrogated on other grounds,* 884 F.2d 442 (9th Cir.1989) (bad faith standard "higher than the substantial justification standard"); Gregory C. Sisk, "The Essentials of the Equal Access to Justice Act: Court Awards of Attorney's Fees for Unreasonable Government Conduct (Part Two)" 56 La. L.Rev. 1, 54 (1995) (noting that where the government acts in bad faith, this "undermines the 'substantial justification' for the government's position"), as well as in other areas. *Cf. United States v. Truesdale,* 211 F.3d 898, 908 (5th Cir.2000) (holding that in order to establish bad faith claim under Hyde Amendment, criminal defendant must show more than that government's position was not substantially justified). Here we simply conclude that the basis for the district court's award of fees was § 2412(b) rather than § 2412(d).

242 F.3d at 1332–33. *See also Newmark v. Principi,* 283 F.3d 172, 178 (3d Cir.2002) ("Because we find § 2412(b) and § 2412(d) to provide for different types of fee awards, and because the cap on fees is positioned in § 2412(d) and is to apply only to fees awarded under that subsection, we conclude that the District Court misconstrued the cap on fees awarded under § 2412(d) as applying to all fees awarded under § 2412."). *Mendenhall v. Nat'l Transp. Safety Bd.,* 92 F.3d 871, 876 (9th Cir.1996) ("Mendenhall requests attorneys'

fees at a reasonable market rate. Such a rate is appropriate where there is a showing of bad faith."); *Hyatt v. Shalala*, 6 F.3d 250, 257 (4th Cir.1993) ("Moreover, it was allowable for the district court to use the market rate for attorneys' fees, exceeding the § 2412(d)(2)(A) cap, when it found bad faith under § 2412(b)."); *Smith v. Bowen*, 867 F.2d 731, 736 (2d Cir.1989) ("Smith asserts that he is entitled to a 'market rate' ... rather than the $75–an–hour standard rate set by the EAJA, because the Government acted in bad faith .... While we have discretion to award market-rate fees under the EAJA upon a finding of bad faith ... there is no basis for granting a market-rate award in this case."); *Baker v. Bowen*, 839 F.2d 1075, 1080 (5th Cir.1988) ("The EAJA also provides a 'bad faith and common benefit/common fund' provision ... in section 2412(b)," which allows for an award at "market rates.").

In an attempt to defeat the potential application of Section 2412(b), the United States relies in part on a "circularity" argument employed in some of the pertinent precedent. *See United States v. Knott*, 256 F.3d 20, 27 (1st Cir.2001); *United States v. Ranger Elec. Communications, Inc.*, 210 F.3d 627, 633 (6th Cir.2000). For example, *Ranger* states, "Section 2412(b) directs the applicant to look for an independent statute which gives a remedy of attorneys' fees and expenses independent of the EAJA. As the Hyde Amendment incorporates the EAJA, it would be circular to go back to the Hyde Amendment to treat it as an independent statute giving the right to attorneys' fees...." 210 F.3d at 633. Inexplicably, this argument fails entirely to recognize that Section 2412(b) permits an attorney's fee award pursuant to either (1) a "statute" or (2) the "common law." 28 U.S.C. § 2412(b). Of course, the Supreme Court identifies in the common law the potential for reimbursement of an attorney's fee in circumstances involving governmental action taken in "bad faith, vexatiously, wantonly, or for oppressive reasons" in litigation. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). Perhaps the claimants' arguments (e.g., a reliance on the statutory rather than common law grant contained in Section 2412(b)) compelled the conclusions reached in *Ranger* and *Knott*. However, this case presents no similar limitation. The Aisenbergs explicitly and consistently invoke the "common law" avenue of reimbursement afforded by Section 2412(b). The plain language of Section 2412(b) permits reimbursement of an attorney's fee in accordance with the common law and without respect to a statutory grant, and the United States' iteration of the "circularity" argument accordingly fails.

An act of bad faith by the United States, which includes an act that is undertaken "in bad faith, vexatiously, wantonly, or for oppressive reasons" within the meaning of that phrase as utilized in *Alyeska Pipeline* triggers the power of the district court to award a reasonable fee under Section 2412(b) without regard to the $125 per hour cap prescribed in Section 2412(d). Stated differently, without regard to the extent of any incorporation by the Hyde Amendment of the "procedures and limitations" of Section 2412, Section 2412 itself imposes no $125 per hour cap on attorney's fees awarded in response to acts that are perpetrated "in bad faith, vexatiously, wantonly, or for oppressive reasons," as confirmed in *Alyeska Pipeline*. The facts of the Aisenberg prosecution offer no occasion for concern with provisions aimed at a "substantially unjustified" civil matter. The facts of the Aisenberg case present a criminal matter that was undertaken in the United States and that was "vexatious, frivolous, or in bad faith." Section 2412 offers no impediment to the recovery of a reasonable attorney's fee.

### III.

Admittedly, a third (and, I think, less compelling) interpretation of the Hyde Amendment is available. That interpretation results in the superimposition on the Hyde Amendment of the $125 per hour cap intended only for awards in civil cases under Section 2412(d). This interpretation assumes that Congress elected in the Hyde Amendment to award, with one hand, a "reasonable attorney's fee" and then, with the other hand, largely to retract that award in Section 2412. Proponents of this view likely will highlight the historical point that during the early legislative discussions of the proposed statute, Representative Henry Hyde alluded to "$125 an hour," which he described as a "modest amount." 143 Cong. Rec. H7786–04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). Representative Hyde's comment arguably provides some support for a $125 cap on the hourly rate for attorney's fees available under the Hyde Amendment.

Of course, reliance on meager legislative history to interpret the Hyde Amendment is not only unnecessary, as noted in *Gilbert*,[9] but also unenlightening. Representative Hyde's "$125 an hour" comment (if relevant at all) occurred during introduction of the initial House version of the proposed legislation, which the Conference Committee materially amended before enactment.[10]

---

9. "Given the plain meaning of the statutory language, we could bypass any consideration of legislative history." *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir.1999).

10. "So, in response to concern that the initial version of the Hyde Amendment swept too broadly, the scope of the provision was curtailed significantly." *Gilbert*, 198 F.3d at 1302. The original version of the Hyde Amendment introduced on September 24, 1997, provided:

> During fiscal year 1997 and in any fiscal year thereafter, the court, in any criminal case pending on or after the date of the enactment of this Act, shall award, and the United States shall pay, to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation costs, unless the court finds that the position of the United States was substantially justified or that other special circumstances make an award unjust. Such awards shall be granted pursuant to the procedures and limitations provided for an award under section 2421 of title 28. United States Code. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by appropriation. No new appropriations shall be made as a result of this provision.

The final version was enacted on November 26, 1997, a month later. The statutory revisions are illustrated by underscores (additions) and strike-throughs (deletions) as follows:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any criminal case (other than a case in which the defendant's represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act (Nov. 26, 1997), may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code. To determine whether or not to award fees and costs under this section, the court for good cause shown, may receive evidence ex parte and in camera (which shall include the submission of classified evidence or evidence that reveals or might reveal the identify of an informant or undercover agent or matters occurring before a grand jury) and evidence or testimony so received shall be kept under seal. Fees and other expenses awarded under this provision to a party shall be paid by the agency over which the party prevails from any funds made available to the agency by

The legislation introduced into the House at the time Representative Hyde referred to the "modest amount" of "$125 an hour" contemplated a mandatory award to a qualifying defendant "unless the court finds that the position of the United States was substantially justified or that other special circumstances made an award unjust." 143 Cong. Rec. H7786–04, H7791 (Sept. 24 1997) (statement of Rep. Hyde). Further, under Representative Hyde's initial conception of the legislation, the United States bore the burden of proof. As the congressman said, "The Government must prove substantial justification or you get attorney's fees." 143 Cong. Rec. H7786–04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde).

The substantially different version of the Hyde Amendment enacted following the Conference Committee neither contains the "substantial justification" standard nor assigns to the United States the burden of proof (as advocated by Representative Hyde). Instead, the Hyde Amendment permits (but does not require) an award of a "reasonable attorney's fee and other litigation expenses" only when the United States' position is "vexatious, frivolous, or in bad faith," and assigns the burden of proof to the defendant seeking the award. *Gilbert* aptly notes the "watered down" scope of the enacted Hyde Amendment, which places a "daunting obstacle" before a defendant seeking an award of attorney's fees and litigation expenses. 198 F.3d at 1301–02.

Compared to the class of cases contemplated by the proposed legislation initially discussed by Representative Hyde before revision by the Conference Committee, the enacted version of the Hyde Amendment dramatically collapses the class of cases in which a defendant recovers. *See United States v. Gardner*, 23 F.Supp.2d 1283, 1288 n. 4 (N.D.Okla.1998) ("[T]he original amendment proposed by Representative Hyde was much broader than the version eventually enacted.... "). The Hyde Amendment (as enacted) holds no promise for the defendant whose unexceptional acquittal raises only a routine residual doubt about the prosecution. On the contrary, the Hyde Amendment (as enacted) applies only to those egregious cases in which a defendant proves that the United States' position falls into the narrow class of "vexatious, frivolous, or bad faith" prosecutions.[11]

appropriation. No new appropriations shall be made as a result of this provision.

11. This conclusion implies no judgment about Representative Hyde's motive or meaning during the September 24, 1997, debate. Representative Hyde, a distinguished legislator and lawyer of long experience and well-documented accomplishment (who undoubtedly and demonstrably understands the complexity and nuance of the legislative process), properly and forcefully preserved for the public record his position respecting the proposed legislation. I conclude merely that under the circumstances the congressman's expressed position on the proposed legislation (and particularly the "$125 an hour" comment) bears minimally upon the meaning of the revised statute ultimately enacted into law.

Parsing legislative history and identifying isolated episodes in an effort to determine statutory meaning constitutes (under the best circumstances) a difficult and often dicey endeavor. *See, e.g., Thompson v. Thompson*, 484 U.S. 174, 191–92, 108 S.Ct. 513, 522, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring) ("Committee reports, floor speeches, and even collogues between Congressmen ... are frail substitutes for bicameral vote upon the text of a law and its presentment to the President.... It is at best dangerous to assume that all the necessary participants in the law-enactment process are acting upon the same unexpressed assumptions."). A statement by a bill's sponsor is entitled to limited influence; much less influence than, for example, a Committee Report. *See Thornburg v. Gingles*, 478 U.S. 30, 43 n. 7, 106 S.Ct. 2752, 2762 n. 7, 92 L.Ed.2d 25 (1986) ("We have repeatedly recognized that the authoritative source for legislative intent lies in the Committee Report on the bill."); *Weinberger v. Rossi*, 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) ("The contemporaneous remarks of a

Even weighing more heavily the early comments of Representative Hyde concerning the appropriate compensation for a "typical" case in which the United States cannot prove "substantial justification" for its litigation, the final embodiment of the Hyde Amendment, governing only cases in which the criminal defendant can prove that a prosecution was "vexatious, frivolous, or in bad faith," must be interpreted based upon its plain language, which awards a "reasonable attorney's fee." The legislative history, including the comments of Representative Hyde, offers no persuasive evidence that the Congress in amending Representative Hyde's initial proposal and enacting the amended proposal, chose to award, for example, civil litigants as specified under Section 2412(b), a "reasonable attorney's fee" for prevailing in a bad faith civil case but chose to award only a severely limited fee to prevailing criminal defendants whose lives and liberty are threatened by the United States in a prosecution that is "vexatious, frivolous, or in bad faith." Congress surely possesses the power to achieve this result, but the court should not interpret the Hyde Amendment to achieve this awkward result unless the language of the statute involved fairly compels that result, which it does not. *See United States v. Holland*, 34 F.Supp.2d 346, 357 (E.D.Va.1999) ("Had Congress intended to limit an applicant's rights to those granted by section 2412(d), it could have said so. There is no reason to believe the Hyde Amendment intended to confer lesser rights upon criminal defendants than the EAJA conferred upon civil litigants.").

■ Notwithstanding the force of this analysis, the fact remains that an alternative reading of the Hyde Amendment and Section 2412 arguably results in the incorporation into the Hyde Amendment of Section 2412(d)(2)(A)'s limitation of $125 per hour on the attorney's fee recoverable under the Hyde Amendment "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." No marked increase in the cost of living has occurred since 1998. However, other "special factors" are present in this case to "justify a higher fee."

First, events that occurred after the disappearance of Sabrina and that resulted in the eventual dismissal of the indictment against her parents have caused the United States to admit liability to the Aisenbergs under the Hyde Amendment. The United States' concession is entirely unprecedented in Hyde Amendment cases, although entirely justified (compelled, actually) by the history of this case. The United States, acting from the most informed vantage of any participant in this controversy, including the Court, evaluated the events that began with Sabrina's disappearance and elected not to defend the

sponsor of legislation are certainly not controlling in analyzing legislative history."); 2A Norman J. Singer, *Statutes and Statutory Construction ("Sutnerland Statutory Construction")* § 48:12 (6th ed. 2000) ("A lone legislator is not competent to testify about the intent of a statute, even if he or she authored it. There is not necessarily a correlation between the understanding and intent of a draftsman and the understanding and intent of the legislature."). No Committee Report was prepared regarding the Hyde Amendment and the Conference Report consists of a

single paragraph that neither defines nor restricts the meaning of "reasonable fee." H.R. Conf. Rep. No. 405, 105th Cong., 1st Sess. 1997, 1997 U.S.C.C.A.N. 2941, Nov. 13, 1997; *see also Gilbert*, 198 F.3d at 1299 ("The legislative history is far from extensive ...."); Lawrence Judson Welle, Note, *Power, Policy, and the Hyde Amendment: Ensuring Sound Judicial Interpretation of the Criminal Attorneys' Fees Law*, 41 Wm. & Mary L.Rev. 333, 363 n. 150 (1999) (analyzing the limited scope and value of the Hyde Amendment's legislative history).

Aisenbergs' claim under the Hyde Amendment, except as to the amount owed. From all that appears, the United States' decision was precisely correct and far-sighted (and ducked a tidal wave of tense discovery sought by the Aisenbergs at, for example, Doc. 432). This concession of liability by the United States stands before a contrasting backdrop of the Department of Justice's unwavering opposition to the enactment of the Hyde Amendment from its moment of introduction by Representative Hyde. Similarly, the Department of Justice uniformly and vigorously has contested Hyde Amendment claims (an observation by which no criticism or other judgment is intended, except to note that the Department of Justice is understandably inhospitable to Hyde Amendment claims and quite able and willing—and properly so—to contest them). After prolonged reflection, the Department of Justice determined to concede the Aisenbergs' claim. That concession, although a sound and commendable judgment (that results in no change in the ultimate outcome of this matter), suggests irresistibly both the existence of an extraordinary and singular set of events and circumstances, i.e., "special factors" within the language of Section 2412(d)(2)(A), and the unprecedented and unmistakable nature of the error that occurred.

Second, Sabrina's disappearance was reported by her parents on November 24, 1997. Law enforcement installed furtive listening devices throughout the Aisenbergs' home on December 13, 1997, and the surveillance persisted until March 2, 1998. The Aisenbergs were indicted on September 9, 1999, about twenty-one months after Sabrina's reported disappearance and about eighteen months after the conclusion of the electronic surveillance. The results of the interception effort were well known by the prosecutors for many months before the Aisenbergs' indictment. The United States knew well the contents of the recordings and the manifest deficiencies that interfered with the effective deployment of these recordings as evidence (assuming that the recordings contained anything of prosecutorial value to the United States). Of course, the State of Florida, which sought permission to intercept the Aisenbergs' conversation and which installed the interception devices and initially marshaled the results, failed to initiate criminal proceedings based on the contents of the recordings, and the United States knew that the State of Florida, which typically prosecutes homicides of every sort, had failed to find in these recordings enough (if any) evidence to support a criminal prosecution. Notwithstanding the ample time available to the United States to evaluate the evidence, coupled with the United States' knowledge of the State of Florida's inaction, the Aisenbergs were subjected to a prosecution that was "vexatious, frivolous, or in bad faith." This is not an example of a prosecution that faltered after the discovery of surprising and exculpatory evidence. This is not an example of a prosecution stymied by the death or disappearance of an important witness or an unexpected reversal in the credibility or testimony of a key witness. This is not an example of a prosecution that falters after a confession by, or the discovery of, another suspect. This is not an example of a prosecution frustrated by some change in the law that adversely and surprisingly affects the calculus of conviction. What sort of prosecution was this?

From the first glance by an informed observer, the indictment poses a conundrum that persists. The indictment purports to recite statements, exact quotations, from the defendants that (if true) powerfully implicate the defendants in the disappearance and possible death of their daughter Sabrina. This "evidence" was available for many months to both the

State of Florida and the United States. Yet, the State of Florida brought no criminal charge and the United States charged only violations of 18 U.S.C. §§ 1001 and 1002, charges essentially alleging only deception and obstruction of law enforcement. Although law enforcement claimed as early as December 12, 1997, that "this investigation is not a kidnapping investigation but a homicide or sale of a minor child" (Doc. 336 at 46), no charge of either homicide or the sale of a child (or any similar charge) was brought by either the State of Florida or the United States. I share the undeniable observation of the magistrate judge in his report and recommendation after the *Franks* hearing that "[I]f the Defendants' intercepted conversations proved they had done these things to their child, they would not be in the dock of a federal court charged with false statements violations."

More importantly, if law enforcement or the pertinent prosecutors ever believed that the recordings established the matters alleged in the indictment, especially those damning quotations attributed in the indictment to Steven and Marlene Aisenberg and allegedly arising from the surveillance recordings, would the Aisenbergs have been charged in federal court with obstruction rather than in state court with a homicide? Stated differently, if a prosecutor believes the evidence includes a tape recording of the defendants, in which one says to the other, for example, "The baby's dead and buried! It was found dead because you did it! The baby is dead no matter what you say—you just did it," does the prosecutor charge only under 28 U.S.C. §§ 1001 and 1002? Of course not. This conundrum is writ large on the face of the indictment.

As was apparent throughout the pendency of the Aisenberg prosecution, the United States adopts no firm position as to the events that resulted in the disappearance of Sabrina. Neither inquiry in court nor review of the voluminous papers reveals a commitment by the United States to either the theory that Sabrina was sold or that she was killed, whether accidentally, negligently, or intentionally. Manifestly, the United States neither knows the truth of, nor now can prove, any combination of those possibilities. The only rational conclusion available is that the United States does not know what happened to Sabrina but acquired a belief (perhaps based on the statistical evidence discussed by the magistrate judge in his report and recommendation after the *Franks* hearing: Doc. 336 at 16–18) that one or the other or both of the Aisenbergs know what happened to Sabrina and are criminally responsible. However, mere belief (if any) is not enough.

Did the United States honestly believe the recordings contained enough evidence to convict the Aisenbergs (of anything)? My review causes me to doubt that anyone believes the recordings implicate the Aisenbergs decisively. From the language of the indictment, from the unusual public flourish with which the indictment was announced and pursued, from the disparity between the horror of Sabrina's disappearance and the modest charges brought against the Aisenbergs, from the United States' strange resistance to airing the recordings (even with the defendants' consent) and to conducting an open audibility hearing, from the United States' unaccountable choice of Anthony Pellicano (now federally indicted on weapons charges) as an "expert" (a dubious claim, indeed) rather than the FBI's criminal laboratory (or some other reputable authority) for consultancy services, from the United States' immediate attempt to disqualify the Aisenbergs' chosen counsel and to force separate representation (which often is defensible on neutral principles but which is richly suspect in this instance),

and from an imposing list of other circumstances, the obvious conclusion is that the United States brought this indictment based not on a careful evaluation of the weight of the evidence but in an effort to "flip" one of these defendants (probably Marlene) and secure testimony against the other (probably Steven, if you assume someone believed what the indictment alleges). In other words, from all that appears, the Aisenberg prosecution was precisely calculated to oppress and threaten one defendant (probably Marlene) in order to procure testimony against the other (probably Steven) in a forthcoming prosecution—probably in state court for some act of homicide. In short, the Aisenberg prosecution was (at least) "vexatious" within the meaning of the Hyde Amendment. (Strictly adhering to the definitions elaborated in *Gilbert*, some might prefer either "frivolous" or "in bad faith." The distinction, if any, is a nice one.) [12]

"Vexatious" seems precisely right as a description of the Aisenberg prosecution because of the element of oppression, calculated in this instance to compel one Ai-

senberg to testify against the other, coupled with the lack of evidence to support the indictment, although "bad faith" (or even "frivolous") might serve as well. Surely, in the sense of governmental responsibility, the instigation and maintenance of a "vexatious" prosecution is an act of "bad faith," i.e., an act in derogation and willful disregard of the duties and responsibilities of the government to act with principled judgment and with fealty to the law and, consequently, to preserve the public's trust.

Since, at least, the time of *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), decisional precedent dealing with the "special factor" provision of Section 2412(d)(2)(A) has focused primarily on some attribute of the lawyers involved. For example, a lawyer's knowledge of foreign law or an arcane foreign language sometimes constitutes a "special factor." Presumably, this interpretation arises because the "such as" phrase in Section 2412(d)(2)(A) provides the "limited availability of qualified attorneys" as the statutory example of a "special factor" jus-

---

12. The Oxford English Dictionary defines "vex":
1. *trans.* To trouble, afflict, or harass (a person, etc.) by aggression, encroachment, or other interference with peace and quiet. 2. Of diseases, etc.; to afflict or distress physically; to affect with pain or suffering. Now poet. 3. To afflict with mental agitation or trouble; to make anxious or depressed; to distress deeply or seriously; to worry with anxiety or thought. 4. To affect with a feeling of dissatisfaction, annoyance, or irritation; to cause (one) to fret, grieve, or feel unhappy. 5. *intr.* To be distressed in mind; to feel unhappy or dissatisfied; to fret or grieve. Also cont. at. 6. *trans.* To disturb by causing physical movement, commotion, or alteration; to agitate, toss about, work, belabour or tear up, etc. 7. To subject (a matter) to prolonged or severe examination or discussion; to debate at excessive length.
The Oxford English Dictionary. Vol. XII. 167 (1970). Included in the definition of "vexa-

tious" in the Oxford English Dictionary is this definition and these illustrative historical examples:
c. spec. Of legal actions: Instituted without sufficient grounds for the purpose of causing trouble or annoyance to the defendant.
1677 YARRANTON Eng. Improv. 9 It is a Sin, that a Gentleman ... should be the occasion of ruining so many Families ... by putting them to such vexatious Suits for their Moneys lent. 1696–7 Act 8–9 William III, c. 11 Diverse evil disposed Persons are encouraged to bring frivolous and vexatious Actions. 1746 FRANCIS tr. Hor., Sat. I, vi. 6 Persius had wealth by foreign traffic gain'd, And a vexatious suit with King maintain'd. 1856 FROUDE Hist. Eng. (1858) II. vi 72 Their courts were unceasingly occupied with vexatious suits.
The Oxford English Dictionary, Vol. XII, 168 (1970).

tifying higher hourly compensation. But, "such as" is a phrase that introduces some item that is comparable in some otherwise unspecified manner to the items for which the "such as" example serves as an illustrative shorthand. If nothing else, the phrase "such as" reveals unmistakably that other examples exist. Accordingly, the phrase "such as" creates an interpretive issue: Which attribute of the "such as" example is the attribute that the stated example shares with the unstated examples of the intended group, i.e., the group of which the stated example is indicative? Probably, the boundary of the intended group of unstated "special factors" is too elusive to allow for a precise definition (hence the congressional selection of the generic and descriptive phrase "special factor"). One conclusion seems safe: Neither common sense nor the statute offers any reason that "special factor" must describe only the claimant's lawyer rather than the behavior of the government or the consequence to the claimant.

Whatever the precise definition of "special factor," an episode that results in a judicial determination that the government instigated and maintained a criminal prosecution that was "vexatious, frivolous, or in bad faith" is an episode that presents a "special factor" within the meaning of Section 2412(d)(2)(A). The existence, for example, of governmental "bad faith" is manifestly a "special factor" that lifts a particular episode out of the "substantially unjustified" category of cases in which

Section 2412(d) awards only a reduced compensation. *See, e.g., Moulton v. United States,* 195 B.R. 954, 959 (Bkrtcy. M.D.Fla.1996) ("[B]ased on the utterly inexcusable and egregious conduct of the IRS, there is a recognizable 'special factor' in this instance."). A review of the episodes that result in a reduced award of attorney's fees under Section 2412(d)(2)(A) reveals that those cases are not qualitatively comparable to the governmental action that results in a criminal prosecution that is "vexatious, frivolous, or in bad faith."[13] (A bad faith prosecution is not merely "substantially unjustified." A bad faith prosecution is not a mere error or misjudgment. As explained earlier in this order, a bad faith prosecution is qualitatively distinct from a "substantially unjustified" civil claim.) The elements necessary to qualify in the rare instance that invokes the remedies of the Hyde Amendment are not within the purview of those elements necessary to invoke the remedies of Section 2412(d)(2)(A). The maintenance of a prosecution that is "vexatious, frivolous, or in bad faith" is a "special factor" within the meaning of Section 2412(d)(2)(A) because nothing in that section contemplates and accounts for such an incident.

To summarize, the United States seeks to impose upon the Aisenbergs' claim under the Hyde Amendment the $125 per hour cap contained in Section 2412(d) of Title 28. That attempt is mistaken as a result of any one of the three statutory constructions explained in this order.

---

**13.** An array of EAJA cases present nothing comparable to a "bad faith" prosecution that threatens, for example, life imprisonment. *See, e.g., Maritime Mgmt., Inc. v. United States,* 242 F.3d 1326 (11th Cir.2001) (a government contract procurement dispute); *United States v. Jones,* 125 F.3d 1418 (11th Cir.1997) (a Voting Rights Act action), *Andrews v. United States,* 122 F.3d 1367 (11th Cir.1997) (a CERCLA action); *Jackson v. Chater,* 99 F.3d 1086 (11th Cir.1996) (social security disability benefits); *Jove Eng'g, Inc. v.* *IRS,* 92 F.3d 1539 (11th Cir.1996) (civil contempt); *Marine Coatings of Ala. v. United States,* 71 F.3d 1558 (11th Cir.1996) (maritime lien dispute); *United States v. Douglas,* 55 F.3d 584 (11th Cir.1995) (forfeiture); *Jean v. Nelson,* 863 F.2d 759 (11th Cir.1988) (challenging INS policies); *Chao v. First Class Coach Co.,* 219 F.Supp.2d 1243 (M.D.Fla. 2002) (failure to pay overtime wages); *Taylor Group, Inc. v. Johnson,* 915 F.Supp. 295 (M.D.Ala.1995) (government contract procurement dispute).

Each construction results in an award to the Aisenbergs of a "reasonable attorney's fee and other litigation expenses." It remains only to compute that award.

## A REASONABLE FEE

■ "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).[14] This so-called "lodestar" approach represents the "centerpiece of attorney's fee awards." *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989).

## I.

■ The first step in the lodestar analysis compels a determination of "hours reasonably expended on the litigation." Of course, hours that are excessive, redundant, unnecessary, or unproductive must be reduced or eliminated, as must hours spent on unsuccessful or otherwise non-compensable claims, "unless those claims were interrelated or connected with the compensable claims ...." 1 Robert L. Rossi, *Attorneys' Fees* § 10:4 (3d ed.2001) (summarizing pertinent cases); *see also* 2 Mary Francis Derfner & Arthur D. Wolfe, *Court Awarded Attorney Fees* § 16.02 (1998) (summarizing pertinent cases). In short, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980), cited with approval in *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933.[15]

14. Of course, " '[t]here is no precise rule or formula' for determining attorney's fees." *Evans v. Jeff*, 475 U.S. 717, 735, 106 S.Ct. 1531, 1542, 89 L.Ed.2d 747 (1986) (quoting *Hensley* ). One commentator observes:

> Court determination of a reasonable fee authorized by statute necessarily requires a judgmental assessment not capable of mathematic precision. The court must analyze the individual circumstances involved, the level of success achieved as reflected in monetary and nonmonetary results obtained, and the objectives of the applicable fee award statute or equitable principle to award a sufficient fee to create an economic incentive for lawyers to represent persons who have been victimized by statutory violations.

1 Alba Conte, *Attorney Fee Awards* § 1.06 (2d ed.1993). *Hensley* directs attention to whether the prevailing party "achieve[s] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award[ ]" and provides that "[w]here a [litigant] has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." 461 U.S. at 434–35, 103 S.Ct. 1933.

15. Among the issues rendered moot by the United States' concession with respect to application of the Hyde Amendment are (1) whether the United States retains financial liability for pre-indictment acts of agencies that participated in the investigation of Sabrina's disappearance and (2) whether the United States must reimburse the Aisenbergs for attorney's fees and other litigation expenses incurred before the indictment (or before some other defining moment in the case). In other words, when did Hyde Amendment liability attach (and by which state or federal agency's acts or omissions), and must the United States reimburse the Aisenbergs for their attorneys' work before that moment? At the Hyde Amendment hearing, the United States candidly recognized that pertinent authority attributes the pre-indictment misconduct of an investigating agency to the United States for purposes of applying the Hyde Amendment, so that (for example) the United States retains responsibility for the acts and omissions of the investigating agencies before the Aisenbergs' indictment. *See, e.g., United States v. Knott*, 106 F.Supp.2d 174, 179–80 (D.Mass.2000), *rev'd on other grounds*, 256 F.3d 20 (1st Cir.2001); *United States v. Gardner*, 23 F.Supp.2d 1283, 1294–95 (N.D.Okla. 1998). The United States stated at the hearing that the United States' concession with

The Aisenbergs seek reimbursement for 11,251.70 hours of attorney and investigator time billed between November, 1997, and October, 2002, by Cohen, Jayson & Foster, P.A. (the "Cohen firm") as follows: [16]

### 1997

| ATTORNEY | HOURS | HOURLY RATE | DOLLAR AMOUNT |
| --- | --- | --- | --- |
| Cohen, Barry A. | 99.50 | 400 | 39,800.00 |
| Cohen, Harry | 0.00 | 0 | 0.00 |
| Kalwary, Kevin [17] | 102.50 | 100 | 10,250.00 |
| Gold, Michael | 31.75 | 150 | 4,762.50 |
| Wright, Mark | 62.00 | 175 | 10,850.00 |
| Cullen, Patricia | 0.00 | 0 | 0.00 |
| Bunz, Rick | 0.00 | 0 | 0.00 |
| Romine, Stephen | 0.00 | 0 | 0.00 |
| Foster, Todd | 11.00 | 250 | 2,750.00 |
| Sheehan, Tracy | 66.10 | 200 | 13,220.00 |
| Darken, Kevin | 0.00 | 0 | 0.00 |
| YEARLY TOTAL | 372.85 | | 81,632.50 |

### 1998

| ATTORNEY | HOURS | HOURLY RATE | DOLLAR AMOUNT |
| --- | --- | --- | --- |
| Cohen, Barry A. | 391.75 | 400 | 156,700.00 |
| Cohen, Harry | 0.00 | 0 | 0.00 |
| Kalwary, Kevin | 406.30 | 100 | 40,630.00 |
| Gold, Michael | 104.00 | 150 | 15,600.00 |
| Wright, Mark | 0.00 | 0 | 0.00 |
| Cullen, Patricia | 2.00 | 200 | 400.00 |
| Bunz, Rick | 7.60 | 150 | 1,140.00 |
| Romine, Stephen | 0.00 | 0 | 0.00 |
| Foster, Todd | 49.25 | 250 | 12,312.50 |
| Sheehan, Tracy | 96.80 | 200 | 19,360.00 |
| Darken, Kevin | 0.00 | 0 | 0.00 |
| YEARLY TOTAL | 1,057.70 | | 246,142.50 |

### 1999

| ATTORNEY | HOURS | HOURLY RATE | DOLLAR AMOUNT |
| --- | --- | --- | --- |
| Cohen, Barry A. | 187.25 | 400 | 74,900.00 |
| Cohen, Harry | 0.00 | 0 | 0.00 |
| Kalwary, Kevin | 706.75 | 100 | 70,675.00 |
| Gold, Michael | 498.75 | 224.4361 | 111,937.50 |

respect to the Hyde Amendment's application means that the United States has "waived" this issue. Tr. of Hr'g. Oct. 23, 2002, (Doc. 475) at 31. Similarly, the United States advances no general objection to reimbursement of the Aisenbergs' attorney's fees and other litigation expenses incurred during the pre-indictment investigation of Sabrina's disappearance. The United States has "waived" this issue.

16. The charts reprinted in this Order were submitted by the Aisenbergs on October 30, 2002, and purport to include a "full listing of all hours of all attorneys through October 25, 2002." *See* Aisenbergs' "Third Set of Supplemental Hours ..." (Doc. 470) at 2 n. 1. Attached to the same submission are itemized billing records describing individually by day the hours expended and work performed by each attorney or investigator during the course of the litigation. On January 3, 2003, the Aisenbergs filed a Defendant's Response to Government's Objections to Defendants' Counsels' Submission of their Final Bill ...' (Doc. 483) that includes additional time for March 26, 2001, to December 31, 2001 (totaling approximately 391 hours billed by various Cohen firm personnel), which time is not included in the charts or billing records filed by

the Aisenbergs on October 30, 2002, notwithstanding the Aisenbergs' assertion in the October 30, 2002, filing about a "full listing of all hours." Confusion caused by inconsistencies or omissions in billing records is construed against the Aisenbergs. Accordingly, for purposes of this order, the Court evaluates the Aisenbergs' claim for 11,251.70 hours as presented in the reprinted charts. All other hours are excluded.

17. Kevin Kalwary is an investigator employed by the Cohen firm. The remaining listed persons are attorneys with the Cohen firm. The United States advances no general objection to inclusion of Kalwary's billable time in the class of fees reimbursable under the Hyde Amendment, although the United States objects to the inclusion of certain time billed by Kalwary respecting "media" matters. *See Missouri v. Jenkins*, 491 U.S. 274, 285, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) (observing that a "reasonable fee" must take into account work performed not only by an attorney but also by all others whose labor contributes to the work product and for which an attorney bills the client).

| Attorney | Hours | | Dollar Amount |
|---|---|---|---|
| Wright, Mark | 0.00 | 0 | 0.00 |
| Cullen, Patricia | 33.50 | 200 | 6,700.00 |
| Bunz, Rick | 310.50 | 173.913 | 54,000.00 |
| Romine, Stephen | 37.00 | 250 | 9,250.00 |
| Foster, Todd | 284.50 | 286.3796 | 81,475.00 |
| Sheehan, Tracy | 0.00 | 0 | 0.00 |
| Darken, Kevin | 0.00 | 0 | 0.00 |
| YEARLY TOTAL | 2,058.25 | | 408,937.50 |

**2000**

| Attorney | Hours | Hourly Rate | Dollar Amount |
|---|---|---|---|
| Cohen, Barry A. | 459.00 | 400 | 183,600.00 |
| Cohen, Harry | 1,356.50 | 150 | 203,475.00 |
| Kalwary, Kevin | 1,177.25 | 100 | 117,725.00 |
| Gold, Michael | 1,454.25 | 250 | 363,562.50 |
| Wright, Mark | 0.00 | 0 | 0.00 |
| Cullen, Patricia | 0.00 | 0 | 0.00 |
| Bunz, Rick | 0.00 | 0 | 0.00 |
| Romine, Stephen | 293.00 | 250 | 73,250.00 |
| Foster, Todd | 985.75 | 300 | 295,725.00 |
| Sheehan, Tracy | 0.00 | 0 | 0.00 |
| Darken, Kevin | 0.00 | 0 | 0.00 |
| YEARLY TOTAL | 5,725.75 | | 1,237,337.50 |

**2001**

| Attorney | Hours | Hourly Rate | Dollar Amount |
|---|---|---|---|
| Cohen, Barry A. | 77.75 | 400 | 31,100.00 |
| Cohen, Harry | 319.25 | 150 | 47,887.50 |
| Kalwary, Kevin | 207.50 | 100 | 20,750.00 |
| Gold, Michael | 119.50 | 250 | 29,875.00 |
| Wright, Mark | 0.00 | 0 | 0.00 |
| Cullen, Patricia | 0.00 | 0 | 0.00 |
| Bunz, Rick | 0.00 | 0 | 0.00 |
| Romine, Stephen | 5.00 | 250 | 1,250.00 |
| Foster, Todd | 142.25 | 300 | 42,675.00 |
| Sheehan, Tracy | 0.00 | 0 | 0.00 |
| Darken, Kevin | 0.00 | 0 | 0.00 |
| YEARLY TOTAL | 871.25 | | 173,537.50 |

**2002**

| Attorney | Hours | Hourly Rate | Dollar Amount |
|---|---|---|---|
| Cohen, Barry A. | 64.50 | 400 | 25,800.00 |

| Attorney | Hours | | Dollar Amount |
|---|---|---|---|
| Cohen, Harry | 82.00 | 150 | 12,300.00 |
| Kalwary, Kevin | 244.75 | 100 | 24,475.00 |
| Gold, Michael | 298.00 | 250 | 74,500.00 |
| Wright, Mark | 0.00 | 0 | 0.00 |
| Cullen, Patricia | 0.00 | 0 | 0.00 |
| Bunz, Rick | 0.00 | 0 | 0.00 |
| Romine, Stephen | 22.00 | 250 | 5,500.00 |
| Foster, Todd | 261.25 | 300 | 78,375.00 |
| Sheehan, Tracy | 0.00 | 0 | 0.00 |
| Darken, Kevin | 193.40 | 250 | 48,350.00 |
| YEARLY TOTAL | 1,165.90 | | 269,300.00 |
| CUMULATIVE TOTAL | 11,251.70 | | 2,416,887.50 |

The annual billings listed above are summarized in the following chart:

**1997–2002 CUMULATIVE TOTALS**

| Attorney | Hours | Hourly Rate | Dollar Amount |
|---|---|---|---|
| Cohen, Barry A. | 1,279.75 | 400 | 511,900.00 |
| Cohen, Harry | 1,757.75 | 150 | 263,662.50 |
| Kalwary, Kevin | 2,845.05 | 100 | 284,505.00 |
| Gold, Michael | 2,506.25 | 239.4963 | 600,237.50 |
| Wright, Mark | 62.00 | 175 | 10,850.00 |
| Cullen, Patricia | 35.50 | 200 | 7,100.00 |
| Bunz, Rick | 318.10 | 173.3417 | 55,140.00 |
| Romine, Stephen | 357.00 | 250 | 89,250.00 |
| Foster, Todd | 1,734.00 | 296.028 | 513,312.50 |
| Sheehan, Tracy | 162.90 | 200 | 32,580.00 |
| Darken, Kevin | 193.40 | 250 | 48,350.00 |
| TOTAL | 11,251.70 | | 2,416,887.50 |

The United States concedes that the number of attorney and investigator hours set forth in the Aisenbergs' initial fee application (totaling 8,906.05 hours) represents an accurate report of time expended from the inception of the Cohen firm's representation of the Aisenbergs to March 26, 2001, the date on which the Aisenbergs filed the initial fee application. (Doc. 367) [18] The United States also concedes the Aisenbergs' entitlement to recover a reasonable attorney's fee generated during litigation of the Hyde Amendment dispute.

18. The Aisenbergs' initial fee application accounted for the work of all the Aisenbergs' attorneys and investigators except Barry A. Cohen (a founder and principal of the Cohen

**1312**

See, e.g., United States v. Whitesell, 1999 WL 1073823, 203 F.3d 833 (9th Cir.1999) (table), (directing reimbursement of an attorney's fee incurred during the appeal of a Hyde Amendment claim); 1 Robert L. Rossi, Attorneys' Fees § 10:4 (3d ed. 2001) ("Under most federal fee-shifting statutes a prevailing party may be compensated for the attorneys' fees incurred in litigating his or her entitlement to an award of fees.").[19]

■ The aggregate hours (i.e., 11,-251.70) expended by the Cohen firm on the Aisenbergs' behalf are neither meager nor

excessive. The asserted hourly total equals approximately 2,250 hours per year during the five-year representation. In the prevailing legal market, reputable private law firms routinely require an attorney to bill 2,000 or more hours per year. Thus, the Cohen firm devoted resources slightly in excess of one attorney working full-time for the five-year span of this case, surely a reasonable (indeed, fairly efficient) allocation of manpower given the case's duration, complexity, and intensity.[20]

Viewed in detail (through the itemized daily time entries of the Cohen firm's at-

firm), whose hours were, according to the application, "donated." On July 3, 2002, the Aisenbergs filed a supplemental application (Doc. 424), which included Cohen's hours from the inception of the representation, notwithstanding the initial "donation" of Cohen's time. The United States objects to reimbursement of fees generated by Cohen before July 3, 2002. After careful consideration of this somewhat unusual circumstance. I conclude that neither the Hyde Amendment nor the particulars of this case preclude either supplementation of the fee application or reimbursement of a reasonable fee for Cohen's work from beginning to end. See, e.g., United States v. True, 250 F.3d 410, 420–21 (6th Cir.2001) (permitting supplementation of a Hyde Amendment fee application and adopting the reasoning of Singleton v. Apfel, 231 F.3d 853, 858 (11th Cir.2000) ("[A]bsent prejudice to the government or noncompliance with court orders for timely supplementation of the pleading requirements, courts may permit supplementation of timely EAJA fee applications.")).

19. Although recognizing the Aisenbergs' entitlement to some reasonable fee for litigation of the Hyde Amendment issue, the United States advances several objections to the attorney's fee incurred by the Aisenbergs after the United States conceded application of the Hyde Amendment on July 2, 2001. See "Government's Objections to Defense Counsels' Submission of their Final Bill in . . . ." (Doc. 482).

20. Several aspects of this case justify the Cohen firm's commitment of enormous and highly unusual resources. For example, and

perhaps most prominently, analysis of the audio recordings entailed expenditure of at least 2,000 hours by the Cohen firm's attorneys and audio expert. At first blush, the extraordinary efforts directed toward merely listening to recordings perhaps raise suspicion. However, both the poor quality of the relatively numerous recordings and the recordings' position as the central and apparently motivating evidentiary force behind the prosecution justifies the intensity of the Cohen firm's audio analysis. Residual doubt about the Cohen firm's time directed to that analysis is erased (perhaps ironically) by a consideration of the efforts of Anthony Pellicano, the United States' audio "expert." At the Franks hearing. Pellicano recounted his exertions to analyze the recordings. Pellicano testified that he listened to "each version" of each recording "at least 100 times." Tr. of Hr'g, Dec. 18, 2000, (Doc. 332) at 184. Within particular recordings. Pellicano listened to "selected phrases . . . several hundred times." Tr. of Hr'g, Doc. 18, 2000, (Doc. 332) at 185. Indeed, as the magistrate judge noted in the report and recommendation, in an attempt to understand the contents of but one disputed excerpt Pellicano purports to have listened to a single portion of a single recording at least five hundred times. Tr. of Hr'g, Dec. 18, 2000, (Doc. 332) at 141, 184. This exertion, which only for purposes of this footnote ! assume Pellicano describes accurately, establishes the extraordinary commitment of time expended by the United States with respect to the recordings. Of course, simple fairness dictates that the defense suffer no penalty for similar undertakings.

My own experience in this case and my understanding of the magistrate judge's time

torneys and investigator) the recorded hours conform approximately to a seasoned observer's expectation concerning the efforts required by accomplished counsel to defend multiple clients in a complex, highly publicized criminal investigation and prosecution that is vigorously contested at every turn.[21] The billing records track the ebb and flow of the litigation. Shortly before and during events of obvious importance (e.g., the grand jury appearances, the release of the indictment, the Aisenbergs' arrest, the *Franks* hearing, the "audibility" dispute, the Hyde Amendment hearing, filing deadlines, and the like), the Cohen firm's attorneys and investigator worked intently (indeed, apparently to the exclusion of any other matter on several occasions) in a coordinated exertion equal to the moment. Not unexpectedly, these episodes result in an ample but reasonable accumulation of billable hours. During less active moments in the life of the case, the Cohen firm devoted reduced (but apparently appropriate) resources to the Aisenbergs' defense, resulting in proportionately reduced hours. My observation of defense counsel, the quality and quantity of papers filed by the defense, and the complexities of this case support the conclusion that the Cohen firm's billing records (with the exceptions noted below) adequately document the "number of hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933.[22] Accordingly. I conclude

commitment confirm the challenge presented by the recordings. My repeated surveys of the recordings (and the revisions of the accompanying transcripts) required an expenditure equal to several weeks of essentially full-time work. The magistrate judge's work concerning *Franks* issues, which focused on the contents of the recordings, required an even more unusual commitment of time equal to three to four months of work.

21. Of course, the United States initially sought to defeat the Aisenbergs' decision to proceed with common counsel (although undoubtedly not because of Hyde Amendment considerations). Interestingly, with the exception of the affidavit of Rochelle A. Reback, submitted by the Aisenbergs in support of the fee request, the record is silent with respect to the magnitude of the prospective efficiencies effected by the Cohen firm's representation of both Steven and Marlene Aisenberg. Conceivably, the fees of separate counsel could have nearly doubled the present cost to the United States.

22. The United States objects to the adequacy of the itemized descriptions of time expended by the Cohen firm after the United States conceded the application of the Hyde Amendment (i.e., July 2, 2001). Upon review, no material discrepancy appears between the pre-concession itemized descriptions (to which the United States advances no objection) and the post-concession descriptions. On the whole, the descriptions supplied by the Cohen firm's attorneys and investigator are minimally adequate. The United States also asserts that the number of hours expended by the Cohen firm after July, 2, 2001, evidences "churning" (i.e., inflated billing in recognition of the prospective fee award) and excessive staffing. No evidence of "churning" or overstaffing appears. The Cohen firm litigated aggressively both before and after the United States conceded the Hyde Amendment. The Conen firm's impeccable presentation at the Hyde Amendment hearing vindicates the hours expended by several participants in preparation for that occasion. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988) ("There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer."). Indeed, both sides offered vigorous and impressive arguments at the Hyde Amendment hearing. Each side, led by seasoned counsel (Ernest F. Peluso [who represented the United States only in Hyde Amendment matters and not in the investigation, indictment, or prosecution] for the United States and Todd Foster and Barry A. Cohen for the Aisenbergs) and supported by an array of skilled and active professionals, demonstrated an elevated level of skill and professionalism.

that, with the exceptions discussed below, the Aisenbergs are entitled to a reasonable attorney's fee based on the Application (Doc. 367), as supplemented, and supporting exhibits.

Although generally acceptable, certain itemized time entries claim unexplained hours or insufficiently describe the hours claimed. Accordingly, the following hours shall be reduced or excluded:

Barry A. Cohen: The single itemized time entry for January 28, 1998, to February 1, 1998, for 32 hours, is described as "Oprah Winfrey Show." The description fails to explain the rather large number of hours expended for the apparent appearance on a television program. The single itemized time entry for September 13, 1998, to September 27, 1998, for 150 hours, is described as "meeting w/Aisenbergs on case," which description is insufficient for the number of hours claimed. The single itemized time entry for September 27, 1998, to September 29, 1998, for 30 hours, is described as "meeting w/Aisenbergs on case," which description is insufficient for the number of hours claimed. These claimed hours (totaling 212) will be cut by 50%. Accordingly, Cohen's total hours are reduced by 106.

Michael A. Gold: The itemized time entries for November 26, 1998, to December 23, 1998, are virtually identical (both in hours claimed and description of task) to itemized time entries for November 26, 1997, to December 23, 1997. I presume this duplication results from an irregularity in the Cohen firm's accounting system. The hours billed for November 26, 1998, to December 23, 1998 are excluded. Accordingly, Gold's total hours are reduced by 38.75.

Kevin Kalwary: The itemized time entries for February 12, 2001, to February 15, 2001, each appears once with a description and once without any description. I presume this duplication results from an irregularity in the Cohen firm's accounting system. The hours billed for February 12, 2001, to February 15, 2001, are excluded. Accordingly, Kalwary's hours are reduced by 10.5.

Stephen Romine: The itemized single time entry for January 1, 2001, to March 23, 2001, appears without any description. I presume this omission results from an irregularity in the Cohen firm's accounting system. The hours billed for January 1, 2001, to March 23, 2001, without a description are excluded. Accordingly, Romine's hours are reduced by 5.0.

The United States objects to time spent on "media" matters by the Aisenbergs' attorneys and investigator.[23] Justice Kennedy's observations announced in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034, 111 S.Ct. 2720, 2728–29, 115 L.Ed.2d 888 (1991), a case reviewing a state bar's disciplinary action against a criminal defense attorney stemming from the attorney's extrajudicial statements at a press conference, are instructive:

An attorney's duties do not begin inside the courtroom door. He or she cannot ignore the practical implications of a legal proceeding for the client. Just as an attorney may recommend a plea bargain or civil settlement to avoid the adverse consequences of a possible loss after trial, so too an attorney may take reasonable steps to defend a client's reputation and reduce the adverse consequences of indictment, especially in the

**23.** In its initial objection concerning media time, the United States also objected to time spent on "entertainment" matters. *See* "Government's Response to Defendants' Application ..." at 12. (Doc. 378) The United States neither defines the "entertainment" matters to which it objects nor, apparently, persists with this objection. In any event, none of the Cohen firm's work concerned "entertainment."

face of a prosecution deemed unjust or commenced with improper motives. A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.

 Of course, an attorney's time may be compensable to the extent that the effort is "necessary to the attainment of adequate relief for [the] client," even when that work is neither "judicial" courtroom time nor otherwise "traditional" legal work. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 558, 106 S.Ct. 3088, 3094, 92 L.Ed.2d 439 (1986). Accordingly, particularly in cases that generate unusual publicity, press appearances and other efforts directed to public relations (i.e., "media time") that contribute directly and substantially to the litigation may be reimbursed. *See, e.g., Gilbrook v. City of Westminster,* 177 F.3d 839, 877 (9th Cir.1999); *Davis v. City and County of San Francisco,* 976 F.2d 1536, 1545 (9th Cir.1992), *vacated in part on other grounds,* 984 F.2d 345 (9th Cir. 1993); *Bullfrog Films, Inc. v. Catto,* 815 F.Supp. 338, 343–44 (C.D.Cal.1993); *but see United States v. Knott,* 106 F.Supp.2d 174, 181 (D.Mass.2000) (disallowing without explanation reimbursement for "public relations services" in a Hyde Amendment case), *rev'd on other grounds,* 256 F.3d 20 (1st Cir.2001).

 The Aisenbergs maintain, with considerable force, that the "media time" expended by the Cohen firm (specifically by attorneys Cohen and Foster and investigator Kalwary) was not only central to the defense's legal strategy but also necessitated by the publicity (entirely derogatory) that attached to the Aisenbergs as a result of the actions and pronouncements of governmental agencies associated with the investigation and prosecution. With respect

to legal strategy, the defense sought to locate the missing child in order to vindicate the Aisenbergs. As Foster candidly noted at the Hyde Amendment hearing, "If we could find the baby, this case goes away." With respect to countering the negative media portrayal of the Aisenbergs, even a cursory familiarity with the public aspects of this case explains the rationale behind Cohen firm's "attempt to demonstrate in the court of public opinion that the client does not deserve to be tried." *Gentile,* 501 U.S. at 1043, 111 S.Ct. 2720. The record comfortably supports both justifications for the Cohen firm's expenditure of reasonable "media time."

As with all the defense's efforts in this case, the Cohen firm undertook the media work with gusto, orchestrating a campaign of national scope using visual, audio, print, and electronic media outlets. The reasonableness of this effort depends on the point in the life of the case at which the Cohen firm expended "media time." In this respect, the case may usefully be viewed in three segments: first, the "pre-indictment stage" dating from Sabrina's disappearance until the return of the indictment (i.e., November 24, 1997, to September 9, 1999); second, the "prosecution stage" dating from the return of the indictment to the indictment's dismissal (i.e., September 9, 1999, to February 22, 2001); and third, the "Hyde Amendment stage" dating from dismissal of the indictment to the conclusion of the Hyde Amendment hearing (i.e., February 22, 2001, to October 25, 2002).

During the pre-indictment stage, the media campaign centered on protecting and rehabilitating the Aisenbergs' reputation in the face of relentless and injurious press coverage. At the Hyde Amendment hearing, the defense skillfully evoked the tone and substance of the media "feeding frenzy" that surrounded Sabrina's disappearance and the subsequent investigation. Under those circumstances, defense coun-

sel retains the option, consistent with the rules governing professional conduct, not only to procure the assistance of the public in locating the child but to present a public response, to nurture the clients' diminished public image, and thereby to reduce public pressure on the prosecution to indict.

During the prosecution stage, the urgency of finding Sabrina for strategic reasons grew. Although the pending charges technically concerned the Aisenbergs' conduct during the investigation, the heart of the case remained the missing child. Concurrently, the protection and rehabilitation of the Aisenbergs' reputation remained imperative, particularly in the face of the indictment's inflammatory content. Perhaps not surprisingly, the announcement of federal charges against the Aisenbergs received national media attention that featured the repetitive broadcast and other republication of the putative quotations attributed to the Aisenbergs in the ill-fated indictment.

During the Hyde Amendment stage, the justification for the Cohen firm's media time is less persuasive. Viewed from the narrow legal (rather than the human) perspective, the dismissal of the charges against Steven and Marlene Aisenberg alleviated the criminal defense need to locate Sabrina.[24] The dismissal of the charges also changed the tone and direction of the media coverage. During the Hyde Amendment stage, media attention focused less on Steven and Marlene Aisenberg and more on the investigation and prosecution conducted by the United States and the supporting agencies. The Cohen firm incurred proportionately less need to publicly protect and rehabilitate the Aisenbergs' reputations. Although dismissal of the charges reduced the importance of expending "media time," the "Defendants' Response to Government's Objections ..." (Doc. 483) points to the value added directly to the litigation by "media time" during the Hyde Amendment stage, including, for example, Kalwary's work on the public records lawsuit seeking documents generated by special prosecutor Norman Wolfinger (who was appointed by Governor Bush to review the investigation of the Aisenbergs), which work led to information presented by the Aisenbergs at the Hyde Amendment hearing.

In sum, the Cohen firm's expenditure of "media time" during the pre-indictment and prosecution stages finds considerable justification and will be reimbursed. However, the Cohen firm's expenditure of "media time" during the Hyde Amendment stage will be cut by 75% in order to account for the reduced concerns about the legal strategy of finding Sabrina Aisenberg and protecting Steven and Marlene Aisenbergs' reputations while also providing credit to the Aisenbergs for the Cohen firm's legitimate activities implicating media concerns.[25] Accordingly, hours expended by Cohen during the Hyde Amendment stage are reduced by 40; hours expended by Foster during the Hyde Amendment stage are reduced by 25.5; and hours expended by Kalwary dur-

---

**24.** Of course, the dismissal was "without prejudice," and the United States maintains that the investigation of Sabrino's disappearance continues. Steven and Marlene Aisenberg remain within the foreseeable scope of any further investigation.

**25.** Segregating "media time" is a somewhat imprecise exercise, particularly given the diverse activities undertaken by Cohen firm personnel on any given day. I have carefully reviewed the itemized daily time entries in an attempt to extract the pertinent "media time" subject to the reduction. Entries describing activity exclusively directed to media matters are counted fully; entries describing activities implicating both media and non-media matters are counted at 50%. This media time hourly total is then subjected to a 75% reduction.

ing the Hyde Amendment stage are reduced by 84.

The reduction in hours discussed above results in the following adjusted cumulative hours reasonably expended by Cohen firm personnel for purposes of calculating the applicable lodestar:

1997–2002 ADJUSTED CUMULATIVE TOTAL HOURS

| ATTORNEY | CLAIMED HOURS | REDUCTION | ADJUSTED TOTAL |
|---|---|---|---|
| Cohen, Barry A. | 1,279.75 | 146.00 | 1,133.75 |
| Cohen, Harry | 1,757.75 | 0 | 1,757.75 |
| Kalwary, Kevin | 2,845.05 | 94.50 | 2,750.55 |
| Gold, Michael | 2,506.25 | 38.75 | 2,467.50 |
| Wright, Mark | 62.00 | 0 | 62.00 |
| Cullen, Patricia | 35.50 | 0 | 35.50 |
| Bunz, Rick | 318.10 | 0 | 318.10 |
| Romine, Stephen | 357.00 | 5.00 | 352.00 |
| Foster, Todd | 1,734.00 | 25.50 | 1,708.50 |
| Sheehan, Tracy | 162.90 | 0 | 162.90 |
| Darken, Kevin | 193.40 | 0 | 193.40 |
| TOTAL | 11,251.70 | 309.75 [26] | 10,941.95 |

 A "reasonable hourly rate" under the lodestar method means "the prevailing market rate in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891

(1984). Although this determination is "inherently difficult" because of, among other things, the vagaries of determining market prices, the essential inquiry is whether "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. 1541; *see also Davis v. Locke,* 936 F.2d 1208, 1215 (11th Cir.1991); *Norman v. Hous. Auth. of City of Montgomery,* 836 F.2d 1292, 1300 (11th Cir.1988) ("To say that the prevailing market rate is the figure at either extreme or at a precise point between the extremes is a divination that cannot be made with the same certainty as ascertaining the value of a futures contract for pork bellies or wheat on a given day."). "[T]he reasonable hourly rate should be determined based on the reasonable worth of services rendered, so long as the rate results in no windfall for the prevailing party." *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.,* 253 F.3d 1332, 1337 (11th Cir.2001).

The Aisenbergs seek reimbursement for attorney and investigator time billed at hourly rates ranging from $100 to $400.[27]

**26.** Of course, as noted above, approximately 391 hours billed by the Cohen firm between March 26, 2001, and December 31, 2001, are also excluded.

**27.** The February 9, 1998, engagement agreement between the Aisenbergs and the Cohen firm, which agreement was drafted but apparently never signed, set the Cohen firm's hourly rates between $150 (for junior attorneys) and $350 (for Barry Cohen). Interestingly, the engagement agreement set Kevin Kalwary's hourly rate at $200, twice that sought by the Aisenbergs. (Of course, the February 9, 1998, engagement agreement, to the extent that the unsigned document ever possessed legal force, is superceded by an October 5, 1999, engagement agreement, which establishes a set fee of $2 million for the Cohen firm's representation of Steven and Marlene Aisenberg.) Accordingly, the February 9,

1998, engagement agreement provides little assistance in evaluating the reasonableness of the asserted hourly rates. The document includes hourly rates that are both below and above those sought by the Aisenbergs (e.g., Cohen's fee is set at $50 less than the current request; Kalwary's fee is set at $100 more than current request). In any event, the February 9, 1998, engagement agreement is not dispositive. *See Blanchard v. Bergeron,* 489 U.S. at 93, 109 S.Ct. 939 ("[A reasonable attorney's fee] ... contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less. Should a fee agreement provide less than a reasonable fee calculated in this manner, the [non-prevailing party] should nevertheless be required to pay the higher amount.").

The Aisenbergs submit uncontradicted affidavits from Daniel L. Castillo, John M. Fitzgibbons, Edward T.M. Garland, Albert J. Krieger, Rochelle A. Reback, and Gary R. Trombley, each a criminal defense attorney familiar with both this case and the prevailing rates charged by criminal defense attorneys of varying experience and reputation in the Middle District of Florida. The affidavits unambiguously support the Cohen firm's rate structure for attorneys. Although not uniform with respect to a reasonable hourly rate for the Cohen firm's investigator, the affidavits adequately support the hourly rate of $100 for Kalwary.[28]

A recent national survey of the nation's 250 largest law firms reveals comparative rate information about two prominent Tampa-based law firms: Carlton Fields, which reports hourly rates between $130 and $400; and Fowler White Boggs Banker, which reports hourly rates between $125 and $350. *See A Firm–by–Firm Sampling of Billing Rates Nationwide,* National Law Review, Dec. 9, 2002, at B12.[29] Because the United States maintains that the pertinent hourly rate may not exceed $125 an hour, the United States offers neither affidavits respecting a reasonable hourly rate nor particular objections to the rates asserted by the Cohen firm.

 *Norman* identifies as centrally important to determining a reasonable rate the "legal skill" possessed and deployed by counsel, and among the pertinent considerations lists experience, judgment, tactical expertise, organization and efficiency, knowledge of trial practice and substantive law, and persuasiveness. 835 F.2d at 1300–01. In this instance, the Cohen firm

mounted an exemplary defense, both meticulous and tenacious. In short, the Cohen firm ranks at or near the top among reputable private criminal defense counsel practicing within the Middle District of Florida (or elsewhere). Undoubtedly, the Cohen firm commands premium retail rates in the pertinent market. In this case, the Cohen firm afforded the Aisenbergs a concomitant premium service, executed throughout with expertise and unrelenting zeal. Accordingly, I conclude that the Cohen firm's rate structure, stated in the Application (Doc. 367), as supplemented, establishes a reasonable basis to compute the lodestar fee.

Applying the adjusted hours to the pertinent reasonable hourly rates results in the following:

1997–2002 CUMULATIVE ADJUSTED TOTALS

| ATTORNEY | ADJUSTED HOURS | HOURLY RATE | DOLLAR AMOUNT |
|---|---|---|---|
| Cohen, Barry A. | 1,133.75 | 400 | 453,500.00 |
| Cohen, Harry | 1,757.75 | 150 | 263,662.50 |
| Kalwary, Kevin | 2,750.55 | 100 | 275,055.00 |
| Gold, Michael | 2,467.50 | 239.4963 | 590,957.12 |
| Wright, Mark | 62.00 | 175 | 10,850.00 |
| Cullen, Patricia | 35.50 | 200 | 35.50 |
| Bunz, Rick | 318.10 | 173.3417 | 55,140.00 |
| Romine, Stephen | 352.00 | 250 | 88,000.00 |
| Foster, Todd | 1,708.50 | 296.028 | 505,763.83 |
| Sheehan, Tracy | 162.90 | 200 | 32,580.00 |
| Darken, Kevin | 193.40 | 250 | 48,350.00 |
| TOTAL | 10,941.95 | | 2,330,958.45 |

Accordingly, the "lodestar" methodology results in a total attorney's fee of $2,330,958.45.

---

28. Fitzgibbons advocates a reasonable hourly fee of $80 for Kalwary's services. Trombley advocates an hourly rate of $85. The four other affiants advocate an hourly rate of $100.

29. The Cohen firm's rate structure results in an average hourly rate of $221.26. Based on the total fee requested divided by the total hours billed, the average value for each hour is $271.94.

## II.

■ Upon determining an appropriate lodestar, "[t]he district court may then adjust the resulting 'lodestar' depending upon a variety of factors, the most important of which is the degree of the plaintiff's success in the lawsuit." *Andrews v. United States,* 122 F.3d 1367, 1375 (11th Cir.1997) (citing *Hensley.* which emphasizes "results obtained"). Indeed, *Hensley* allows for consideration of the additional factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).[30] *Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. 1933. However, *Hensley* cautions that "many of [the *Johnson*] factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." 461 U.S. at 434 n. 9, 103 S.Ct. 1933 (*citing Copeland v. Marshall,* 641 F.2d 880, 890 (D.C.Cir.1980)). In subsequent cases, the Supreme Court circumscribes the application of some *Johnson* factors and reiterates the need for considered caution before imposing fee multipliers generally. *See Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 1549–1550, 79 L.Ed.2d 891 (1984) (eliminating except in "rare" and "exceptional" cases modifications based on "complexity [and] novelty of the issues," "special skill and experience of counsel," "quality of representation," "results obtained," and "contingent nature of the litigation"); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. at 565–66, 106 S.Ct. 3088 (eliminating consideration of the "superior quality" of counsel's performance when the hourly rate is otherwise reasonable);

*Blanchard v. Bergeron,* 489 U.S. at 92–94, 109 S.Ct. 939 (limiting the importance of "contingent-fee" agreements when setting a reasonable attorney's fee). In short, *Hensley* and its progeny express a pronounced skepticism toward the use of a multiplier (based on the *Johnson* factors) in a case in which the allowed hours and pertinent hourly rates are reasonable. *See Delaware Valley Citizens' Council,* 478 U.S. at 565, 106 S.Ct. 3088 ("A strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee is wholly consistent with the rationale behind the usual fee-shifting statute ...."); 2 Mary Francis Derfner & Arthur D. Wolfe, *Court Awarded Attorney Fees* § 16.04 (1998) ("Thus, the Court's precedents with respect to the lodestar fee calculation show a marked preference for a single step inquiry. That is, the lodestar figure arrived at by multiplying hours reasonably expended on the litigation by a reasonable hourly rate should generally be presumed to be the proper fee.").

The Aisenbergs seek an upward adjustment of the requested lodestar fee through application of a multiplier based on the "results obtained" and the pertinent *Johnson* factors. The Aisenbergs' papers advocate an upward adjustment without specifying a multiplier. However, at the October, 2002, hearing, the Aisenbergs sought a 3.0 multiplier, which, if applied to the pertinent lodestar total, would result in attorney's fees of $6,992,875.35.

■ Although this case is both "rare" and "exceptional," I conclude that the cir-

---

**30.** *Johnson* enumerates the following familiar guidelines: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the preclusion of other employment by the attorney due to acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases. 488 F.2d at 717–19.

cumstances compel no multiplier based on either the "results obtained" or the other *Johnson* factors. In fact, several of the *Johnson* factors, including those circumscribed by Supreme Court precedent, retain forceful pertinence to this case. However, both the Cohen firm's premium retail hourly rates and the number of hours allowed satisfy the considerations for which the *Johnson* factors account and limit the persuasiveness of the argument favoring a multiplier.

 Irrespective of an enhancement based on the *Johnson* factors, a reasonable

lodestar fee may be enhanced based on a delay in the receipt of payment. *See Missouri v. Jenkins*, 491 U.S. 274, 282, 109 S.Ct. 2463, 2468, 105 L.Ed.2d 229 (1989) ("In setting fees for prevailing counsel, the courts have regularly recognized the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value."); *see also Norman*, 836 F.2d at 1302 ("In this circuit, where there is a delay the court should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than at historic rates.").[31]

31. Courts implement assorted methods for calculating delay enhancements in a variety of litigation contexts. *See. e.g., Davis v. Locke*, 936 F.2d 1208, 1215 (11th Cir.1991) (affirming the district court's application of a multiplier of 1.6 based on risk, difficulty in obtaining legal counsel, and delay in a civil rights action); *Formby v. Farmers and Merchants Bank*, 904 F.2d 627, 633–34 (11th Cir.1990) (affirming the district court's application of a delay multiplier of 1.33 in an employment action); *Tufaro v. Willie*, 756 F.Supp. 556, 563 (S.D.Fla.1991) (applying a delay multiplier of 1.1 to a $75,000 lodestar in a civil rights action); *Morgan v. Gittens*, 915 F.Supp. 457, 473 (D.Mass.1996) (implementing a 15% upward adjustment of an attorney's fee award in a school desegregation action to account for a two and one half year delay in payment); *Cerva v. EBR Enterprises*, 740 F.Supp. 1099, 1106–09 (E.D.Pa.1990) (using the prime rate published in the first edition of the Wall Street Journal for each of the five years in which the action was pending to compute an enhancement of $3,664 to a $20,875 fee award, resulting in a delay multiplier of approximately 1.18); *Proffitt v. Mun. Auth. of Borough of Morrisville*, 716 F.Supp. 845, 854 (E.D.Pa.1989) (applying a delay enhancement of $12,900 to a fee award of 172,984—a computation based on half of the average prime rate for each calendar year of the litigation— in a Clean Water Act suit); *Amico v. New Castle County*, 654 F.Supp. 982, 1008 (D.Del. 1987) (applying a delay multiplier of 1.135 in a civil rights action); *Shakman v. Democratic Org. of Cook County*, 677 F.Supp. 933, 942 (N.D.Ill.1987) (applying a delay multiplier of 1.059 in a voting rights action); *Williams v.*

*Marriott Corp.*, 669 F.Supp. 2, 6 (D.D.C.1987) (implementing a 15% upward adjustment for delay in payment of attorney's fees in an employment action); *Weiss v. York Hospital*, 628 F.Supp. 1392,1414–15 (M.D.Pa.1986) (enhancing a lodestar of $1,372,892 by $530,-000—a computation based on the average quarterly prime rates during the six year pendency of the litigation—to account for a delay of payment in a class action antitrust suit, equivalent to a delay multiplier of approximately 1.4); *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F.Supp. 148 (N.D.Ohio 1986) (awarding a multiplier of 2.48 in a complex securities action based on contingency, delay, and early settlement); *Malchman v. Davis*, 588 F.Supp. 1047, 1060 (S.D.N.Y.1984) (applying a multiplier of 1.685 in a class action antitrust suit based on delay, complexity, and importance); *Institutionalized Juveniles v. Secretary of Public Welfare*, 568 F.Supp. 1020, 1033 (E.D.Pa.1983) (awarding a delay multiplier of 1.25 to compensate in a civil rights action) *Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820, 822–24 (N.D.Cal.1982) (adjusting the fee award to account for a delay in payment by increasing the average hourly rate from the historic rate of $85 to the "current" rate of $115, resulting in a delay multiplier of approximately 1.35); *In re Baldwin–United Corp.*, 79 B.R. 321, 346–350 (Bkrtcy. S.D.Ohio 1987) (awarding $810,844 to six law firms to compensate for a three-year holdback of approximately $5,615,000 in fees, equivalent to a delay multiplier of approximately 1.15).

The circumstances of the present action, which has persisted for over five years, justify the application of a multiplier of 1.15 to the lodestar of $2,330,958.45 to compensate the Aisenbergs' for the delay in reimbursement. Accordingly, the attorney's fee award is enhanced by $349,643.77, resulting in a total attorney's fee of $2,680,602.22.

## III.

In addition to an attorney's fee, the Aisenbergs seek reimbursement of "costs" totaling $195,670.32. (Doc. 447)[32] The United States advances no specific objections to the Aisenbergs' litigation expenses, including the expenses incurred during litigation of the Hyde Amendment dispute. Although somewhat cursorily documented, the Aisenbergs' litigation expenses fit within the relatively broad class of reimbursable expenses for items normally billed to clients and necessary to conduct this sort of complex litigation effectively. *See Jean v. Nelson,* 863 F.2d 759, 776–78 (11th Cir.1988).[33] The amount of litigation expenses is reasonable. Accordingly, the United States shall reimburse the Aisenbergs for litigation expenses in the amount of $195,670.32.

Pursuant to the Hyde Amendment, the Aisenbergs are entitled to a reasonable attorney's fee in the amount of $2,680,602.22 and other litigation expenses in the amount of $195,670.32.

### THE GRAND JURY

At least twice the Aisenbergs have sought release of the grand jury proceedings that resulted in their indictment. On February 17, 2000, the Aisenbergs filed a "Motion for Production of Grand Jury Minutes and for Hearing to Determine Whether to Dismiss Indictment for Investigative and Prosecutorial Misconduct." (Doc. 95) This motion contains among other matters an account by the Aisenbergs of (1) their receipt of a subpoena on January 30, 1998, requiring their appearance before the grand jury on February 4, 1998; (2) the unscheduled visit, apparently coordinated by law enforcement, to the Aisenbergs' home on the eve of the Aisenbergs' grand jury appearance by representatives of the Florida Department of Children and Family to question the fitness of the Aisenbergs to retain custody of their son, William, and other daughter, Monica; (3) the Aisenbergs' appearance before the grand jury on February 11, 2000, after the United States represented to United States District Judge Henry Adams that the Aisenbergs were "subjects" but not "targets" of the grand jury's investigation; (4) the Aisenbergs' view of some of the accusations mounted against them by the United States, including suggestions of child abuse, child neglect, molestation, and a failed polygraph; (5) an alleged pattern of leaks by the United States in an effort to defame the Aisenbergs; and (6) a section entitled "An Unpleasant But Necessary Analysis" that reviews certain episodes in the investigative and prosecutorial history of participants in this case. The motion raises questions about the United States' conduct in the grand jury and seeks the records of the grand jury in support of the Aisenbergs' accusations of prosecutorial misconduct.

---

**32.** The Court construes the Aisenbergs' application for "costs" as a request for "other litigation expenses," which the Hyde Amendment permits in addition to a reasonable attorney's fee.

**33.** The expense items include expert witnesses and consultants; hearing transcripts; travel meal, and hotel; litigation support services; electronic legal research; mediation; postage and telephone; and document, photograph, videotape, and audiotape retrieval and duplication.

Again, on July 29, 2002, the Aisenbergs sought records of the grand jury in "Defendants' Motion for Production of Grand Jury Minutes, Internal Files of the United States Attorneys Office, and Other Materials to Support Claim for Attorney's Fees and Costs Under Public Law 105–119 (Hyde Amendment)." (Doc. 432) The United States responded to the Aisenbergs' motion and was dismissive of the Aisenbergs' assertions about grand jury and other misconduct. (Doc. 440) The Court deferred any ruling on the motions because Hyde Amendment liability was conceded by the United States and any discovery otherwise available (and, perhaps, none is available except as specified in the Hyde Amendment) appeared most likely unnecessary.

With the entry of this order, the attorney's fee issue closes in the district court. However, the Aisenbergs persist in their interest in the grand jury proceedings that resulted in their indictment. I shared that interest throughout the proceedings and accordingly required the United States to file the grand jury transcripts under seal many months ago. I now consider unsealing the transcripts.

In *Douglas Oil Company of California v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), civil anti-trust litigants sought grand jury transcripts arising from a criminal investigation in another district. Justice Powell's opinion for the majority remains the principal pronouncement concerning the question (as framed by the court), "[W]hat justification for disclosure must a private party show in order to overcome the presumption of grand jury secrecy applicable to such transcripts?" 441 U.S. at 213, 99 S.Ct. 1667. First, footnote 10 of Justice Powell's opinion restates forcefully the considerations that historically have justified grand jury secrecy:

In *United States v. Procter & Gamble Co.,* 356 U.S. 677, 681–682 n. 6, 78 S.Ct. 983, 986 n. 6, 2 L.Ed.2d 1077 (1958), we said that the reasons for grand jury secrecy had been summarized correctly in *United States v. Rose,* 215 F.2d 617, 628–629 (C.A.3 1954):

" '(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect [an] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.' "

Justice Powell, although acknowledging the persistent vitality of these considerations, cites *Dennis v. United States,* 384 U.S. 855, 872, 86 S.Ct. 1840, 1850, 16 L.Ed.2d 973 (1966), for the premise that " 'none of the reasons traditionally advanced to justify nondisclosure of grand jury minutes' was significant" in the circumstances of *Dennis.* Then Justice Powell concludes:

It is clear from *Procter & Gamble* and *Dennis,* that disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and that the burden of demonstrating this balance rests upon the private party seeking disclosure. It is equally clear that as the considerations justifying secrecy become less relevant, a party asserting a need for grand jury transcripts

will have a lesser burden in showing justification. [citations omitted] In sum, as so often is the situation in our jurisprudence, the court's duty in a case of this kind is to weigh carefully the competing interest in light of the relevant circumstances and the standards announced by this Court. . . . Moreover, we emphasize that a court called upon to determine whether grand jury transcripts should be released necessarily is infused with substantial discretion. *See Pittsburgh Plate Glass Co. v. United States, supra,* at 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323.

441 U.S. at 223, 99 S.Ct. 1667.

■ The Aisenbergs' prosecution involves no suspect "whose indictment may be contemplated." The Aisenbergs have already been indicted, they expected indictment, and they did not, of course, flee. The deliberations of the grand jury are complete (more than two years ago) so no one will "importune" the grand jurors or interfere with or impede their deliberations. Because the grand jury is finished and no trial will occur, no opportunity exists for "subornation of perjury" from any witness. Because the grand jury is complete, no opportunity exists to impair "free and untrammeled disclosures" by witnesses who testify before the grand jury. The protection of the "innocent accused from disclosure of the fact that he has been under investigation" is no longer a consideration pertinent to the Aisenbergs. The press brimmed with speculation about the Aisenbergs from almost the moment Sabrina vanished. Any hope of protecting the Aisenbergs from "disclosure" was destroyed by the United States' issuance of a grand jury subpoena to the Aisenbergs and the televised trip by them and their counsel to the door of the grand jury (of course, the press "mysteriously" knew exactly when and where the Aisenbergs would appear for the grand jury and the television cameras captured the Aisen-

bergs' stricken faces for national broadcast).

The Aisenbergs have agreed unconditionally and consistently to the release of the grand jury transcripts (and the surveillance recordings, as well). The Aisenbergs have believed (so far, correctly) that their best interest benefitted directly as public disclosure increased. Non-disclosure preserves no remaining interest of the Aisenbergs.

As these proceedings now stand, neither the Aisenbergs nor anyone else is either formally charged or formally acquitted in the matter of Sabrina's disappearance, a circumstance that perhaps will persist indefinitely. Although the Aisenbergs' indictment is dismissed, the details that led to the indictment are unknown both to them and to the public. The Aisenbergs seek release of the transcripts of the grand jury proceedings. With only the most minimal and inconsequential countervailing considerations, the Aisenbergs' request is reasonable and fair.

Another factor is present here that never affected Justice Powell's deliberations in *Douglas Oil.* The Hyde Amendment prescribes a remedy for a defendant if a prosecution is "vexatious, frivolous, or in bad faith." In other words, in some very minuscule sliver of cases after enactment of the Hyde Amendment the judiciary will cause, for example, the Department of Justice to pay public funds to reimburse defendants victimized by a "vexatious, frivolous, or bad faith" prosecution. The public has a strong interest in the events leading to a vexatious, frivolous, or bad faith indictment and prosecution for which the prevailing defendant is compensated from public funds. The public has an interest in inspecting these troubled prosecutions to determine the source of the United States' misdirection. The United States should not be entitled to shield the

pertinent history behind the cloak of grand jury secrecy, especially in a case in which the defendants seek disclosure, the evidence is already largely public, the grand jury's session ended months earlier, no trial will occur, and the matter is essentially at a standstill. The only contrary interest remaining is that of the United States, which may want to avoid a full airing of the episode. That interest, unaccompanied by some other material consideration, is without meaningful weight. The insulation of misdirected or overzealous prosecutorial exertions from public scrutiny forms no part of the justification for grand jury secrecy. The public is entitled to know.

The transcripts will permit the evaluation of, among many other things, whether the Aisenbergs were merely "subjects" of the grand jury when the United States issued a subpoena for their appearance, whether the examination of the Aisenbergs before the grand jury served a bona fide investigative purpose rather than another prosecutorial purpose, whether the recordings from the Aisenbergs' home were presented fairly, whether the testimony established probable cause for the indictment, and whether the proceedings otherwise were in accord with established law, Department of Justice policy, and other pertinent guides. Again, the public is entitled to know, especially in the wake of an award under the Hyde Amendment.[34]

### CONCLUSION

The Aisenbergs' Hyde Amendment application (Doc. 367) is **GRANTED**. Steven and Marlene Aisenberg are entitled to recover from the United States an attorney's fee in the amount of $2,680,602.22 and other litigation expenses in the amount of $195,670.32. Accordingly, the Clerk is directed to enter a judgment for $2,876,272.54 in favor of the Aisenbergs and against the United States.

The Aisenbergs' motions seeking the release of the transcripts of the proceedings of the grand jury (Docs. 95, 432) are **GRANTED** only to the extent that (1) the United States is ordered to file on or before February 7, 2003, in the public file any previously unfiled transcripts of grand jury proceedings or hearings involving the Aisenbergs and (2) the Clerk is directed to **UNSEAL** the presently sealed transcripts of the grand jury proceedings and all hearings pertaining to this case on February 10, 2003, not later than 5:00 p.m.[35]

The Clerk is directed to terminate any remaining motions and close the file.

### REPORT AND RECOMMENDATION

PIZZO, United States Magistrate Judge.

The Defendants, who are charged with conspiracy and making false statements to law enforcement in violation of 18 U.S.C. §§ 371 and 1001, move to suppress a state authorized intercept and claim that applying agents deliberately made false statements and omissions and that the surveillance violated Florida's statutory scheme (doc. 90). United States District Judge

---

**34.** Perhaps an award under the Hyde Amendment ought to tilt decisively the balance of considerations under Rule 6(e) and *Procter & Gamble,* 356 U.S. at 681 n. 6, 78 S.Ct. 983. to the extent that public disclosure of grand jury proceedings is the presumptive consequence absent some persuasive reason for non-disclosure of all or part of the grand jury transcript.

**35.** The United States' sealed notice of filing (Doc. S–35) in response to the Court's earlier order to file the grand jury transcript states, "The attached transcripts represent all of the transcripts of grand jury proceedings related to this case in the government's possession." This order requires the United States to file all transcripts of grand jury proceedings in this case, without respect to whether the transcript was earlier "in the government's possession." No redundant transcripts are required.

Steven D. Merryday referred the matter to me for a report and recommendation with directions to conduct such hearings as are necessary (doc. 119). *See* 28 U.S.C. § 636(b)(1); Local Rule 6.01(c)(14). After a suppression hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), I recommend the district court grant the motion for the following reasons.

## I.

At 6:42 a.m. on November 24, 1997, Marlene Aisenberg called 911 and frantically reported someone had kidnapped her five-month old daughter, Sabrina Aisenberg. Within minutes, a Hillsborough County deputy sheriff arrived at the Aisenbergs' Valrico home. Teams of detectives, deputies, Florida Department of Law Enforcement agents, and FBI agents eventually scoured a four-mile radius for clues. Their exhaustive efforts, combined with massive media attention, yielded no promising leads. Authorities for the next two weeks maintained a twenty-four hour vigil at the Defendants' residence waiting for a ransom demand. No one called.

Agents suspected the Defendants' account from the start. Several reasons fueled this: the lack of any physical evidence at the crime scene or reports of unusual activity in the neighborhood, the presence of a dog in the house which reportedly barks at strangers but did not bark the night of the baby's disappearance, the rarity of a crime like this occurring in the manner the Defendants described, the failure of mass publicity to draw meaningful leads, Marlene Aisenberg's peculiar comments to interviewing detectives, and the

Defendants' behavior toward investigating agents. The Defendants likely surmised they were suspects too; they hired present defense counsel within days after reporting their daughter missing.

On December 12, 1997, Hillsborough County Sheriff detectives Linda Sue Burton and William Blake, the two lead detectives, applied to a state court judge for an order authorizing the interception of the Defendants' communications at their residence.[36] Although neither one had applied for a wire before, they met with a superior, Corporal Knowles, to decide what facts and information should be included in their affidavit. Knowles then drafted the application, the proposed order, and the authorization using forms maintained by the Hillsborough County Sheriff's Office (HCSO).[37] Burton and Blake then reviewed Knowles's work for factual accuracy. Thus, the two affiants claimed probable cause existed to believe the Defendants "and others as yet unknown, have been committing, are committing and are about to commit" certain offenses against the State of Florida, namely: homicide, sale of a minor child, child neglect with great bodily harm, and aggravated child abuse in violation of Fla. Stat. §§ 782.04, 63.212(1)(d), 827.03(3), and 827.03(2). An intercept, the affiants reasoned, would likely uncover evidence of these crimes.

Burton and Blake presented their joint application to Assistant State Attorney Eric Myers who presumably reviewed the documents and presented them to State Attorney Harry Lee Coe for his approval. The same day, Chief Circuit Judge F. Dennis Alvarez authorized the request.

---

**36.** Blake served as a homicide detective; Burton worked as a detective on juvenile matters and as director of the Hillsborough County Child Death Review Team. Although the two may have been named lead detectives at one point, Blake soon concluded he reported to Burton about the case.

**37.** Corporal Knowles is deceased. Just who made the decision to seek an intercept in the first place is unclear from the record before me.

That order permitted agents to monitor the Defendants' home for thirty days and required the state attorney (or a designated representative) to submit reports every ten days "showing what progress ha[d] been made toward achievement of the authorized objective and the need for continued interception."

On December 13, 1997, authorities placed intercepts in the Aisenbergs' kitchen and bedroom. Per instructions, monitors minimized conversations every two minutes, unless they were recording a pertinent conversation, and shut down the bedroom intercept from midnight to 7:00 a.m. Three tape decks controlled by a master switch operated simultaneously. Two decks recorded the tapes to be submitted to the state attorney and the court. Monitors continuously inserted and removed tapes from the third deck (the work-copy deck) as they identified pertinent calls. The monitor who identified a relevant call later transcribed that conversation usually within twenty-four hours (although sometimes other personnel transcribed the call). Corporal Knowles then retrieved these handwritten transcripts, summarized them, and prepared the state attorney's ten-day progress reports to the court.[38] At some point in this process, Burton and Blake listened to the pertinent calls (known as P-calls) with the aid of the monitors' transcripts. When they or others made changes to the transcripts after Knowles made his summaries, Knowles did not correct his draft summaries for the ten-day progress reports.

On January 9, 1998, and again on February 6, 1998, Burton and Blake applied for thirty-day extensions of the intercept. Again, while neither detective prepared these documents, they met with superiors and discussed what should be included. Knowles, who authored the first extension, and Sergeant Roman, who drafted the second, decided what information to include and simply pasted the pertinent progress report summaries from the previous thirty days of surveillance to show the intercept's progress and the need to continue it.[39] Each drafter attached transcripts of the summarized conversations as exhibits, but neither one checked to see if the transcripts matched the summaries nor if any updated transcripts rendered the summaries inaccurate.

Burton and Blake, like they did for the initial intercept application, reviewed the extensions for factual accuracy. Like Knowles and Roman, neither took the time to determine if a transcript supported the summary. Although Burton now admits she spotted some differences, she said nothing. Assistant State Attorney Myers also did not note any inconsistencies, and he did not question the detectives about the applications. Eventually, Judge Alvarez approved the extensions.[40]

State authorities terminated the wire on March 2, 1998. The 79 days of surveillance generated fifty-five audio cassettes

---

**38.** It is doubtful if anyone at the state attorney's office reviewed Knowles's proposed progress reports for accuracy. Assistant State Attorney Myers likely just signed off on the periodic reports and forwarded them to the judge.

**39.** Sergeant Roman had extensive experience applying for wiretaps. Indeed, he trained Knowles regarding Florida's statutory requirements; therefore, he was intimately familiar with Knowles's practice. In this inves-

tigation he replaced Knowles who took leave to attend to his ailing wife. Roman used Knowles's work product in large part despite quickly spotting problems with the previous applications.

**40.** At the Court's request, the government has filed *in camera* the applications for electronic surveillance (including extensions), the authorizations, progress reports, and sealing order (docs. S-26, 27, and 28).

recording over 2,600 conversations. More than seventeen months later, a federal grand jury returned a seven-count indictment charging the Defendants with conspiracy and making false statements to investigators regarding the disappearance of their daughter.[41]

## II.

The Defendants essentially give four reasons to suppress the evidence derived from the electronic surveillance. First, they argue detectives Burton and Blake, in violation of the Fourth Amendment, intentionally, or with reckless disregard for the truth, made materially false statements or omitted material facts in each application. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). More particularly, the Defendants contend the detectives misled the reviewing judge about their behavior, their affection for their daughter, the evidence at the crime scene, their interviews by law enforcement, potential leads, and the content and context of their intercepted conversations. Second, the surveillance orders, contrary to Florida law, authorized the interception of communications about crimes outside the wiretap scheme, namely, sale of a minor child, child neglect with great bodily harm, and aggravated child abuse. Accordingly, the warrants are invalid and all surveillance evidence should be suppressed. Third, agents monitoring the wire failed to adequately minimize communications protected by the marital and attorney-client privileges. Fourth, Burton and Blake failed to show an investigative

need for electronic eavesdropping, a statutory prerequisite (doc. 90).[42]

The government, in response, denies Burton and Blake misled the reviewing judge. If the detectives did make any misstatement or omitted any information, they did not do so deliberately, and their misstatements or omissions were immaterial to the probable cause findings. Thus, the government urges a *Franks* hearing is unnecessary. If also rejects the Defendants' other reasons for suppressing the evidence (doc. 170).[43]

On October 16, 2000, after the benefit of oral argument, I issued an order (doc. 257) finding the Defendants had made a substantial preliminary showing warranting a limited *Franks* hearing as to certain paragraphs of the first and second extensions (first extension: ¶¶ V5–6, V8–11, V13, V17, V20–24; second extension: ¶¶ V10, V17–19). Notably, most of these paragraphs concern issues pertaining to the audibility of the intercepted conversations.

This report first addresses the *Franks* issues. It explains the standards for evaluating a *Franks* challenge, continues with my reasons for deciding a *Franks* hearing is unnecessary as to the initial intercept application, and follows with my findings regarding the first and second extensions. The remainder of the report outlines Florida's electronic surveillance scheme, analyzes the Defendants' and government's arguments pertaining to the consequences of conducting surveillance on unauthorized predicate crimes, and addresses the Defendants' claims about lack of proper mini-

---

**41.** Count one charges both Defendants with conspiracy to violate 18 U.S.C. § 1001. *See* 18 U.S.C. § 371. Counts two, three, and seven accuse the Defendants jointly with committing substantive § 1001 offenses. Lastly, the remaining counts charge the Defendants individually with making false statements (Marlene Aisenberg—counts five and six; Steven Aisenberg—count four). Counts two through six allege the Defendants jointly or

individually made false statements to investigators before Burton and Blake applied for the wire on December 12, 1997.

**42.** The Defendants have supplemented their motion to dismiss at docs. 103, 113, 133, 195, 223, 229, 246, 255, and 260.

**43.** The government has supplemented its response at doc. 254.

mization during the surveillance and the investigative need for the surveillance.

### III.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held a defendant has the right under the Fourth Amendment to challenge the truthfulness of a police officer's sworn statements in support of a search warrant. But this right is limited and prescribed. Accordingly, the Court outlined a three-stage analysis for evaluating *Franks* claims.

First, the defendant must make a "substantial preliminary showing" the affiant made a "false statement knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155, 98 S.Ct. 2674. The Eleventh Circuit defines "reckless disregard for the truth" to include instances where the affiant "should have recognized the error, or at least harbored serious doubts" about his representations. *United States v. Kirk*, 781 F.2d 1498, 1502–03 (11th Cir.1986). A defendant must be specific regarding his claim of falsity or reckless disregard. Conclusory allegations are insufficient. *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. The defendant should point to the exact portions of the application he challenges, provide a statement of reasons for his contentions, and supply an offer of proof supporting his grounds or give some satisfactory explanation for not doing so. *Id.* Negligence or innocent mistakes do not violate the Fourth Amendment. *Id.; Madiwale v. Savaiko*, 117 F.3d 1321, 1326 (11th Cir. 1997).

*Franks* concerns only the affiant's own deliberate falsity or reckless disregard. Hence, the source of the alleged false statement is significant. The affiant, for example, is entitled to rely on the observations of other law enforcement officers in a common investigation. In such instances the affiant's statements, even if incorrect, are still " 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165, 98 S.Ct. 2674. Nonetheless, the affiant in some way must set out in his application that he is basing his information on others. This satisfies the Fourth Amendment's particularity requirement and allows the reviewing judge to make an independent probable cause determination. *Id.* at 165, 98 S.Ct. 2674; *Kirk*, 781 F.2d at 1504–05.

Second, if the defendant satisfies these threshold demands, *Franks* requires the reviewing judge to set aside the disputed material and examine the remaining affidavit. If the redacted application supports a probable cause finding, no hearing is necessary. If it does not, the Fourth Amendment requires a hearing. *Franks*, 438 U.S. at 171–172, 98 S.Ct. 2674.

Lastly, should the court decide a hearing is necessary, the defendant bears the burden of proving by a preponderance of the evidence his claims of perjury or reckless disregard. If the defendant does this, the reviewing judge, like at the previous stage, must set aside these statements and determine if the edited application supplies probable cause. If it does not, the warrant is void, and the fruits of the electronic surveillance must be excluded to the same extent as if the face of the affidavit lacked probable cause. *Franks*, 438 U.S. at 156, 98 S.Ct. 2674.

Although *Franks* dealt with false statements, the Eleventh Circuit also applies its reasoning to omissions. *Madiwale*, 117 F.3d at 1326–27; *United States v. Martin*, 615 F.2d 318, 328–29 (5th Cir.1980).[44]

---

**44.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as precedent the former Fifth Circuit's decisions rendered before October 1, 1981.

Thus, an agent who intentionally or with reckless disregard omits facts material to an affidavit's probable cause violates the Fourth Amendment. *Madiwale*, 117 F.3d at 1326–27. The Eleventh Circuit permits a defendant to show recklessness without direct evidence. A court, instead, can infer recklessness from the omission itself if the fact is "clearly critical to a finding of probable cause." *Id.* at 1327 (quoting *Martin*, 615 F.2d at 329). In other words, the omitted fact is material if, when added to the application, probable cause no longer exists. *Madiwale*, 117 F.3d at 1327.[45]

During this three-stage process, a reviewing judge views the affidavit and warrant through traditional Fourth Amendment lenses. The warrant is presumed valid, supporting affidavits are not examined in a hypertechnical manner, and a realistic and commonsense approach is used. *Franks*, 438 U.S. at 171, 98 S.Ct. 2674; *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). In fact, even the doubtful or marginal search under a warrant may be sustainable where one without a warrant would fail. *Ventresca*, 380 U.S. at 106, 85 S.Ct. 741. The probable cause standard is a " 'practical, nontechnical conception.' " *Gates*, 462 U.S. at 231, 103 S.Ct. 2317 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). It is a "fluid concept" dependent on the assessment of the probabilities in particular factual contexts. *Gates*, 462 U.S. at

232, 103 S.Ct. 2317. Law enforcement officers, it follows, are entitled to form certain "common-sense conclusions about human behavior." *Id.* at 231–32, 103 S.Ct. 2317. The judge's task is "simply to make a practical, common-sense decision" whether a "fair probability" exists that evidence of the crime will be uncovered in a particular place taking into account the totality of the circumstances presented in the affidavit. *Id.* at 238, 103 S.Ct. 2317. Applying this standard to electronic intercepts, an application must show probable cause exists to believe: (a) an individual is committing, has committed, or is about to commit a crime enumerated in FLA. STAT. § 934.07; (b) particular communications concerning that offense will be obtained through such interception; and (c) the facilities where the oral communications are to be intercepted are to be used or have been used in the commission of such an offense. *See* FLA. STAT. § 934.09(3)(a), (b), and (d).

## IV.

### A. The initial application

The Defendants assert Burton and Blake deliberately, or with reckless disregard, made material false statements or material omissions in sixteen of the twenty-two "fact" paragraphs outlining probable cause in the initial wiretap application.[46] They challenge the detectives' reports about their demeanor, their interviews, the crime scene, the lack of any unusual activity in the neighborhood, and the FBI's study on child abductions.

---

**45.** In *Madiwale*, the plaintiffs sued a police officer under 42 U.S.C. § 1983 claiming the officer omitted material facts in her affidavit for a search warrant. The court, addressing the issue of qualified immunity, restated the rule in this circuit: "[A]n officer would not be entitled to qualified immunity when 'the facts omitted ... were ... so clearly material that every reasonable law officer would have known that their omission would lead to a

search in violation of federal law.' " 117 F.3d at 1327 (quoting *Haygood v. Johnson*, 70 F.3d 92, 95 (11th Cir.1995)). Admittedly, this is not a civil action under § 1983; nonetheless, the test adds gloss to defining the "materiality" of a claimed omission.

**46.** These are ¶¶ 1, 2, 6–9, 11–15, 17, 18, and 20–22 at part V of the application.

After carefully considering the Defendant's arguments, their exhibits in support, and the government's responses, I find Burton and Blake made false statements with reckless disregard, but a *Franks* hearing is unnecessary because the application arguably supports sufficient probable cause for murder.[47]

### 1. The Defendants' behavior

Burton and Blake feature a central theme in their application: the Aisenbergs exhibited behavior at odds with the gravity of the reported event—an infant snatched from her crib while her parents slept. The detectives start with the 911 call. Marlene Aisenberg's tone, Burton and Blake comment, sounded "very hysterical" when she first reported her daughter had been kidnapped. Steven Aisenberg then took the phone from his wife and answered the operator's questions. While he talked to the operator, Marlene Aisenberg spoke to some "unknown" person using another telephone. No longer hysterical, the affiants opine she sounded "calm" with "her thoughts collected" (¶ V1). Burton and Blake add that HCSO deputy Warren, who arrived minutes later, observed that the Defendants did not appear "very upset" (¶ V2).

Burton and Blake found little food or diapers in the house for the child: six jars of baby food, one-half box of dry formula, and just four unused diapers; not enough, Burton says, for a day's needs (¶ V7). They observed the Defendants displayed no pictures of their infant in the home (¶ V22h) and retreated to their bedroom several times during the next several days to avoid law enforcement (¶ V21). Lastly, neither Defendant asked the affiants questions about the investigation (¶ V22i). This behavior, the affiants opine from their experience, models the behavior of "[i]ndividuals involved in the homicide or sale of a minor child," i.e., an inability "to display signs normally associated with those who have lost a child through unexplained circumstances" and a "fail[ure] to stock an adequate supply of items such as food, diapers and other necessities to maintain the well being of the missing victim" (¶¶ III3–4).

The Defendants assert these statements are deliberately false or were made with reckless disregard for the truth or the agents omitted material facts, facts which would have negated the inferences the agents created in their application. Most of these claims do not demand much comment. As stated previously, law enforcement officers seeking to show probable cause for a warrant are entitled to form certain "common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231–32, 103 S.Ct. 2317. Likewise, the affiants may justifiably rely on the personal observations of fellow officers participating in the same investigation. *Ventresca*, 380 U.S. at 111, 85 S.Ct. 741; *Kirk*, 781 F.2d at 1505. Burton and Blake did this. Undoubtedly, the Defendants, together with their family and friends, strongly disagree with detectives' conclusions about their lack of affection for their daughter and the demeanor they demonstrated when officers arrived at the scene. They may also have reasons for not asking Burton and Blake about the investigation, preferring instead that their attorney handle these matters given the particular circumstances presented. They may have decided to go to their room for simple privacy. But these complaints do not warrant a *Franks* hearing. Admittedly, the affiants' statements about insufficient baby supplies are

---

**47.** As the government points out, the Defendants do not make a facial challenge claiming the application lacks probable cause for murder; instead, their argument pertaining to probable cause is limited to a post-*Franks* setting.

inaccurate, but I do not find them deliberate or reckless. The clutter in the Aisenbergs' house, evidenced by the video taken by law enforcement, explains why the detectives' incorrect accounts are at worst negligent and at best innocent mistakes. Besides, these statements are immaterial. The inference the detectives urge—the lack of diapers and baby food in the house shows the Aisenbergs were planning to get rid of Sabrina Aisenberg—is simply unconvincing.

Burton and Blake's interpretation about the 911 call, however, is recklessly misleading. The two obviously did not witness Marlene Aisenberg during the Aisenbergs' conversations with the operator; instead, their opinions about her "calm" and "collected" demeanor rest on the 911 tape. Thus, their conclusions differ in quality from those based on personal observations; moreover, their ability to discern Marlene Aisenberg's demeanor is no better than the Court's. After listening to the tape several times, I find the affiants' opinions are unreasonable and made with reckless disregard for the truth. Marlene Aisenberg is not "calm" nor "collected" while talking to her mother; she is wailing. The affiants also knew she was speaking to her mother, not some "unknown party." Mrs. Sadowsky informed Burton her daughter had called her; indeed, Marlene Aisenberg can be heard (without difficulty) saying "I gotta go, Mom!" when her husband is relaying questions from the 911 operator. A *Franks* hearing as to this issue, however, is unnecessary. Even if the detectives' opinions are redacted, the application supplies probable cause.[48]

### 2. Other leads and an unknown intruder

The detectives, according to the Defendants, lied or purposely omitted information from their application that would have negated probable cause. Specifically, the Defendants assert the agents did not advise the judge about the physical evidence uncovered at the scene suggesting an unknown intruder may have snatched the child; purposely misled him about the reason they found no evidence of forced entry (the doors were unlocked); lied about the Defendants' alarm system; falsely stated the dog barked at everyone who entered their residence; and falsely reported the investigation had revealed no unusual activity in the neighborhood (¶¶ V6, V8, V9, V18, V20, V22a, V22c, V22e, V22f). After studying the Defendants' exhibits in support, I find the Defendants have not made the necessary substantial preliminary showing required by *Franks*.

As to these claims, the detectives' statements are substantially accurate. None of the leads put forth by the Defendants is striking. None of the physical evidence discovered at the scene appears promising. As to some of this evidence, like the shoe print on the dust ruffle, hair samples, and unidentified latent prints, the detectives did not obtain test results until after they applied for the intercept. Besides, an affiant cannot be expected to include in an affidavit every piece of information gathered during the course of an investigation. Otherwise, applications would be exposed to endless conjectures about investigative leads, fragments of information, and other matters that might, if included, redound to

**48.** The governing standard of review requires me to give deference to a judge's earlier determination of probable cause even if the showing is marginal or doubtful. *Ventresca,* 380 U.S. at 106, 85 S.Ct. 741. This is such a case. Applying *Ventresca's* approach, Burton and Blake's reckless statements about the 911 call, even if redacted, do not alter the impact of Deputy Warren's observations. Namely, Warren's conclusions about Marlene Aisenberg's demeanor when he arrived at the scene immediately after the 911 call are similar in nature to the affiants' opinions regarding her behavior during the call.

a defendant's benefit. *Franks* imposes more stringent standards for a hearing. *United States v. Colkley*, 899 F.2d 297, 300–301 (4th Cir.1990).

### 3. Defendants' interviews

Burton and other law enforcement officers questioned the Aisenbergs on November 24 and 25, 1997. The Defendants say Burton and Blake deliberately mischaracterized these interviews (¶¶ V11–V15) (doc. 90, pp. 13–18). Although I find the Defendants' contentions difficult to follow, their complaints here are minor: the misidentification of the officer who questioned Steven Aisenberg on November 24, 1997, at 8:50 a.m.; whether Marlene Aisenberg used the word "crib" or "bed"; conclusions regarding her use of the past tense when making comments about her child (she "loved" her baby); and whether Marlene Aisenberg's interviews were inconsistent. All this is either immaterial to probable cause, observations the affiants are at liberty to make, or conclusions the judge could accept or reject given the information presented to him. For example, the judge could have disagreed with the agents' belief that Marlene Aisenberg's statements were inconsistent. A *Franks* hearing is unnecessary.

### 4. Statistical studies

The day before making their application, Burton and Blake telephonically interviewed Special Agent Mark A. Hilts, supervisor of the FBI's Child Abduction and Serial Killer Unit. Agent Hilts informed the affiants about a "cooperative research project" with the University of California at Los Angeles pertaining to 550 cases of "child abduction and/or homicide reported to the FBI during the period 1985–1995."

This study noted the majority of the cases involving infants "were found to be ... emotion-based crimes (68%) or abductions wherein the offender needed a child to fulfill the illusion of having experienced pregnancy and childbirth" (¶ V17). Only family members perpetrated these "emotion-based crimes" (homicides) in the studied cases. Of all the infant abductions reviewed, only one involved an abduction from the family's residence. The offenders were either strangers (70%) or acquaintances (30%); none were family members. Lastly, Hilts remarked his unit's experience has been "that some parents have falsely reported their murdered children as victims of abduction, in order to cover-up their own involvement."

The detectives reference other data culled from the FBI's Violent Criminal Apprehension Program (VICAP), a national database of solved and unsolved homicides. Examining cases whose victims were less than one year old and whose last known location was the victims' residences, the database revealed a care giver is usually responsible for the child's death (91.67%; i.e., 44 of 48 cases). The remaining four instances are unresolved abductions (¶ V17).

Burton and Blake point to these statistical studies to buttress their contention it is likely a family member murdered the child and the parents falsely reported an abduction to hide the crime from investigators. The Defendants claim the affiants selectively cited data from these works and omitted information which would have detracted from their importance and relevance, specifically a study by the National Center for Missing and Exploited Children (NCMEC).[49] They also object to using

---

**49.** According to the Defendants, Major Terry (HCSO) was aware of *An Analysis of Infant Abductions,* done by NCMEC, before Burton and Blake applied for the warrant. They assert this work shows one-fourth of the infants abducted were taken from the home and 94% of all infant abductors were primarily strangers (doc. 90, pp. 18–19).

statistical studies like this to establish probable cause (doc. 90, pp. 18–20). Importantly, however, the Defendants do not argue the detectives' summaries are specifically false.

These arguments are without merit. The Defendants do not make a substantial preliminary showing the agents deliberately omitted material information. These studies only informed the judge what he likely knew from his experience. A crime like the Defendants reported—an abduction of an infant from her home by a stranger—is a rare event; other explanations are more plausible. Besides, in a quantitative way, these studies reflect the experience and expertise of law enforcement officers trained in these type of offenses. The Supreme Court permits this. *United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (officers are entitled to make reasonable inferences based upon their experience with aliens and smugglers); *United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (same); *see also* 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.2(c) (3d ed.1996). Furthermore, information inadmissible at trial may be used to support probable cause. *See Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (officer permitted to use hearsay to show probable cause).

### B. The extensions

The Defendants claim the affiants deliberately misrepresented, or acted with reckless disregard for the truth in representing, facts in thirteen paragraphs of the application for the first extension and four paragraphs of the application for the second extension. Almost all concern intercepted conversations. According to the Defendants, some of the recordings are unintelligible, and the affiants have distorted the context of the conversations.

The Aisenbergs paint a consistent pattern, and they proved this pattern beyond a preponderance of the evidence at the *Franks* hearing. The detectives report conversations no reasonably prudent listener can hear, quote conversations that do not appear in the supporting transcript at all or in the manner described, and deliberately or with reckless disregard summarize conversations out of context. The government steadfastly rejects all of this. It does so against a record showing: systemic, technical problems producing recordings plagued by distortion, interference, and mechanical noises; application transcripts that make no sense; revised transcripts that continue to make no sense; revised transcripts that contradict the application transcripts in material respects; a continual effort to amend transcripts (to purportedly improve them) up to and through the date of this report; admissions, as evidenced by the government's transcripts, that significant amounts of particular conversations cannot be understood or were not recorded (due to minimizations); and the government's tacit acknowledgment that certain recordings are so poor or so irrelevant it will not offer them as evidence at trial.[50]

#### 1. First Extension: ¶ V5

On December 13, 1997 at approximately 10:57 p.m. a conversation was intercepted on the listening device located in the master bedroom (P–1, conversation number 22). Steven Bennett Aisenberg and Marlene Joy Aisenberg were con-

---

**50.** No party has cited a case, and I am unaware of any, setting forth a test for the audibility of recordings in the context of a *Franks* proceeding. Nonetheless, I am guided by Judge Merryday's thoughtful analysis in his Order Respecting Audibility. *United States v. Aisenberg,* 120 F.Supp.2d 1345 (M.D.Fla. 2000).

versing and during the conversation Steven Bennett Aisenberg stated "You think I did that?" Marlene Joy Aisenberg then advised "You been acting weird every night." Steven Bennett Aisenberg asked "You think (possibly Tina) behind it." and Marlene Joy Aisenberg replied "Uhuh." If should be noted that this recording is of poor quality. It was also noticed that Marlene Joy Aisenberg was upset and crying during this conversation. Later in the conversation a discussion of figures took place and Marlene Joy Aisenberg asked "About how much is the set amount (inaudible). Steven Bennett Aisenberg replied '(inaudible) about (one-hundred or nine-hundred) thousand.'" (SEE EXHIBIT "B") [51]

The Defendants claim this recording (G Ex. 20A) is largely unintelligible. I agree. By this paragraph, Detectives Burton and Blake suppose that Steven Aisenberg had done something to the child, whom the detectives presume is dead, and that the Defendants were talking about money to sell or dispose of the child. But after listening to the tape carefully, I can understand only a few phrases during its approximately twenty minutes. The speakers' voices are mostly distorted and muffled. Noises such as hissing, mechanical humming, and wire interference (telephone ringing in the background) permeate the recording.[52] The television is constantly playing. While one can reasonably hear Steven Aisenberg say, "you

think I did (it or that)?", no prudent person could reasonably conclude this question pertained to his missing daughter. Nothing preceding or after the comment is particularly audible. Indeed, a prudent person straining to understand the conversation would likely guess the Aisenbergs were talking about their bills (like the "water bill," which the monitor also heard and jotted in the log). For Burton and Blake to deduce from this unintelligible conversation the Defendants were speaking about selling or disposing of their child (much less murder) is baseless and reckless.[53]

### 2. First Extension: ¶ V6

On December 24, 1997 at approximately 11:19 p.m. a conversation was intercepted on the listening device located in the master bedroom (P–2, conversation number 98). Steven and Marlene Aisenberg were speaking and during the conversation Steven Aisenberg advised "That amounts to four to five thousand dollar bail." Marlene replied "What?" Later in the conversation Steven Aisenberg advised "It depends on you, you had to deal with the pain everyday. You know what I'm saying, not everybody has that." Later Marlene Aisenberg advised "I'm scared." Then Steven Aisenberg advised "On top of a little baby." Marlene Aisenberg replied "I said, I saw them together, on the fourth, he was upset I thought, gee, you know could it

**51.** This paragraph and the succeeding ones are direct quotes from the extension applications. Occasionally I have underlined parts to easily identify the challenged language.

**52.** The Defendants' forensic audio expert, Bruce E. Koenig, who previously served as the Special Agent Supervisor in the FBI's Engineering Section, testified all the tapes he examined had similar problems. The intercept system introduced extraneous sounds such as ringing phones, hissing, and hum-

ming. This noise directly impacts the ability to understand the recorded speech. Koenig pointed to studies showing comprehension proportionally suffers as signal to noise ratios increase. As if this were not enough, distortion caused by microphones picking up the speakers' voices from too great a distance added to the unintelligibility.

**53.** The government has advised the district court it does not intend to use this tape at trial.

be dead, you know, dead." Steven Aisenberg replied "They belong without you, you, Oh my God, we pulled her clothes off, we, I," Marlene Aisenberg then replied "(inaudible) find it." They then discussed something about a hospital. Later in the conversation Steven Aisenberg advised "No, it wouldn't even bother me killing the dog." "Umm, the young, talking abuse." Later in the conversation Marlene Aisenberg advised "Sell that van, and (inaudible) change that five-hundred (inaudible) baby blanket thrown away." Steven Aisenberg then advised "They gonna have to because (inaudible) my baby back (long pause) You know, we can always take the story back." (SEE EXHIBIT "C")

The Defendants assert this recording (G Ex. 12A) is largely unintelligible. I agree. Like the previous recording, this tape suffers from the same systemic problems: distortion, muffled voices, interference (ringing), and mechanical hissing. Even identifying the male speaker is difficult.[54]

*3. First Extension: ¶ V8*

At approximately 10:41 a.m. a conversation was intercepted on the listening device located in the master bedroom (P–4, conversation number 133). Steven and Marlene Aisenberg were speaking and during the conversation Steven stated "... and that's it. You just had a stomach ache (inaudible) to worry about it. I don't have to worry so far." Marlene replied (inaudible) "I hate you, I hate you for what you did to our tiny daughter." Steven replied "Shut up, I know

what you did to me." Marlene then stated "That is my fault, we didn't need to (inaudible) black people to kidnap her, we need to go back." Later in the conversation Steven stated "Our tiny baby didn't suffer because of your" Marlene interrupted the conversation with an inaudible statement and then advised "I understand that, I know why you need to (inaudible) you're getting out of control. You won't hear me." (SEE EXHIBIT "E")[55]

The Defendants claim this recording (G Ex. 15A) is unintelligible. I agree. It suffers from the same pervasive distortion and noise as the previous recordings. Some quotes in the summary are not even in the transcript attached to the application. For example, the summary quotes Marlene Aisenberg saying: "That is my fault, we didn't need to (inaudible) black people to kidnap her, we need to go back." But the application transcript has her stating: "That is my (truck). We didn't need ... to tell lies to the kidnap people of a kidnapping. We need to go back ———— (INAUDIBLE) ————." Yet another government version (April 12, 2000), supplied to the district court in an effort to resolve disputed transcript issues, has none of this. Instead, it has Marlene Aisenberg saying: "They absolutely got me for kidnaping. Where did you hear that, Steve? ... Uh ..." Likewise, the statement, "Our tiny baby didn't suffer because of your" is missing in the application transcript and the government's revised transcript.[56]

---

54. The government has advised the district court it does not intend to use this tape at trial.

55. This intercepted conversation occurred on December 28, 1997.

56. As these various transcripts underscore, the differences are significant. This is not a case in which transcripts differ in minor or immaterial detail. The fact this occurs so often with so many conversations points to the obvious. As Koenig observed based on his experience, if a number of transcripts about the same conversation are different it is likely the disputed portions are unintelligible.

#### 4. First Extension: ¶ V9:

On January 6, 1998 at approximately 11:07 p.m. a conversation was intercepted on the listening device located in the master bedroom (P–5, conversation number 269). Steven Bennett Aisenberg and Marlene Joy Aisenberg were having a discussion in reference to the news broadcast about the fact that Marlene had taken a polygraph earlier that day. They discussed Marlene's parents reaction to the news cast. Later in the conversation Marlene advised "I didn't say shit, I didn't say nothing (inaudible) shit (inaudible) not anything." (SEE EXHIBIT "F")

The Defendants claim this conversation (G Ex. 13A) is mostly unintelligible. I agree. It is impossible to hear any mention about polygraphs, either from the Defendants or from any news broadcast. Besides, Burton and Blake knew, or should have known, the reference about Marlene Aisenberg's taking a polygraph earlier that day was false because the HCSO last polygraphed her on November 25, 1997.

The government again presents three versions of the same conversation: the summary, the application transcript, and a later transcript based upon the state attorney's recording. All are different; none makes sense. The application transcript quotes Marlene Aisenberg this way: "(INUADIBLE) as well it's not gonna take shit (INAUDIBLE) (laughing) (INAUDIBLE) giving me shit—(INAUDIBLE)." The transcript based on the state attorney's recording quotes her this way: "He goes well, if I had to take a guess I didn't say that. I said that (INAUDIBLE) (LAUGHING) Barry said he wouldn't (INAUDIBLE) giving me shit, so I said screw them." Although the differences

are apparent, the government argues otherwise. Furthermore, it ignores the timing of these purported statements as evidenced by its transcripts. Presumably, any broadcast comments about the polygraph occur at the start of the thirty-minute recording. Marlene Aisenberg's quoted statements, gauging by the transcripts, do not appear until near the end of the tape. Across this gulf of time, the transcripts are punctuated with "inaudibles" and at least seven minimization pauses. These pauses generally lasted one to two minutes each (doc. S–26, Minimization Procedures). To conclude Marlene Aisenberg's purported comment near the end of the recording responds to the claimed broadcast at the beginning with no idea what occurred in between is baseless and deliberately reckless.[57]

#### 5. First Extension: ¶ V10

On December 16, 1997, at approximately 1:05 p.m. a conversation was intercepted on the listening device located in the kitchen (P–2, conversation number 20). Marlene and Steven Aisenberg had a conversation and during the conversation Steven became upset because Marlene was telling other people about what was going on reference the case. Steven stated "But there is information they don't need to know, ok." "Later in the conversation Steven reiterated" "(inaudible) what happens in this house stays in this house. You can't trust a soul. If the alarm people are calling you can't tell them that stuff, you can't." (EXHIBIT "G")

Unlike the previous recordings, this one is intelligible. Burton and Blake maintain Steven Aisenberg's statements prove the

---

**57.** Detective Burton testified that "on the way" to have Judge Alvarez review and approve the application, she noticed differences between the summary and the transcript. Because she deemed these discrepancies to be minor, she told no one. I note the government has advised the district court it does not intend to use this tape at trial.

Defendants were trying to hide something. Although Burton candidly admits she has no idea what the Aisenbergs are hiding, the detective thinks it must be inculpatory. However, the Defendants submit the subject matter of the conversation is obvious; they are discussing their security. Burton and Blake deliberately or recklessly distorted this conversation by omitting pertinent parts of the recording. After listening to the tape several times, I agree the affiants materially distorted what the Defendants said.

The work-copy recording (G Ex. 21A) begins just after monitors had minimized Marlene Aisenberg's telephone conversation with Judy Bailey.[58] Admittedly, one cannot hear, at least from this tape, Marlene Aisenberg mention Judy Bailey's name. Nonetheless, it is obvious Marlene Aisenberg is recounting to her husband a conversation she has just finished with someone about an effort to put Sabrina Aisenberg's flyer in the New York papers. Even the introduction in the application transcript and the first few lines of reported dialogue confirm this. The logs of the preceding calls, taken by the same monitor (M.Diaz) who prepared the application transcript, note that "Judy" telephoned the Aisenbergs (Defendants' Ex.1.G.L.).[59] Yet, the detectives explain none of this in their summary.

Had the detectives listened to the entire conversation (G Ex. 21B), they would have heard Marlene Aisenberg tell Judy Bailey the alarm will be hooked up that day and an extra key pad will be installed in their bedroom. Her husband, apparently perturbed about her revealing this, mutters (likely to himself), "Jesus Christ, just shut up." The two women continue their telephone conversation for several minutes. After the call ends, Marlene reports what Bailey said about posting flyers in the New York papers (the work-copy tape begins here). He admonishes his wife not to disclose certain information that, despite everyone's good intentions, could eventually reach the public. Some "ground rules" are in order.

> Marlene Aisenberg: She has the connection in the *New York Post* and *New York Times,* I guess, or whatever those big New York (inaudible) is called. They are putting a full flyer in those papers. That is unbelievable.
>
> Steven Aisenberg: Uh huh. Now we have to set some ground rules.
>
> Marlene Aisenberg: You know, you forget that I am allowed to talk to them Steve.
>
> Steven Aisenberg: There's information they don't need to know, o.k.
>
> Marelene Aisenberg: You know hon, they are doing ... (Steven Aisenberg interrupts)
>
> Steven Aisenberg: They, they're, yes, they're doing for us Mar, but you know what? They unknowingly say to somebody, "Oh yeah, the people aren't in the Aisenberg's home anymore." Or, "Yeah, they still have that trap and trace on the phone." Unknowingly. Unknowingly to whoever it was. What happens in this house stays in this house. You can't (inaudible) that the alarm people are coming. You can't tell them that stuff. You can't.

---

**58.** Bailey was a neighbor of the Aisenbergs at the time. Law enforcement had likely interviewed her before this conversation took place.

**59.** Bailey calls while the Aisenbergs are trying to teach their daughter, Monica, to write the alphabet and the number 2 (Defendants' Ex. 1.G.L. at call # s 15 and 16; the log notes this telephone conversation up to the call referenced in the application transcript, call # 20). The full version of the conversation as recorded on the state attorney's copy (G Ex. 21B) supports this.

Marlene Aisenberg: Honey, they all want to make sure that the house is secure.

Steven Aisenberg: (inaudible) We're doing what we need to do.

The monitor then minimizes the conversation (G Exs. 21A and B).

This conversation is exculpatory. It weighs against finding probable cause to believe the Defendants murdered their child. The Defendants' statements should cause a reasonably prudent officer to ask several questions. If the Aisenbergs had murdered their child, why would Marlene Aisenberg react positively to news designed to locate the child? Why would Steven Aisenberg warn his wife not to reveal details about the alarm unless he is concerned about the security of his family given his child's disappearance? Why would he be concerned if his wife tells someone about a trap and trace unless it is because he fears this could jeopardize the investigation into their daughter's disappearance? If the Defendants had murdered their child, and therefore knew no one would call to demand a ransom, what difference would it make who knew about the trap and trace? If the Aisenbergs paid someone to dispose of the child (as Burton and Blake theorized), is it not more plausible that they would want to leak news about a trap and trace to warn accomplices about calling? [60]

Marlene Aisenberg, by her responses, understood her husband to be concerned about their family's safety. Steven Aisenberg's statements about the trap and trace suggest he did not want his wife to divulge information which could hamper the investigation into their daughter's disappearance. Burton's conclusion—this conversation proves the Defendants are trying to hide information from the police—makes no sense. The affiants reported this conversation out of context and acted with reckless disregard when they omitted material facts from the application.

### 6. First Extension: ¶ V11

At approximately 5:06 p.m. a conversation was intercepted on the listening device located in the kitchen (P–3, conversation number 38). Marlene Aisenberg spoke advising "Help" "Me, help me, help me, Oh, oh, oh, oh." (SEE EXHIBIT "H")

Note: Detective William Blake advised that early in this investigation Marlene Aisenberg was observed speaking the same way as noted in this conversation when under pressure giving indications of possible severe mental or emotional distress.[61]

The source of Marlene Aisenberg's distress, the affiants reason, is not her baby's kidnapping. Because Burton and Blake believe the Aisenbergs murdered or sold their child, Marlene Aisenberg is crying out from an overwhelming sense of guilt. Although the application does not succinctly spell this out, the affiants affirmed this at the *Franks* hearing. Indeed, Detective Blake testified Marlene Aisenberg's expression of emotion here reminded him of a particular murder suspect who suddenly cried out and confessed during a police interrogation. Frankly, the comparison is as bizarre as the settings are different—a suspect under interrogation at the station house and a mother at home with her children.[62]

---

**60.** A "trap and trace" is a "device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. § 3127(4).

**61.** This intercept occurred on December 16, 1997.

**62.** I note the government does not intend to offer this tape at trial.

The Defendants claim their eight year old son, William, is the one who cried out, "help me, help me." Sarah McCall, their babysitter, listened to the recording and identified William as the speaker (saying it was not uncommon for him to make such outbursts). Admittedly, only someone familiar with William's behavior could identify his voice on this recording (G Ex. 14A). The monitors and the affiants could not have discerned this.

But a reasonably prudent officer would have quickly ruled out Marlene Aisenberg as the one who screamed out. And no reasonably prudent officer would have made the connection the affiants make— Marlene Aisenberg suddenly cried out "help me, help me" to express her grief for having murdered or sold her child. The tape begins with what sounds like a child's voice. A woman speaks momentarily in the background; it sounds like Marlene Aisenberg. A child is talking softly. Then loud wailing abruptly pierces the house and quickly ends. The same calm woman's voice, probably Marlene Aisenberg, immediately continues in the background. For a reasonably prudent officer to deduce the person wailing is Marlene Aisenberg, he would have to ignore the female's voice before and after the sudden hollering. Or, he would also have to conclude Marlene Aisenberg spoke calmly, then for some unexplained reason howled "help me." Having satisfied her need to express her grief (as the affiants posit), she instantly composed herself and carried on her quiet conversation. Obviously, such deductions defy human experience.[63] Blake's opinion is baseless. Burton and Blake misrepresented this conversation with reckless disregard.

### 7. First Extension: ¶ V13

At approximately 5:34 p.m. a conversation was intercepted on the listening device located in the kitchen (P–5, conversation number 109). Marlene Joy Aisenberg and Steven Bennett Aisenberg engaged in a conversation and during the conversation Marlene Aisenberg advised "I don't like lying to my dad at all and I'm in his face (inaudible)." Steven Aisenberg replied "(inaudible) well tell your dad not to ask you any questions concerning the case, cause you can't answer a lot." Marlene Aisenberg replied "You know (inaudible) everybody's so quick to think, you know. You don't understand, my parents are here just as much as (inaudible) and I'll tell you one thing, you know if it would have been my father who said about the *abusing* first." Steven Aisenberg replied "I know I have said that already." They then discussed someone who "Came up with a crazy idea.". Marlene then complained about her parents being "shut out completely" and how she (Marlene Aisenberg) doesn't appreciate it. Steven Aisenberg then replied "But Mar, what you need to understand, there's certain things you cannot say to your parents. When they're questioning your parents, then technically they're not questioning my family, cause they're not here. There are certain things pending, the

---

**63.** Blake, no doubt, is convinced he is correct. But to accept his testimony, I would have to credit what is contrary to the teachings of basic human experience and completely at odds with ordinary common sense. The fact that he believes this and testified to it is not enough. "If a witness were to testify that he ran a mile in a minute, that could not be accepted, even if undisputed. If one testified, without dispute, that he walked for an hour through a heavy rain but none of it fell on him, there would be no believers." *United States v. Chancey*, 715 F.2d 543, 546–47 (11th Cir.1983) (reversing the district judge for erroneously crediting the testimony of the government's key witness for Fed.R.Crim.P. 29 purposes).

case, that you cannot say to them. And it's unfortunate that they're so close too, so it's for there sake." Later in the conversation Steven Aisenberg advised "No, there's a difference in protecting yourself and not protecting yourself, and if my being rude to your friends means protecting you then I'll be very rude to your friends." "But just you understand, I'll be very rude to all your friends, I don't care. My priority is you, not them and your priorities should be yourself and your family, not them. That's why I'm rude to them." (SEE EXHIBIT "J")[64]

The Defendants submit the underlined word, "abusing," is not on the tape (G Ex. 22A) and contend the affiants should not have intentionally or recklessly included the word in the transcript and summary paragraph. Instead, the Defendants say the word is actually "immunity." The government, in its response to the motion to suppress, submits the affiants did not misstate the conversation and their interpretation is reasonable (doc. 170, p. 45). But at the *Franks* hearing, both Burton and Blake admitted the word is "immunity" and not "abusing." "Immunity" can be heard clearly.[65] Burton and Blake misquoted this conversation with reckless disregard.[66]

### 8. First Extension: ¶ V17

On January 5, 1998, at approximately 5:55 p.m. a conversation was intercepted on the listening device located in the kitchen (P–11, conversation number 681). Steven Bennett Aisenberg and Marlene Joy Aisenberg were having a general discussion and during the conversation Steven advised "Let's discuss this independently Hon." "Let's discuss that in the bedroom, you gotta pay attention to what's around you." Later in the conversation Marlene asked "Did they finish packing," no? "What if they check the shed?" Steven replied "You know nothing." Marlene then advised "I said doing it won't kill me, alright, you know, fine." (SEE EXHIBIT "N")

The Defendants have two specific objections to this paragraph. First, although the application transcript's synopsis mentions Steven Aisenberg is talking to his son, William, the summary says no such thing. By omitting this information, the affiants distorted Steven Aisenberg's statements and placed his comments in a "sinister" light. Their second objection is that certain statements are inaudible: "shed" and "I said doing it won't kill me, alright, you know, fine." The government maintains the summary and the supporting transcript are accurate and demonstrate the Defendants had something to hide

---

**64.** This intercept occurred on December 17, 1997.

**65.** The detectives first listened to all these tapes on cassette deck transcribers commonly used for office dictation. Burton testified she noticed the error only after listening to the recording after it had been transferred to a compact disc (presumably a higher fidelity format). I have listened to all these cassette recordings using a transcriber provided by the government and represented to be similar to the ones the affiants operated. I had no difficulty hearing the word, "immunity," and I do not credit Burton's testimony.

**66.** I have considered whether the term, "immunity," adds to the probable cause calculus or detracts from it. Obviously, talking about "immunity" can suggest culpability for some type of crime. But this conversation patterns earlier ones where Steven Aisenberg is admonishing his wife about discussing matters pertaining to the investigation. Accordingly, I do not find including "immunity" into the conversation adds to probable cause. Further, I find redacting "abusing" from the paragraph is a material change; it supported the affiants' theory regarding aggravated child abuse, a crime the affiants targeted in their intercept applications.

from law enforcement, such as they dumped the baby's body in some shed.[67]

This paragraph exemplifies the careless approach the affiants took to the warrant process. Even though the recording is poor and one can hear only parts of the conversation with any confidence, agents swore to the judge implying their information is trustworthy and reasonably grounded. The judge relied on their proffer and the inference their proffer imparted. Unfortunately, the judge was unaware the question "what if they check the shed?" is more likely "what if you think they said?" Or, if he had listened to the same muffled sounds, he could just as easily have surmised the speaker said something else. He did not know the remark, "I said doing it won't kill me, alright, you know, fine," cannot be heard. He did not know the recording's quality and brevity make any reliable affirmation about what the speakers are saying and what they mean impossible. The judge could never have imagined Blake would later testify he had no firm conclusion or even a reasonable suspicion how this conversation related to any of the predicate crimes. Had the judge known all this, I suspect his conclusion would be the same as mine. Burton and Blake were simply guessing about the conversation and silently hoping the judge would agree.[68] I find the affiants made these statements with reckless disregard.

### 9. First Extension: ¶ V20–24

20. On November 23, 1997, a video tape recording was made of the missing baby, Sabrina Paige Aisenberg, by the parents. After reviewing this video your affiant's noted what appeared to be missing hair on the side of the head and bruises on the facial area of the baby. On December 11, 1997, the video tape recording was taken to video enhancement facilities located at Walt Disney World by Detective Carlos Somellan, Hillsborough County Sheriff's Office. Several still photographs were retrieved from the video recording of Sabrina Paige Aisenberg.

21. On December 30, 1997, your affiant, Linda Burton met with Doctor Laleh Posey, a Pediatrician who works with the Child Protection Team, Tampa General Hospital. Doctor Posey was given the photographs to examine. Doctor Posey in her expert opinion concluded that hair had been pulled out of the left side of the baby's head and the area around the left eye was bruised. Also noted was a linear bruise was observed on the left side of the face near the mouth. A linear bruise was also noted in the area from where the hair had been pulled out.

22. It should be noted that during the initial interviews of Marlene Joy Aisenberg by your affiants she advised that there were no injuries to Sabrina Paige Aisenberg prior to her reported disappearance.

23. During the initial interview Marlene Joy Aisenberg advised that on November 22, 1997 she had taken both Sabrina Joy Aisenberg and William Aisenberg, her older son, to Mr. Willys Hair Salon, located at 3634 Lithia–Pinecrest Road, Valrico, Florida. Williams Hair was cut by Stacey Allen, an employee of Mr. Willys Hair Salon.

24. On December 17, 1997, your affiant Linda Burton interviewed Stacey Allen and Allen advised that she had observed hair missing from the left side of Sabrina Paige Aisenberg's head.

---

67. Burton searched nearby sheds and storage units and found nothing.

68. Judge Alvarez, of course, was entitled to rely on the affiants' representations. He had no duty to listen to the recordings.

**1342**

A television viewer, after watching a local broadcast of a video showing Sabrina Aisenberg crawling, called the sheriff's tip line and opined hair was missing from the baby's scalp. Apparently from this tip, Burton reviewed the tape, Marlene Aisenberg's November 22, 1997, home video (Defendants' Ex. 6), and discussed it with other investigators at a regular task force meeting. The group agreed they needed to retrieve still frames from the video and have medical experts give an opinion. They also agreed they would not conduct any interviews of lay witnesses until the physicians had reported their findings.

But by this time, Burton and Blake knew no one who had observed Sabrina Aisenberg within days of the 911 call had reported any bruising or anything unusual about the child. Blake interviewed Yashira Perez on November 24 at her school. Perez, who babysat the child on November 22, reported the infant seemed fine. Ginny Westberg, who worked with Marlene Aisenberg and saw the baby on the Wednesday before the 911 call, told Burton on November 25 she spotted nothing unusual. Burton interviewed Kristen Kelly, William Aisenberg's classmate who appears in Marlene Aisenberg's home video, on December 9. She said she saw no bruises or any injury. The affiants also knew the baby had attended her cousin's birthday party the afternoon (Sunday) before the 911 call. In fact, authorities had custody of the birthday video. Nonetheless, as the Defendants complain, Burton and Blake omitted these facts from the application.

Burton and Blake met Dr. Posey, the medical director of the county's child protection team, and showed her the stills (G Ex. 25). The detectives failed to tell the pediatrician about what witnesses had observed; anecdotal information the physi-

cian would have considered helpful. Dr. Posey studied the grainy photos and offered her differential diagnosis—possible bruising under the left eye and under the nose and an unexplained patch of hair missing from left side of the scalp. These areas seemed "suspicious" to her. She did not tell the detectives, contrary to what they stated in the application, she had "concluded" in her "expert medical opinion" the infant's face was bruised and "hair had been pulled out."

Likewise, Stacey Allen's testimony at the *Franks* hearing differed from what Burton reported in the application, that Allen observed hair missing from the left side of Sabrina's head (¶ V24). Burton included Allen's statement to show an eyewitness had observed Sabrina's injuries. Giving Burton the benefit of the doubt that she interviewed Allen on December 17, 1997,[69] Burton acted with reckless disregard by failing to include in the affidavit the remainder of the hairdresser's statement. Allen told Burton the baby's hair appeared to be rubbed off in a manner typical of newborns, not that it had been pulled out as Burton implied. Considering by then Burton had talked with others who stated the child appeared fine shortly before her disappearance, Burton acted with reckless disregard by implying to the reviewing judge that an eyewitness had observed an injury.

### 10. Second Extension: ¶ V10

On January 29, 1998, at approximately 11:40 p.m. a conversation was intercepted on the listening device located in the bedroom (P-9, conversation number 451). Steven Bennett Aisenberg and Marlene Joy Aisenberg had returned from appearing on the Oprah Winfrey

**69.** Stacy Allen testified that she was on maternity leave on December 17, 1997. Detectives, she said, never interviewed her at that time.

show and were discussing matters concerning the show and investigation. Marlene Aisenberg makes a comment which is partially inaudible and on two separate occasions, Steven Aisenberg responds to Marlene Aisenberg's statement by responding "They have that!!!" to which Marlene Aisenberg answers "Well ... they haven't figured it out yet." Marlene Aisenberg then discusses with Steven Aisenberg a Tampa Tribune article which comments on how Oprah Winfrey was skeptical about the story surrounding the disappearance of baby Sabrina. (SEE EXHIBIT M)

The Defendants contend portions of this tape are unintelligible and they cannot hear the quote, "Well ... they haven't figured it out yet." The government counters the affiants did not mislead the judge. Notably absent in their response, however, is some affirmation that Marlene Aisenburg uttered these words. Indeed, the government omits the quote in a revised transcript submitted to the district judge (April 12, 2000 version). Burton testified she included this paragraph to demonstrate the Aisenbergs were hiding something from law enforcement. One can only wonder which tape she reviewed to reach such a conclusion. Certainly it cannot be this one (G Ex. 19A).

The beginning of the tape presents the same systemic problems apparent in the others. I cannot hear "Well ... they haven't figured it out yet." But eventually one can hear Marlene and Steven Aisenberg converse about her recent appearance on the "Oprah Winfrey" television show. The two go back and forth about what was on the show and what may have been "cut out." Each time Marlene Aisenberg comments about a point she thought had been edited from the telecast, Steven Aisenberg replies, "They have that." Or he says, "No, they have that." Burton's representation that this conversation

evinces the Aisenbergs' determination to hide "something" from the police is factually baseless. I find Burton and Blake recklessly misrepresented its context to the reviewing judge.

### 11. Second Extension: ¶ V17

On January 21, 1998, at approximately 9:19 p.m. a conversation was intercepted on the listening device located in the kitchen (P–17, conversation number 955). Steven Aisenberg is talking to an unknown subject on the telephone and during the conversation, he and Marlene Aisenberg both begin talking at the same time about the bruises and the hair in the photographs of Sabrina Aisenberg. Steven Aisenberg comments "*...you don't see...under the eye...*" "*There's bruises.*" Marlene Aisenberg talks over Steven Aisenberg and is heard stating "*...the hair.*" to which Steven Aisenberg states, again concerning the pictures of Sabrina Aisenberg, "*...over there, one with the hair...*" Marlene and Steven Aisenberg then begin a conversation concerning an incident involving a bathtub and *sedatives*. Some of the conversation involved talking over each other. Steven Aisenberg states "*... the sedatives ...*you know, we did it and then you, they climbed in." to which Marlene Aisenberg responds "*and she...drink.*" to which Steven Aisenberg answers "then I quieted you." "Then I quieted you and then you like you got up because the kids were crying in the bath tub, take care of that and ummmm that's when *we use it...* " Later in the conversation, Marlene Aisenberg reminds Steven Aisenberg that "You know we can't say anything...brother, without talking to Barry..." Marlene and Steven Aisenberg then continue the conversation discussing the video of Sabrina Aisenberg. (SEE EXHIBIT T)

The Defendants argue the affiants falsely included the underlined phrases, omitted material facts, and purposely distorted the conversation. Although the government concedes the underlined phrases do not appear in the application transcript, it points out the statements appear in the progress report submitted to the state court judge. Thus, the government argues, the phrases "exist," and the affiants did not manufacture them or intentionally mislead the judge.

According to Burton and Blake, they included this summary to convince the judge the Aisenbergs battered or murdered their child. The Aisenbergs acknowledge photographs exist showing injuries to their baby; they are determined to keep this discovery a secret. Absolutely nothing in the recording supports the affiants' conclusions. Any reasonable listener, if informed about what prompted the conversation, would quickly realize the Defendants are not doing what the affiants and the summary suggest. The detectives' implications, like some of the quoted statements, are pure fiction.

Burton and Blake deliberately omitted to tell the judge what they did about an hour before this recording starts. At approximately 8:15 p.m., the Burton and Blake stop unexpectedly at the Defendants' home (Detective Blake testified they dropped by to keep the Aisenbergs posted on the case's progress). The detectives confront the Defendants with photographs of their child. Using the ones shown to Dr. Posey, Burton points to the "suspicious" areas. Marlene Aisenberg denies seeing any bruising. During the encounter, Marlene Aisenberg excuses herself to attend to her two children who were in the bath tub.

Fifteen minutes after leaving the Aisenbergs, Blake and Burton stop at Ginny Westberg's house. They show the same photos to Westberg. Westberg tells the detectives she does not see any bruises and remarks the baby's hair always looked patchy. After the detectives leave, Westberg telephones the Aisenbergs. She informs Steven Aisenberg about her encounter with Blake and Burton.

This prelude explains Steven Aisenbergs' first few statements (G Ex. 17A):

> If you can write down as close to word for word as what transpired from the time they came to the time they left. And, um, and if you can get that to us you know before tomorrow morning or by . . . you know. We have to be down by the attorney's by nine, so we will be leaving here about quarter of eight to drop William off at school and Monica and be down there.[70]

Obviously, Steven Aisenberg is not speaking to his wife. As the government's revised transcript (April 12, 2000) belatedly implies, he is on the telephone with "Ginny" asking her to write down what "transpired between the time [the detectives] came and the time they left." After hanging up, Steven and Marlene Aisenberg review their encounter with the detectives so they can later inform their lawyer.

The affiants knew all this. The Defendants did not all of sudden talk about evidence of injuries to the child as this summary suggests. Burton and Blake prompted the conversations. They knew about the events the Aisenbergs and Westberg were discussing. This is why they stopped by the Defendants' home—to spur talk. They knew precisely what Steven

---

70. The transcript attached to the application only partially quotes the first two sentences. The transcriber summarizes the rest.

Aisenberg meant when he said "the kids were crying in the bath tub." It had nothing to do with sedatives, a word I cannot hear after carefully listening to the recording. Likewise, I cannot hear any of the other underlined portions of the summary.[71] The affiants deliberately misled the judge. They omitted information and distorted the conversation. They included statements which the Defendants did not say or cannot be heard.

### 12. Second Extension: ¶ V18

On January 21, 1998, at approximately 9:54 p.m. a conversation was intercepted on the listening device located in the kitchen (P–18, conversation number 958). Marlene Joy Aisenberg is discussing the hair missing from Sabrina Aisenberg. She states "...I mean ... you know... hair, that light spot where hair is ... and um, they said that it ... pulled out." (SEE EXHIBIT U)

This conversation follows the preceding one (¶ V17) by twenty minutes. Again, Marlene Aisenberg is telling someone about the affiants' visit and their claims that photographs prove hair is deliberately missing from her child's head (G Ex. 23A).[72] Like the previous paragraph, the Defendants complain Burton and Blake

distorted her statements by omitting these facts. I agree.

While the summary accurately recites what Marlene Aisenberg said, it fails to identify "they" as in *"they* said that it ... pulled out." Of course "they" are Burton and Blake. The detectives also conveniently omit Marlene Aisenberg's retort to their suggestion she (or her husband) pulled hair out from her baby's scalp— "unbelievable." For the same reasons I gave earlier, I find Burton and Blake deliberately misled the judge. Including this information materially changes the context and negates probable cause.[73]

### 13. Second Extension: ¶ V19

On January 25, 1998, at approximately 9:52 p.m. a conversation was intercepted on the listening device located in the kitchen. (P–20, conversation number 1032). Marlene Joy Aisenberg and Steven Bennett Aisenberg were having a conversation and it becomes apparent that Marlene Aisenberg has said something to someone which concerns Steven Aisenberg. Marlene Aisenberg is nonchalant about making the statement and advises "...I am glad I told her," to which Steven Aisenberg responds "Hon, you know, you just don't, be careful." Steven Aisenberg goes on to state that

**71.** During the *Franks* hearing, one of the prosecutors, while questioning some witnesses, implied Marlene Aisenberg acknowledged bruising when she stated: "(Inaudible) now they've got these pictures. You know, not ah them fucking pictures, them fucking pictures in that video Sabrina is crawling, rolling on the floor and loving it ..." Presumably, the source for this dialogue is the government's revised transcript (April 12, 2000, at p. 3) which it submitted to the district judge for review. The defense transcript (May 1, 2000, at p. 4) differs: "You know, not, ah, there's nothing (inaudible), nothing (inaudible) in that video, Sabrina is crawling, rolling on the floor and loving it. (Inaudible)." I find the defense's version more accurate.

**72.** The Defendants submit Marlene Aisenberg is speaking to Kevin Kalwary, an investigator with the defense firm, on the telephone (*see* Defense transcript submitted to the district judge dated May 1, 2000). The Defendants did not present evidence supporting this at the *Franks* hearing; nonetheless, I note the Aisenbergs mention the need to contact Kalwary about Burton and Blake's visit.

**73.** The Defendants also claim this conversation is protected by the attorney-client privilege. I see no need to reach this issue for the reasons stated later in this report. Besides, the government represents it does not intend to use this recording at trial.

this "...is also backfiring on us." "... you got very lucky, you know what I'm saying ok, how many other people did you tell?" Marlene Aisenberg then discusses the polygraph with Steven Aisenberg and states to him "...they told me something different and you said to fake it...". After more brief conversation, Steven Aisenberg then instructs Marlene Aisenberg to "Just don't talk to anyone." "Just do what I ask." (SEE EXHIBIT V)

The Defendants argue the affiants distorted the conversation and included statements which are inaudible. The government responds defense counsel merely dislikes the nature of this conversation as reflected in the application transcript; regardless, Burton and Blake did not deliberately or with reckless disregard mislead the reviewing judge (doc. 170, pp. 53–54). I disagree.

This conversation mimics earlier ones: the Aisenbergs are reviewing what each has said to others about the case. First, Steven Aisenberg tells his wife he recently spoke with someone who had previously led him in "prayer," the one who had asked him about his "feelings." [74] Aisenberg asked if the individual recalled their earlier discussion about the polygraph. The person did remember the conversation; Aisenberg had remarked it was inconclusive. "Kevin or Barry," Aisenberg informed his friend, might need to speak to him. By now, Burton and Blake knew "Barry" and "Kevin" to be defense counsel (Barry Cohen) and the defense's investigator (Kevin Kalwary).

When she heard her husband's account, Marlene Aisenberg mentioned her discussion with her friend (the name is unintelligible to me) who had asked questions about the polygraph results. Rumors had apparently circulated about the tests. Marlene Aisenberg seemed anxious to tell her friend the exam results; Steven passed, but authorities decided her two tests were inconclusive. Again, consistent with his previous admonitions, Steven Aisenberg warned her to be careful about what she says to others. It could "backfire."

None of these statements, made in the setting I have described, are incriminating. Unfortunately, affiants suggest something altogether different to the judge. They continue to weave the same cloak, the Defendants are hiding something. But this summary adds more to the cloth; the suggestion that Marlene Aisenberg purposely lied during her polygraph tests. Proof, according to the affiants, is her interjection to her husband, "you said to fake it." The Defendants, however, declare "you said to fake it" is really "you spoke to David." To settle the score, the government called Anthony Pellicano, an audio expert. Pellicano testified he listened to this part of the tape at least *five hundred times*. Apparently, he still cannot decide if Marlene Aisenberg said "fake it" or "David." He is leaning toward "David." An objective listener using simple equipment does not need to listen to this tape five hundred times to make out what Marlene Aisenberg told her husband. Once is enough. Marlene Aisenberg said "you spoke to David." Burton and Blake distorted this conversation with reckless disregard.

### C. Evaluating the revised extension applications

I listened to these recordings with headphones, sometimes without headphones,

---

**74.** The Defendants identify this individual as their rabbi. Although I cannot hear the word, "rabbi," their representation is reasonable given the context of the conversation. Further, the government acknowledges in its April 2000 transcript Steven Aisenberg spoke with a rabbi.

and in open court. I listened first without the aid of transcripts and then listened again looking at the application transcripts and application summaries. The quality of some recordings is strikingly poor. So is the accuracy of Burton and Blake's reporting; quotes in the summaries often do not match the corresponding transcript. Conversations offered to show probable cause for a targeted offense often are irrelevant or exculpatory. This case is not the typical *Franks*-type case. In the typical case, the defendant claims one or a few statements in the application are deliberately or recklessly false. Here, these claims pervade the extension applications. The Defendants have shown by a preponderance of the evidence that Burton and Blake engaged in a pattern of inappropriate conduct. The detectives gave substance to unintelligible recordings and they distorted the context of intelligible conversations.

These errors are not innocent or negligent mistakes or omissions. A reasonable and prudent officer would have recognized these mistakes. At the very least, a reasonable and prudent officer would have harbored serious doubts about the accuracy of the extension applications. *See United States v. Kirk*, 781 F.2d 1498, 1503 (11th Cir.1986) (surveilling agents should have recognized their error or harbored serious doubts when they misidentified a suspect). Because *Franks* requires me to modify the applications in light of these findings, the issue is whether either re-

vised extension application supplies probable cause and otherwise meets Florida's surveillance scheme.[75]

Pursuant to FLA. STAT. § 934.09(5) (1997), an application to extend an intercept must meet the requirements of § 934.09(1) and (3). In other words, the application has to satisfy all the prerequisites for an initial application; additionally, it has to include a statement outlining the results of the intercept to date or reasonably explain why it has failed to obtain the desired results. The judge, before permitting the intercept to continue, is required to make the same findings he made when he first approved the intercept: probable cause to believe that an individual is, has, or is about to commit a listed offense; probable cause to believe that particular communications concerning that offense will be obtained through such interception; normal investigative techniques are unlikely to succeed; and probable cause exists to believe the communications will be intercepted at the particular place being used. *See* 18 U.S.C. § 2518(5); *United States v. Giordano*, 416 U.S. 505, 532–33, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).[76]

After redacting and modifying the challenged paragraphs of the extension applications per my *Franks* findings, I conclude the authorizations are invalid. As required by § 934.09(1), the revised applications do not support probable cause to believe one or both of the Defendants are

**75.** Obviously, if the first extension application fails to supply probable cause, the second extension application necessarily fails too because it is the fruit of the first. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nevertheless, given the nature of this report, both applications are evaluated.

**76.** State law governs the validity of state court orders authorizing electronic surveillance. *See United States v. Mathis*, 96 F.3d 1577, 1583–1584 (11th Cir.1996); *United States v. Bascaro*, 742 F.2d 1335, 1347 (11th Cir.1984). Florida's wiretap scheme is similar to its federal counterpart (18 U.S.C. §§ 2510–2522). Indeed, 18 U.S.C. § 2516(2) permits state courts to authorize the interception of wire or oral communications in conformity with § 2518 and applicable state law. In other words, a state is free to enact more restrictive legislation than the federal model, which acts as the least restrictive plan. *See State v. Rivers*, 660 So.2d 1360, 1362 (Fla. 1995).

committing, have committed, or will commit murder, the only targeted offense permissible under FLA. STAT. § 934.07 (1997). Nor do the revised applications provide probable cause to believe that particular communications concerning murder will be obtained through further electronic surveillance.

## V.

Florida's wiretap scheme, in conformity with Title III (see 18 U.S.C. § 2516(2)), permits the state attorney to authorize an application for an intercept to a judge for specific offenses. See FLA. STAT. § 934.07 (1997). The applicant must set out a full and complete statement of the facts and circumstances justifying his or her belief the enumerated crime has been, is being, or is about to be committed. FLA. STAT. § 934.09(1)(b)(1). A judge must then find probable cause exists not only to believe that an individual is committing, has committed, or is about to commit an enumerated offense, but also that communications concerning such an offense will be obtained through the interception. FLA. STAT. § 934.09(3)(a) and (b). Burton and Blake sought and obtained intercepts for communications pertaining to homicide, sale of a minor child, child neglect with great bodily harm, and aggravated child abuse in violation of FLA. STAT. §§ 782.04, 63.212(1)(d), 827.03(3), and 827.03(2) (1997). Of these, only murder is listed in § 934.07.[77] The Defendants contend the inclusion of the non-listed offenses renders the orders invalid (doc. 90, pp. 89–93, and

doc. 255). In support, they cite *United States v. Ward*, 808 F.Supp. 803 (S.D.Ga. 1992), a case in which the district judge granted a defendant's motion to suppress because the application listed some offenses not enumerated in the authorizing statute. The government argues *Ward* is not binding and is distinguishable. In contrast to *Ward*, the non-listed offenses here serve as predicates to felony-murder or are sufficiently related to homicide so as to not require suppression. Besides, even if affiants failed to specify these offenses as predicates for felony-murder, the "good faith" exception applies (doc. 170, pp. 65–74, and doc. 254). See *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

### A. Felony–Murder

The government correctly observes all the non-listed offenses can serve as predicates for felony-murder under § 782.04. But it neglects to admit the affiants never proposed such a theory in their applications. Their applications are devoid of any details suggesting how the particular offense of felony-murder "has been, is being, or is about to be committed." FLA. STAT. § 934.09(1)(b)(1). Indeed, the affiants consistently offered two hypotheses throughout their applications, murder or sale of a child: "Your affiants through experience and training believe that in fact this investigation is not a kidnapping investigation but a homicide or sale of a minor child." See e.g., initial application dated December 12, 1997, at p. 20, ¶ 22. Sergeant Roman,

---

77. Although the applications and orders identify "homicide" as the targeted crime, the documents cite FLA. STAT. § 782.04 (1997), the murder statute, as the operative violation. Homicide is defined as the killing of one person by another; thus, not every homicide is a murder or even a criminal act. See *Black's Law Dictionary* 739 (7th ed.1999). Florida statutorily recognizes this distinction. See Fla. Stat. ch. 782 (1997). Thus,

§ 934.09(3)(a) limits intercepts for the most serious criminal homicide—murder (and its varying degrees) as outlined in § 782.04. Intercepts for other types of criminal homicides, like manslaughter, are not authorized under Florida's wiretap scheme. The Defendants concede "homicide" means "murder" for purposes of §§ 934.09(3)(a) and 934.07 in this case.

who drafted the second extension, likewise never implied a felony-murder theory despite realizing the two prior applications Knowles prepared included offenses outside Florida's wiretap scheme. It is likely Knowles knew this too. Roman trained Knowles; he recognized his co-worker's familiarity with the statute's requirements.

While courts should not review warrants hypertechnically but instead realistically and commonsensically, *see Ventresca,* 380 U.S. at 109, 85 S.Ct. 741, I find it difficult to accept the government's proposition. Indeed, if one reads the applications fairly, it is hard to imagine the applicants ever conjured all the felony-murder scenarios the government puts forth. Even the minimization instructions are at odds with the government's notion. These instructions admonish monitors: "Rule Three—you can only intercept conversations where (name omitted) is a party and where the subject of the conversations is homicide, sale of a minor child, child neglect with great bodily harm, or aggravated child abuse" (doc. S–26, Minimization Procedures). Realistically, only aggravated child abuse could logically be incorporated under some implied felony-murder theory given the time frame involved. The affiants knew that less than twenty-four hours had elapsed from the end of the birthday party to the time the Defendants called 911. If authorities suspected aggravated child abuse had occurred, they had to realize it would have had to lead to the infant's quick death. Effectively, the temporal distinction between any aggravated abuse and death would be blurred. Certainly nothing in the application provided cause to believe death from child neglect with great bodily harm or death during the sale of a minor child had taken place during this limited time. Thus, the government cannot justify the inclusion of non-listed offenses by a felony-murder theory the affiants never contemplated.

## B. Good Faith

The government recognizes the Florida Supreme Court has refused to apply *León's* good faith exception to wiretap cases. In *State v. Garcia,* 547 So.2d 628 (Fla.1989), the Florida Supreme Court reasoned FLA. STAT. § 934.06 provides a statutorily created exclusionary remedy; *Leon* addresses the judicially created sanction implementing the Fourth Amendment. To circumvent *Garcia,* the government contends federal law applies to the issues the Defendants raise, citing *United States v. Malekzadeh,* 855 F.2d 1492 (11th Cir.1988), a case in which the Eleventh Circuit applied *Leon* to a Florida wiretap (doc. 254).

*Malekzadeh* does not hold, as the government posits, federal courts should apply federal law when evaluating motions to suppress a state wiretap obtained by state actors. Rather, it concludes the federal rules of evidence govern the admissibility of evidence obtained via a valid state wiretap. *Malekzadeh,* 855 F.2d at 1496. The Eleventh Circuit, as noted previously, has consistently looked to state law for deciding the validity of state intercepts. *See United States v. Mathis,* 96 F.3d 1577, 1583–84 (11th Cir.1996); *United States v. Bascaro,* 742 F.2d 1335, 1347 (11th Cir. 1984); *United States v. Nelligan,* 573 F.2d 251, 253–54 (5th Cir.1978). These cases recognize one of the principal features of the federal legislation—states are free to enact more restrictive electronic surveillance statutes than Title III.

In view of the Eleventh Circuit's admonition regarding the controlling law for deciding the validity of state wiretaps, *Malekzadeh's* use of good faith principles to a Florida wiretap is puzzling. To follow *Malekzadeh* by applying a good faith rationale here contradicts the *Nelligan–Bascaro* line of cases. It also would effectively eliminate Title III's notion that states can impose more restrictive demands for elec-

tronic surveillance. Significantly, the Florida Supreme Court issued *Garcia* after the Eleventh Circuit ruled *Leon's* good faith rationale applied to a Florida state court wiretap. Perhaps, if the Eleventh Circuit faced the issue again it would find *Garcia* controlling. Regardless, *Malekzadeh* conflicts with the earlier line of Eleventh Circuit cases applying state law to state wiretaps. The rule in this circuit when this occurs dictates the earlier line of precedent governs. *See Walker v. Mortham,* 158 F.3d 1177, 1188–89 (11th Cir. 1998) (holding when *circuit authority is in* conflict, a court should apply the earliest line of authority). I, therefore, decline to follow *Malekzadeh* to the extent it promotes "good faith" principles to an intercept authorized by a Florida court.

Moreover, even if *Malekzadeh* did control, I would find *Leon* still does not apply. As I have indicated, the applications for the first and second extensions contained deliberately false and reckless material statements and omissions. The Supreme Court specifically declined to allow good faith exceptions to warrants based on such applications. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405 (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). Similarly, Knowles had to know when he drafted the initial application he had targeted offenses outside Florida's surveillance scheme. These actions were not minor technical mistakes; limiting intercepts to prescribed offenses goes to the heart of the surveillance statute.

### C. Non-listed offenses

The starting place for any analysis begins with the statute giving an "aggrieved party" the right to seek relief.

Fla. Stat. § 934.09(9)(a) (1997) provides in pertinent part as follows:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority may move to suppress the contents of any intercepted wire, oral, or electronic communication, or evidence derived therefrom, on the grounds that:

1. The communication was unlawfully intercepted;
2. The order of authorization or approval under which it was intercepted is insufficient on its face; or
3. The interception was not made in conformity with the order of authorization or approval.

Only subsections 1 and 2 arguably apply here and both mirror 18 U.S.C. § 2518(10)(a)(i) and (ii). In a series of cases, the Supreme Court reviewed, explained, and applied the federal provisions. *See United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974); and *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Two essential themes emerge from these decisions as they relate to this case. First, subsection (ii) (and therefore its state corollary, Fla. Stat. § 934.09(9)(a)(2) (1997)) is limited to those instances where the order *on its face* is deficient. *Giordano,* 416 U.S. at 526 n. 14, 94 S.Ct. 1820. Namely, the order omits some statutory requirement. Second, the term "unlawfully intercepted" as used in subsection § 2518(10)(a)(i) (and its state counterpart, Fla. Stat. § 934.09(9)(a)(1) (1997)) does not mean all violations of the wiretap scheme require suppression. "Congress intended to require suppression where there is a failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary

investigative device." *Giordano,* 416 U.S. at 527, 94 S.Ct. 1820. For example, in *Giordano,* the court determined the approval of a senior official in the Justice Department plays "a central role in the statutory scheme," and ordered suppression of the intercepted wire communications. 416 U.S. at 528, 94 S.Ct. 1820. In *Chavez,* the Court refused to suppress wiretap evidence when the Attorney General authorized the wire but the application and order incorrectly identified the Assistant Attorney General as the authorizing official. 416 U.S. at 579–80, 94 S.Ct. 1849. Suppression, the Court reasoned, would not further the goal of guarding against unwarranted use of wiretapping. *Id.* at 571, 94 S.Ct. 1820. Similarly, in *Donovan,* the Court refused to suppress evidence even though the application failed to meet the identification requirements of § 2518(1)(b)(iv) and notice requirements of § 2518(8)(d). 429 U.S. at 434–40, 97 S.Ct. 658. These sections were not central to the underlying legislative purpose of Title III. *Id.*

The initial order authorizing the intercept and the orders approving the extensions facially comply with Florida's statutory demands. Although the orders identify unlisted offenses, this fact alone does not render them facially invalid. In other words, each order targets a designated offense, murder, and otherwise facially complies with the statutory requisites. *See Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (order not invalid under § 2518(10)(a)(ii) because it clearly identified, though erroneously, the appropriate Assistant Attorney General with authority to approve the application; but the interception is invalid under § 2518(10)(a)(i) because an Executive Assistant to the Attorney General authorized the application without the appropriate designation of authority).

Because the orders are not invalid on their face, the Defendants must look to § 934.09(9)(a)(1) for relief by demonstrating the communications were unlawfully intercepted. That is to say, the Defendants must show §§ 934.07 and 934.09(3)(a), the statutory requirements violated, occupy "a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance." *Chavez,* 416 U.S. at 578, 94 S.Ct. 1849.[78]

In *United States v. Ward,* 808 F.Supp. 803 (S.D.Ga.1992), the case the Defendants principally rely upon, the government sought and obtained an order authorizing the interception of communications pertaining to the transmission of wagering information, illegal gambling, interstate transportation of wagering paraphernalia, Hobbs Act, obstruction of state or local law enforcement, conspiracy to commit said violations, and income tax evasion. 808 F.Supp. at 819. Of all these crimes, interstate transportation of wagering information and tax evasion were not designated offenses under Title III. Despite the fact the remaining offenses were listed crimes for Title III purposes, the judge suppressed all communications, even those relating to the listed crimes. He reasoned Congress took deliberate steps to restrict wiretap authorizations to specific offenses. *Id.* at 806. The government, for example, would have been required to minimize the interception of communications not otherwise subject to seizure under Title III. "Permitting the Government to proceed in this instance without sanction for the overinclusive applications and intercepts offers no incentive for the Government to fulfill

**78.** Admittedly, the Defendants do not specifically cite in their papers § 934.09(9)(a)(1) or 18 U.S.C. § 2518(10)(a)(i), but their argu-

ments are broad enough to include such references.

its responsibility to comply from the outset with a central and functional provision of Title III." *Id.* at 808. Sanctions, the judge reasoned, would serve the deterrent purpose of Title III's exclusionary rule by placing the onus on the government for insuring compliance with the statutory scheme at the outset of the process. *Id.*

Undoubtedly, Congress purposely limited the use of electronic surveillance to identified offenses. This is the central theme of the legislative work. *See Giordano,* 416 U.S. at 514, 94 S.Ct. 1820 (the purpose of Title III is to effectively prohibit on the pain of civil and criminal penalties all interceptions of oral and wire communications except those specifically provided for in the Act, most notably those intercepts authorized by court order in connection with the investigation of the serious crimes listed in § 2516). Florida rigorously applies this concept. *See State v. Rivers,* 660 So.2d 1360, 1363 (Fla.1995) (Title III does not authorize intercepts for nonviolent prostitution-related offenses). Florida strictly construes its surveillance statute and limits the law's application to the specific provisions set out by the legislature. *Id.* at 1362. But *Ward's* exclusionary reach, suppressing intercepted communications for authorized crimes along with communications for unauthorized offenses, is too broad as a general proposition. While *Ward's* holding fosters Congress's goal for limiting unauthorized interceptions, it stifles Congress's aim for allowing investigators to intercept communications pertaining to authorized crimes. *Cf. Donovan,* 429 U.S. at 435, 97 S.Ct. 658 (the failure to identify additional persons in an intercept application who are likely to be heard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization).

The Supreme Court's use of § 2518(10)(a)(i) suggests reviewing courts should, when faced with mixed applications like the ones here, strive to employ narrower sanctions other than *Ward's* total ban. In appropriate instances, a court should be able to surgically remove unauthorized communications from the body of intercepted communications. This method would allow the government to offer the validly intercepted communications as evidence in a subsequent proceeding.

The Eleventh Circuit has counseled this type of approach for 18 U.S.C. § 2517(5) violations. This section requires the government to obtain prior judicial approval before disclosing intercepted communications about crimes different than the ones specified in the authorization order. But if the government fails to abide by this provision, it does not mean the court must dismiss the indictment. Nor is the court required to suppress all seized communications and throw out intercept evidence relevant to the designated Title III crimes along with evidence for the non-designated offenses. Sanctions are to be applied flexibly with an awareness of § 2517(5)'s purpose. *United States v. Watchmaker,* 761 F.2d 1459, 1470 (11th Cir.1985) (refusing to dismiss RICO indictment when government failed to obtain disclosure order under § 2517(5) before using state wiretap evidence pertaining to drug offenses).

In *United States v. Van Horn,* 789 F.2d 1492, 1503–04 (11th Cir.1986), the Eleventh Circuit adopted this flexible approach, one that requires courts to keep in mind the statutory goal involved. The *Van Horn* surveillance application listed certain drug offenses as its focus (21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 1962(c)-(d)), but the indictment charged different drug violations (21 U.S.C. §§ 848, 952(a), and 963). The prosecutors did not secure judicial approval before revealing the contents of the intercepts to the grand jury, and the defendants moved to suppress the intercept evidence claiming the

government violated 18 U.S.C. § 2517(5). The court rejected their arguments. Citing former Fifth Circuit precedent, it emphasized § 2517(5)'s purpose: to prohibit the government from getting an intercept for one crime as a subterfuge for obtaining evidence of a different crime for which the prerequisites are lacking. *Id.* at 1503 (citing *United States v. Campagnuolo,* 556 F.2d 1209, 1214 (5th Cir.1977)). The judge's approval of surveillance extensions with knowledge of the intercepted conversations as reported in the progress reports satisfied § 2517(5)'s goals. *Van Horn,* 789 F.2d at 1503–04.

*Watchmaker's* and *Van Horn's* approach implements the message the Supreme Court preached in *Giordano, Chavez, and Donovan*—the statutory exclusionary rule remedy should match the particular goal Congress attempted to achieve when it included the particular provision in question. The statutory goal implicated in this case is precise: limit the intercepted communications to authorized crimes and exclude communications about unauthorized offenses.

However, using a flexible-sanction's approach to implement the identified goal necessarily contemplates the government has seized intelligible communications. Indeed, § 2518(10)(a), the Defendants' vehicle for enforcing Congress's statutory limits on electronic surveillance, presumes the court will be presented with intelligible communications to review. An "aggrieved person ... may move to suppress the contents of any wire or oral communication intercepted pursuant to the chapter." 18 U.S.C. § 2518(10)(a). Title III defines "contents" to mean "information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). Thus, a court implicitly assumes the inter-

cepted conversations the government will offer as evidence at a trial are of such a quality that a "listener can hear satisfactorily the words spoken and reliably distinguish them from other words that sound similar" and understand "enough of the recording ... to permit the listener to reasonably determine the sense in which the words are used, i.e., the sense in which the speaker intended them." *United States v. Aisenberg,* 120 F.Supp.2d 1345, 1349 (M.D.Fla.2000). Moreover, the court anticipates the government will be able to establish the "communications" at issue are relevant as contemplated by Fed. R.Evid. 401.[79] Namely, the statements are either intrinsically relevant or the government can demonstrate their relevancy through extrinsic evidence.

But identifying intercepted communications meeting these standards, after listening to the work-copy recordings and evaluating the testimony presented at the *Franks* hearing, is difficult if not impossible. The government hears what no reasonably prudent listener can; it interprets what can be heard as no reasonably prudent listener would. Faced with the quality and nature of the recordings so far presented in this case, it is doubtful any judge, no matter how skilled and dedicated, could parse the conversations into its component parts looking for evidence of murder, sale of a minor child, child neglect with great bodily harm, or aggravated child abuse. Admittedly, such an exercise, if successful, would satisfy the intent of Title III's framers by allowing the court to excise unlawfully intercepted communications, thus, limiting the intercept to its permissible reach. But in this case, the nature and quality of the recordings make it impossible. Moreover, the reality is that

---

**79.** Rule 401 defines "relevant evidence" as evidence having a tendency to make the existence of any fact that is of consequence to the

determination of the action more or less probable than it would be without the evidence.

if evidence of these crimes existed, if the Defendants' intercepted conversations proved they had done these things to their child, they would not be in the dock of a federal court charged with false statement violations. A federal judge would not be examining the "contents" of the intercepted communications for compliance with Title III or Florida's electronic surveillance scheme.

Faced with this canvas of nebulous conversations, the Court's task of measuring the merits of the motion to suppress against Title III's twin aims is exacerbated by the nature of this prosecution—false statement violations under § 1001. The government's central theme is the Defendants falsely reported their daughter had been kidnapped. Obviously, it proposes to use the Defendants' intercepted conversations to prove something else likely happened to the child. The indictment, like the intercept applications, insinuates two possible scenarios: the Defendants either murdered or sold their child. If the government's approach at the *Franks* hearing is indicative, the government is not wedded to a specific theory. Either supposition, murder or sale of a child, will suffice, so long as it is plausible enough to convince a jury beyond a reasonable doubt the Defendants lied to investigators as charged. Yet, the intercepted conversations do not supply probable cause to believe the Defendants murdered their child, the only offense authorized by FLA. STAT. § 934.07 (1997). Nor do these conversations provide probable cause to believe the Defendants committed the other crimes listed in the applications.

Employing the Eleventh Circuit's gauged sanctions approach to this confluence of varying, ambiguous, unintelligible, somewhat-intelligible, irrelevant conversations is the root of the review problem. What the government advocates is the indiscriminate use of all these intercepted conversations, irrespective of any relevancy to an authorized crime under FLA. STAT. § 934.07, to suggest something happened to the child other than what the Defendants reported to law enforcement. But to allow this indiscriminate use of intercepted communications without regard to the limited purposes dictated by Florida's wiretap scheme eviscerates the law's intent. It invites the Court to give its imprimatur to Detective Burton's driving justification for the wire, "the Defendants must be hiding something."

Adopting a commensurate, flexible sanction matching the particular goals Congress outlined for Title III, which the Florida legislature adopted, does not work in this case because the communications the state seized are either unintelligible, do not stand for the proposition the government advances, or are unrelated to the offenses described in § 934.07. For these reasons, the only plausible sanction for the seizure of communications based on applications containing non-listed offenses under § 934.07 is to suppress the fruits of all three intercepts. This sanction is proportionate to the statutory scheme's intent. Specifically, it ensures the intercepted conversations will not be used for a purpose other than one contemplated by the statute.

### D. Minimization and Privileges

In somewhat interrelated arguments, the Defendants contend the orders are invalid because they impermissibly authorized the interceptions of communications protected by the marital privilege; further, the agents failed to appropriately minimize marital and attorney-client protected conversations (doc. 90, pp. 94–105). These arguments are without merit.

The Defendants, notably, cite no authority for the proposition that a wiretap order is *per se* invalid if it targets the intercep-

tion of communications of two individuals who are married. Accepting this proposition would mean law enforcement officers could never intercept communications between spouses even if probable cause existed to believe both had committed an enumerated crime. Neither Congress nor the Florida legislature intended to prohibit this. Indeed, the wiretap schemes make clear that Congress and the Florida legislature anticipated authorities would intercept privileged communications pursuant to a valid wiretap order. *See* 18 U.S.C. § 2517(4); FLA. STAT. § 934.08(4) (1997).

Following Title III, Florida requires authorization orders instruct monitors to minimize the interception of conversations not otherwise subject to interception under the statute. FLA. STAT. § 934.09(5) (1997); 18 U.S.C. § 2518(5). All three orders included such provisions, and the monitors received appropriate instructions regarding these procedures. Because the orders are valid to this extent, the admission at any trial of conversations that are arguably protected by the attorney-client privilege or marital privilege is governed by Fed.R.Evid. 501. *United States v. Mathis,* 96 F.3d 1577, 1583–84 (11th Cir.1996); *United States v. Malekzadeh,* 855 F.2d 1492,1496 (11th Cir.1988).

### E. Investigative Need

Lastly, the Defendants contend the affiants violated FLA. STAT. § 934.09(1)(c) (1997) by applying for the intercept too soon.[80] That section essentially requires the affiants to explain in their application whether or not they tried other reasonable investigative procedures and if not why. Because the investigation was only eighteen days old, the Defendants reason, the state had not given enough time for tradi-

tional investigative methods to work. The Defendants, however, do not specifically identify what authorities should have done short of acquiring the intercept.

Section 934.09(1)(c) mirrors 18 U.S.C. § 2518(1)(c). Both statutes underscore an important legislative theme. Electronic eavesdropping is not to be "routinely employed as the initial step in criminal investigation." *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820. Nor is it to be "resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Florida courts and this circuit interpret these provisions identically. It is not necessary for the applicants to show first that all possible techniques or alternatives to wiretapping have been exhausted. It is enough that other reasonable investigative procedures have been tried and either have failed or appear likely to fail or to be too dangerous. *State v. Birs,* 394 So.2d 1054, 1057 (Fla. 4th DCA 1981). Nor will Florida courts invalidate an intercept order simply because defense lawyers are able to suggest some investigative technique that might have been used and was not. All that is demanded is that the application explain the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves. *Hudson v. State,* 368 So.2d 899, 902–03 (Fla. 3d DCA 1979), (citing *United States v. Hyde,* 574 F.2d 856, 867 (5th Cir.1978)); *see also United States v. Nixon,* 918 F.2d 895, 901 (11th Cir.1990) (§ 2518(1)(c) does not require application to provide a comprehensive exhaustion of all possible techniques; instead it must simply explain the retroactive or prospective failure of several investigative tech-

---

**80.** The Defendants appear to limit their argument to the first intercept. Although the extension applications must satisfy the same requirements as the initial one, I see no need to

address the investigative need for the extensions given my findings as to their lack of probable cause and the Defendants's failure to raise the issue.

niques that reasonably suggest themselves) (citing *Van Horn,* 789 F.2d at 1496).

Generally, this issue surfaces in a different setting. Agents are attempting to pierce the inner workings of a drug conspiracy or an organized crime conspiracy. Evaluating the need for a wire in these instances is relatively straightforward. Traditional investigative techniques have developed a strong probable cause showing for the electronic surveillance by identifying the conspiracy's existence and some of it participants. Eventually, the investigation progresses to the stage where electronic surveillance becomes the more reasonable tool for exploring the scope of the conspiracy and the identity of all or most of the conspirators. The wire produces tangible incriminating results (unlike here), and the courts review for statutory compliance knowing the wiretap or intercept has successfully infiltrated the criminal group. Thus, courts are reluctant to engage in a what-if analysis given the success of the electronic surveillance when compared to speculating about the potential success of some other investigative technique.

Here it is the absence of evidence, not the presence of evidence, that fuels law enforcement's desire for an intercept. Traditional investigative methods have yielded nothing promising to support the Defendants' claims of kidnapping. Yet, the affiants essentially admitted at the *Franks* hearing they did little to investigate the offenses described in the application using traditional methods. For example, by December 12 (the date the state judge approved the first intercept) no one had completed any financial analysis of the Defendants. The Federal Bureau of In-

vestigation had subpoenaed documents, but it was likely awaiting receipt of the requested items by that date. Certainly its analyst was unable, based upon the information available to him then, to give any opinion as to whether the Aisenbergs had deposited any large sums of money suggesting a sale of the child. These questions should have been answered before seeking the intercept. Nor had the investigators, according to the government, interviewed family members and acquaintances asking detailed information about the Aisenbergs' treatment of their children and Sabrina Aisenberg in particular.[81] Likewise, law enforcement had not processed all the evidence seized from the Aisenbergs. This is elementary detective work. The government emphasizes law enforcement spent massive resources searching for the infant. This is undoubtedly accurate. I can think of no other local investigation in the past several years which has commanded such dedicated and laudatory efforts by so many agencies. The difficulty is that the government seeks to equate the efforts to find the child with the efforts to satisfy its obligation under § 934.09(1)(c) and 18 U.S.C. § 2518(1)(c). But this a false comparison; the two investigations while intertwined were not the same. What emerged from the *Franks* hearing is the sense that authorities had split their investigation into two components, the massive search for the child and the parallel investigation of the parents as suspects. By December 12, law enforcement had dedicated most of its effort to looking for the infant and tracing all potential leads as to her whereabouts. They had not done some of the basic detective work for building a case against the Defendants for the crimes outlined in the application.

---

**81.** The government attempted to show at the *Franks* hearing that Burton and Blake conducted only limited interviews of family members and acquaintances. As noted previously, the government offered this to suggest the affiants had not omitted in their application exculpatory information about the lack of bruising.

Adherence to FLA. STAT. § 934.09(1)(c) and 18 U.S.C. § 2518(1)(c) not only promotes the legislative goal of limiting the use of intercepts so that they are not "routinely employed as the initial step in criminal investigation," *Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), it assists the judge in fulfilling his statutory responsibility. It assures the judge he can evaluate the probable cause requirement with confidence. The basic investigative steps have been completed. The initial phase is over. He can take the information produced from this stage knowing the applicants have met their obligations for using traditional methods first and decide if it is likely the intercept will produce additional results, namely, incriminating communications about the targeted crimes. But the affiants did not give Judge Alvarez a full and complete statement about their investigative efforts into the charged offenses. They did not tell him they knew several people had seen the child the day before she was reported missing but had not interviewed these witnesses yet. These witnesses, interviewed in late January 1997, stated they saw nothing unusual about the child the day before her parents reported her missing. The affiants did not tell the judge they were still awaiting a financial analysis on the couple, a financial analysis which would show nothing unusual. They did not inform him crime labs were still processing evidence. They did not reveal a federal grand jury would be convened in several weeks to investigate the Defendants. Had they unveiled all this to him, he likely would have reviewed the application in a different light. Judge Alvarez, unaware, had to fulfill his responsibilities in a vacuum of information. After considering the respective arguments, I find the initial application did not meet the requirements of FLA. STAT. § 934.09(1)(c) (1997).

## VI.

For the reasons stated, it is hereby

RECOMMENDED:

1. The Defendants' motion to suppress electronic surveillance (doc. 90) be GRANTED.

February 14, 2001.

## NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report. It shall also bar the party from attacking on appeal the factual findings in the report accepted or adopted by the district court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir.1982) (*en banc*).